UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

     v.

ANTHONY WEINER,

          Defendant.

No. 17 Cr. 307 (DLC)

## SENTENCING MEMORANDUM ON BEHALF OF ANTHONY WEINER

Arlo Devlin-Brown
Erin Monju
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018
212-841-1046

*Attorneys for Anthony Weiner*

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

RELEVANT FACTS ....................................................................................................... 4

I.      Anthony's Personal Background ........................................................................... 4

        A.      Anthony's Troubled Childhood ................................................................ 4

        B.      Anthony's Remarkable Career in Public Service .................................... 6

II.     Anthony's Sickness, Offense Conduct, and Recovery ....................................... 12

        A.      The Beginning of the Sexting Habit ...................................................... 12

        B.      Anthony's Pattern of Sexting Online with Adults ................................ 15

        C.      Anthony's Communications with the Teenager ..................................... 15

        D.      Anthony's Diagnosis, Intensive Treatment, and Ongoing Recovery ................. 19

III.    The Improper Injection of the Investigation into the U.S. Presidential Election............. 25

IV.     The Plea Agreement and Guilty Plea .................................................................. 28

ARGUMENT .................................................................................................................. 30

I.      The Sentencing Guidelines Calculation, Based On Illogical Cross-References, Is
        Due No Weight ................................................................................................... 31

II.     The § 3553(a) Factors Do Not Warrant A Custodial Sentence ......................... 37

        A.      The Unique Nature and Circumstances of the Offense, Far Less Severe
                Than Others Prosecuted, Do Not Require Incarceration ....................... 37

        B.      Anthony's History and Personal Characteristics Warrant Leniency ................. 44

                1.      The Offense Was the Product of Sickness, Not Venality ...................... 44

                2.      Anthony's Extraordinary Progress in Treatment ...................... 48

                3.      Anthony's Decades in Public Service ........................................ 50

                4.      Anthony's Commitment to His Son ............................................ 52

        C.      Incarceration Is Not Required to Satisfy the Remaining Goals of
                Sentencing ............................................................................................. 55

1.   Anthony's Ignominy Is Itself a Deterrent ................................................. 55

2.   Anthony Does Not Present a Threat to Other Minors.............................. 56

3.   Anthony Has Already Experienced Significant Punishment, Some of It Unfair ....................................................................................... 59

III.   A Sentence of Probation with Conditions Including Continued Treatment and Community Service Is Sufficient, But Not Greater Than Necessary, to Satisfy the Goals of Sentencing ........................................................................................... 60

CONCLUSION.......................................................................................................... 67

## INTRODUCTION

This crime arose from the sad confluence of untreated addiction and profit-seeking curiosity.  In January 2016, Anthony Weiner, at the depths of an uncontrolled sickness, was compulsively responding from his Manhattan apartment to all comers who contacted him over the internet.  Hundreds of miles away, a curious high school student, looking to generate material for a book the Government has disclosed she is now shopping to publishers, wanted to see if she could induce the infamous behavior for which the disgraced former Congressman was by then best known.  She could.  He at first rebuffed her repeated requests, but within a few weeks, with his judgment clouded by disease, he committed the crime for which he has accepted responsibility, exchanging sexually explicit messages with her as he did with the many adult strangers to whom he responded online.  The high school student documented their interactions from the outset, selectively photographing her phone to preserve messages otherwise designed to vanish.  In September 2016, she sold her story to a British tabloid for $30,000.  The instant federal investigation was properly launched in response, and then, quite improperly, injected into the U.S. presidential election, quite possibly affecting its outcome.  After the election was over, the high school student told Government investigators that this had been one of her goals from the outset.

*     *     *

It may never be possible, perhaps not even for Anthony, to fully understand what caused him to transgress this final barrier, moving from exchanging what had been ruinous but perfectly lawful sexually explicit messages with women over the internet to engaging in the criminal communications in this offense.  But there are several aspects of Anthony's conduct that are foundational to the imposition of a sentence that fits the unique circumstances of the crime here:

*First, this crime is a product of a sickness.*  One can debate labels, quibble over particulars, but no one can dispute that Anthony's operatic self-destruction, of which the instant case has been

but the final act, was born of deep sickness.  Before encountering the high school student here, Anthony had already repeatedly been ruined by scandals in which his "confidential" adult counterparts reported their explicit encounters to the tabloids.  And yet he compulsively responded to this teenage stranger too, under his own name as always, with his self-destructive behavior this time compounded by criminal exchanges for which he would almost certainly be caught.  One does not have to be a psychologist to know that these are not the actions of someone well, and every mental health professional who has examined Anthony in the wake of this scandal has come to the same conclusion.

*Second, Anthony is no predator.*  The result of the Court's independent psychosexual evaluation, like every other, has been clear:  Anthony has no abnormal sexual interest in teenagers.  His (numerous) other fantasy sexting[1] partners were adults.  He never sought out teenagers on the internet, and didn't seek out the victim either.  He never sought physical contact with the victim, a common feature in cases of this sort.  And he didn't engage in the other predatory behaviors that are typically present in cases of this kind, such as misrepresenting himself to gain access to the victim or threatening to expose the victim if she stopped engaging in explicit conduct.  Anthony's case is worlds apart from other criminal sexting offenses.  He responded to the victim's request for sexually explicit messages not *because* she was a teenager, but in spite of it.  He responded as a weak man, at the bottom of a self-destructive spiral, and with an addict's self-serving delusion that the communications were all just internet fantasy — willfully ignoring that there was a young person at the other end of the connection, hundreds of miles away, who could be damaged by these exchanges through the ether.

---

[1] We use the term "sexting" to refer to online communications between two people in which explicit texts or images are shared through the exchanges.

*Third, Anthony is finally getting better.*  Even after his Congressional career collapsed, his Mayoral hopes had been dashed, and his relationships with family and friends disintegrated, Anthony remained in deep denial of the problem the rest of the world knew he had.  Ironically, his "treatment" after the 2011 scandal that led to his resignation from Congress involved an emphasis to Anthony that he was in control of his behaviors and could stop them if he wanted to, perhaps the worst thing one can tell an addict.  Nearly one year ago, when his sexting exchanges with the teenager here were splashed across the headlines, Anthony finally got the help he had for so long denied he needed.  The stunning progress he has made is indisputable, testified to by the professionals who have treated him, the Court-appointed psychologist who has examined him, fellow addicts in recovery, and by friends and family who have seen — finally — an introspective Anthony, highly attuned to his personal flaws and deeply committed to becoming a better person.  But even more than these observations, it is Anthony's own deeply personal meditation to the Court on sickness and recovery (Exhibit 1 to this submission) that speaks most powerfully to his progress.

\*       \*       \*

We respectfully submit this memorandum on behalf Anthony Weiner to provide the Court with a fuller account — beyond the tabloid headlines — both of Anthony's crime and the broader context of a remarkable life that has resulted in much good.  Punishment must, of course, be imposed, but the sentence here should reflect the truly unique circumstances of this offense, one far less egregious than any sexting case that has been prosecuted in this district.  The sentence should also reflect the specifics of Anthony's sickness, which Anthony has made enormous progress in addressing and which requires continuing treatment that is simply not available in federal prison.  Finally, the sentence must provide the Court with tools — and Anthony with

3

incentives — to continue on his path toward wellness. The Court's ability to sentence Anthony to probation, and to incarcerate him for years should he violate the terms of his release, provides this in abundance.

We therefore respectfully submit, based on the unique circumstances of Anthony's case and his extraordinary rehabilitation, as well as the other reasons herein, that a sentence of probation that mandates continued treatment and community service would be sufficient, but not greater than necessary, to accomplish the goals of sentencing.

## RELEVANT FACTS

### I.       Anthony's Personal Background

As Judge Jed Rakoff has observed, "if ever a man is to receive credit for the good he has done, and his immediate misconduct assessed in the context of his overall life hitherto, it should be in the moment of his sentencing, when his very future hangs in the balance." *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006). It is therefore important to begin with what has often been lost in the caricatures of Anthony Weiner in the popular media: Anthony is a person of humble beginnings, who transcended a difficult childhood to build a remarkable career in public service, and who — after his compulsive sexting destroyed his political career — devoted himself to raising his son from his son's earliest days, enabling his wife to serve in a demanding role for Secretary Hillary Clinton.

### A.       Anthony's Troubled Childhood

Anthony was born on September 4, 1964 in Brooklyn to Mort, a neighborhood lawyer, and Fran, a public school teacher. (PSR ¶ 46.) Anthony had, in many respects, a secure, middle class upbringing. But there was turmoil beneath the placid surface: Anthony's developmental years were marred by emotional dysfunction caused by the troubled behavior of his elder brother, Seth

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████

As Anthony's mother, Fran, writes of the Weiners' ████████████████████████

███████████████████████████

All of Anthony's early life was in contrast to his older brother Seth. ████████████████████████████████████████████████████████████████████████████████████████████████████

(F. Weiner Letter, Ex. 3)  And as Jason writes of his relationship with Anthony:

> As kids, Anthony had an outsized role in my life . . . .  My parents were working full time and dealing ███████████████████████████████ . . . , so it was left to Anthony to look after me. . . .

> . . . Anthony was put in a position of needing to be the perfect kid that wasn't a problem for anyone.  It seems that Anthony was largely left to fend for himself.  There seemed to be implicit message coming from my parents to Anthony: "We're busy with Seth.  Do well in school.  Never get in trouble.  Overachieve.  Take on an auxiliary parent role with Jason.  Grow up fast."  And he did.

(J. Weiner Letter, Ex. 4.) ████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████

The emotional detachment Anthony learned from these formative experiences followed him into adolescence and adulthood, where he struggled to make meaningful attachments with both friends and significant others.  While Anthony entered into a series of relationships in college

5

and as an adult, he was unable to make meaningful emotional connections to these women, ████████████████████ (*See* Must Report at 16–18.)

Things got worse after Anthony's brother Seth died. ██████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████ As Jason writes of this period:

> [I]nto his adult life, on the surface [Anthony] seemed to relish this role as the problem solver and caretaker and wear it well. . . . But all the while, there seemed to be something missing emotionally. . . .  He was busy fixing everyone else's problems but neither he nor anyone else was addressing his issues.

(J. Weiner Letter, Ex. 4.)

Instead of confronting the negative behaviors he had learned at home and building or repairing his relationships with those close to him, Anthony sought adulation from strangers, which he received in spades as an elected official, fueling his frenetic work on his constituents' behalf. It was this adulation from strangers, amplified by his increasing career successes, that allowed Anthony to avoid grappling with his emotional deficits — at least until his career and personal life crashed down spectacularly.

**B.      Anthony's Remarkable Career in Public Service**

Anthony's first foray into public service began in college, where, as a political science major and member of student government, he found his calling debating campus policy.  Feeling he had finally identified something he was good at, Anthony began working for then-U.S. Congressman Charles Schumer in 1985.  In 1991, Anthony launched his own long-shot bid for a seat on the New York City Council representing the 48th District in central Brooklyn.  During the election, Anthony "earned his reputation as a dogged campaigner, knocking on seemingly every

door" and "relentlessly shaking hands at subway stops."[2]  Astoundingly, Anthony won.  At the time, he was the youngest person ever elected to the job.

While on the Council, Anthony tenaciously served his constituents and New Yorkers at large, developing a graffiti clean-up program for at-risk youth; fighting for stricter fire safety standards in public housing after dozens of fires erupted in buildings across the city; working to increase the number of police officers and improve access to fresh food in his district; protecting senior citizens from discriminatory insurance premiums and rent hikes; and pushing for an increase in federal funding for public housing. (*See* ▬▬▬▬ Letter, Ex. 11.)  Indeed, nearly six years into his tenure, the *New York Times* noted that Anthony was "considered [to be] one of the Council's brightest members and a gifted speaker who [was] particularly knowledgeable on public safety issues."[3]

But Anthony's efforts were mostly of the sort that would never be reported in the press. Those who knew Anthony during his time on the City Council recall his firm commitment to helping everyday New Yorkers get what they needed from City government. ▬▬▬▬▬▬, a former City Council staffer of Anthony's, recalls "the hundreds and thousands of his constituents (and even non-constituents)" that Anthony helped:

> Anthony did not ask if you were a voter, a contributor, a Democrat or Republican. If you lived or worked in the district or simply contacted his office for help, Anthony would do his best for you.  He knew that if someone contacted him it was because they were desperate, had reached an impasse with a governmental agency, and thought only Anthony could help.  Anthony's office number was the de facto 311 before there was 311.

---

[2] *See* Randal C. Archibold & Ian Urbina, *A Scrappy Congressman, Ready for His Next Risk*, NEW YORK TIMES (Aug. 30, 2005), *available at* http://www.nytimes.com/2005/08/30/nyregion/metro campaigns/a-scrappy-congressman-ready-for-his-next-risk.html.

[3] *See* Jonathan P. Hicks, *Congress a Backdrop to Council Race*, NEW YORK TIMES (July 14, 1997), *available at* http://www.nytimes.com/1997/07/14/nyregion/congress-a-backdrop-to-council-race. html.

(████████ Letter, Ex. 11.) Judith Baron, a fellow public servant, remembers the "approachable" and "caring" Councilmember who "really wanted to know how he could help" — both in his district and out. (J. Baron Letter, Ex. 8.) Former State Senator Tom Duane, a former colleague of Anthony's on the City Council, also recalls Councilmember Weiner as "dedicated to helping people who lived and worked in his district as well as throughout New York City." (T. Duane Letter, Ex. 13.) And ████████, a former staff member of Anthony's when he was on the City Council and in Congress, writes of Anthony's desire to help others, including mentoring his staff:

> On most nights, [as a City Council member,] Anthony would drive around his district, visiting various community meetings. Knowing by then that I was interested in a political career, Anthony invited me to tag along, so I could learn what the job of a councilman entailed. . . .
>
> Over those early years, Anthony served as an impromptu instructor, providing me with an invaluable education on public service. There was no incentive for him to do so — he was not getting paid; there was no media attention to be gained. My parents were not big donors.
>
> He did it because he genuinely wanted to help.

████████ Letter, Ex. 15.)

In 1998, after seven years on the City Council, Anthony announced his candidacy to succeed Congressman Schumer, who had declared his own bid for the U.S. Senate. After another "energetic scramble throughout the district," Anthony prevailed in a close race, becoming the U.S. Representative for New York's 9th Congressional District, covering parts of Brooklyn and Queens.[4] In keeping with his record on the City Council, Anthony continued to serve as a fierce advocate for New Yorkers: Anthony was an early champion of single-payer health care, before

---

[4] *See*, Jonathan P. Hicks, THE 1998 CAMPAIGN: CONGRESS; *Weiner Is Victor Over Katz In Bid to Replace Schumer*, NEW YORK TIMES (Sept. 16, 1998), *available at* http://www.nytimes.com/1998/09/16/nyregion/the-1998-campaign-congress-weiner-is-victor-over-katz-in-bid-to-replace-schumer.html.

the idea took root with many Americans.  He pushed to expand the Community Oriented Policing Services ("C.O.P.S.") grant program for local police departments, when departments were struggling to hire officers in the wake of the 2008 financial crisis.  Anthony also fought all forms of discrimination: He championed same-sex marriage, from a relatively conservative Congressional district, long before it was common to do so, prompting former Congressional intern and campaign staffer, Flavio Alves, to write of the credit he gives Anthony for his early role in the expansion of LGBTQ rights.  (F. Alves Letter, Ex. 6.)  Anthony also cosponsored bills that guaranteed equal benefits to the domestic partners of federal employees, required employers to accommodate employees' faiths, and increased resources to combat hate crimes and racial profiling.

And Anthony was an advocate for issues of particular concern to New Yorkers: foremost among them was Anthony's vocal support for funding health care for September 11th first responders and others impacted by the toxic conditions at Ground Zero.  As John Feal, a September 11th first responder and advocate recalls of Anthony's service:

> Anthony fought for us publicly, never backing down, and making sure we were not forgotten.  But there is so much more he did behind the scenes to make sure that the 9/11 Heroes got the medical care they needed.  But more importantly your Honor, Anthony showed so much kindness and care to me and others in the community as we struggled with sickness and personal challenges.  He cared about helping us so deeply.  You can't fake that.

(J. Feal Letter, Ex. 14.)  Anthony also achieved a "significant victory" when the Interior Department announced that it would reopen the Statue of Liberty's crown to visitors, eight years after it closed in the wake of September 11th[5] — to Anthony, visiting the crown had always been

---

[5] *See* Sewell Chan, *Statue of Liberty's Crown Will Reopen July 4*, NEW YORK TIMES (May 8, 2009), *available at* https://cityroom.blogs.nytimes.com/2009/05/08/statue-of-libertys-crown-will-reopen-july-4/.

"an iconic New York kid experience."[6]   Anthony also secured Superfund status for Newtown Creek, ensuring that the industrial waterway separating Brooklyn and Queens would receive federal remediation funds, and fought ceaselessly to provide New York City with much needed federal funding for a range of projects. (*See* S. Klein Letter, Ex. 19.)

A common theme of Anthony's service in Congress, as it was during his time on the City Council, was that many of the moments that truly revealed the content of his character were not the well-publicized legislative accomplishments, but his quieter efforts, behind the scenes, to help constituents. For example, former constituent Alex Singer writes that, when he could not reach his son in London after the 2005 bombings there, Anthony promptly worked with the U.S. Embassy in London to connect Mr. Singer with his daughter-in-law, who reported that she and her husband were safe. (A. Singer Letter, Ex. 25.) Similar examples abound. Anthony pushed for mandatory *in vitro* fertilization coverage after talking with a fellow New Yorker about her struggles. ███████ Letter, Ex. 23.) He helped his constituents in Belle Harbor grieve and recover from two disasters — September 11th and the crash of American Airlines Flight 587 a few months later — that impacted the community "tremendously." (B. Larkin Letter, Ex. 20.) And community leader Pesach Lerner writes, "what made Anthony special was the care and concern he showed to the individual. He felt their pain and their needs became his; and, he acted accordingly." (P. Lerner Letter, Ex. 21.)

Anthony's staff also remember fondly the work he did on behalf of constituents, in and out of the limelight. As former staffer, Christina Tsatsakos, writes:

> Anthony worked harder for the "little guy" than anyone I had ever met. . . . There were people who got Social Security benefits being withheld to them because of Anthony's help. There are immigrants to this country that were able to stay, or

---

[6] *See* Mark Jacobson, *Anthony and the Giant*, NEW YORK MAGAZINE (May 3, 2009), *available at* http://nymag.com/nymag/features/56440/.

bring their families because of Anthony's intervention. . . . Anthony made sure that we always helped.

(C. Tsatsakos Letter, Ex. 26.) And Lawrence, another former staff member, similarly recalls being able to "witness firsthand the compassion Anthony had for members of his district," noting that "[w]hile many other elected officials would turn people away, Anthony would help anyone with a City, State or Federal problem." (Lawrence Letter, Ex. 18.)

Anthony's work also revealed a deeply empathetic side of his personality. Lawrence recalls that when "constituents were upset that a home for developmentally delayed adults would be opening in the neighborhood," Anthony stood his ground, proclaiming that "perhaps our children would benefit from knowing there are others in the world who are not as well off as we are." (Lawrence Letter, Ex. 18). And former staffer ███████ writes of telling moments that few were "privy to" from Anthony's days in Congress:

> Many people think of Anthony as a fighter — one who loves debate and thrives on standing up for what he believes. And that perception is not without merit. But there is a kindness that most people are not aware of.
>
> In the early 2000s, when Anthony's congressional office was based in Sheepshead Bay, a homeless man began hanging around the street outside our office. The optics were not great. A few staff members suggested calling the local police precinct and asking that he be moved. Anthony caught wind of the plot and quickly quashed it. His life is already difficult, he said. Let's not make it any harder.
>
> Around the same time, we had an office caseworker in her 80s named ██████. ██████ was good at her job but had fallen ill, and had not been to work for weeks. We needed her salary to pay for a new staff member, but Anthony refused to let her go. He was worried about complicating her condition. He would regularly call ██████ to check in on her, on his rides back from Washington.

(███████ Letter, Ex. 15.)

In short, while Anthony may now be best known for suggestive photographs splashed across the covers of tabloids, his committed public works over the past thirty years have improved the lives of thousands of New Yorkers. Tragically, and as discussed below, some of the qualities

11

that helped Anthony succeed in politics — including his frenetic pace and taste for constant, if fleeting, connections — helped bring about his downfall.

## II.    Anthony's Sickness, Offense Conduct, and Recovery

Anthony's hunger for the adulation of strangers, while masking emotional deficits with roots in his childhood, also fueled his meteoric political rise.  By 2009, Anthony's national prominence had reached new heights, largely through his well-publicized efforts to obtain needed health care for September 11th first responders.  At the same time, smartphones and the proliferation of social media platforms had begun to transform users' connectivity and frequency of access to online communications.  Anthony — who prided himself on being accessible to his constituents — moved quickly to capitalize on these new technologies, developing a strong presence on Facebook and Twitter, and responding to and engaging with members of the public who reached out to him.  At a speed like never before, Anthony was now able to tap directly into the self-validating enthusiasm of unknown admirers, attention that also propelled his increasing national celebrity.  But it was, of course, this very intersection of technological innovation, fleeting connection, and emotional needs rooted in a troubled childhood that had within it the seeds of Anthony's spectacular self-destruction.

### A.    The Beginning of the Sexting Habit

It started innocently enough, as destructive habits often do.  Anthony began to exchange texts and other messages with constituents and admirers alike.  Some of the admirers were female, validating him not just as a politician, but as a man.  Some of the conversations became sexually

explicit,[7] affirming him still further.  It seemed harmless to Anthony — it was fantasy, after all; no one was cheating, and no one was getting hurt.

But people were getting hurt.  Anthony's wife discovered his secret, and he said he would stop.  He didn't.  Anthony was getting hurt too.  What once had fueled him began to consume him, and Anthony started spending hours at a time on his growing habit, sexting with more women, and hiding his phone in shame.  He was developing a parallel existence on the internet — one that allowed him to avoid facing up to his inability to sustain emotional connection and intimacy in real life, ███████████████

He was also getting careless.  On May 27, 2011, Anthony accidentally publicly posted a suggestive photograph of himself in his underwear, leading to a multi-week tabloid frenzy, the publication of numerous more "private" images Anthony had shared with online admirers, and eventually, Anthony's resignation from Congress on June 16, 2011.[8]  The rapid implosion of his Congressional career did not end his conduct, however, and Anthony — now facing public condemnation, not adoration — took solace from those strangers who continued to reach out to him on social media.  Of course, after his scandal, an increasing number of those who reached out to Anthony did so with curiosity as to whether they too could sext with him.  They could.  And, while Anthony endeavored to rebuild his public life, he continued to engage in explicit conduct

---

[7] While the scale of Anthony's behavior may be unique, the fact that he sexted — *i.e.*, engaged in sexually explicit chats and image sharing online — is not uncommon: a recent study by the Kinsey Institute has found that fully 74% of Americans surveyed reported exchanging explicit electronic messages with others.  *See* MEDIUM, *Technology and Modern Sexuality: Results from Clue and Kinsey's International Sex Survey* (Aug. 9, 2017), *available at* https://medium.com/clued-in/sex-and-tech-survey-33d64ecc3eda.

[8] *See* Raymond Hernandez, *Weiner Resigns in Chaotic Final Scene*, NEW YORK TIMES (June 16, 2011), *available at* http://www.nytimes.com/2011/06/17/nyregion/anthony-d-weiner-tells-friends-he-will-resign.html.

13

online, eventually igniting a scandal in 2013 that ended his promising run for Mayor of New York City, as another stranger, Sydney Leathers (who later provided the victim here with guidance on selling her story) went public with their online exchanges, staked him out on election day, and used the resulting publicity to catapult herself into the adult film industry.[9]   Anthony's personal and professional life was, once again, in shambles — more so than ever before.

Despite these devastating consequences, Anthony continued to communicate with scores of strangers online.  Perhaps with his personal relationships in crisis and the attention he could get as a politician now irretrievably gone, sexting with strangers was the only means he had left of obtaining the connection he craved.  Sadly, the obvious mental health issues driving Anthony's online conduct went untreated.  Anthony believed that the fantasies he shared with strangers whom he would never meet were not harmful, somehow rationalizing away that these exchanges had twice-destroyed his political career and grievously harmed his marriage.  Like many an addict, Anthony also believed that his conduct was under control — he could stop at any time if he decided to — an impression unfortunately reinforced by therapy that ignored the compulsive nature of his sickness.[10]   (*See* PSR ¶¶ 63–64; Must Report at 13; A. Weiner Letter, Ex. 1.)  His brother Jason recalls that, at the time, Anthony "wouldn't entertain for a moment that perhaps he had an addiction.  He couldn't stand the idea he wasn't fully in control of his actions and decisions, even as evidence to the contrary continued to mount." (J. Weiner Letter, Ex. 4.)

---

[9] *See* Mara Gay, *Sydney Leathers, former sexting partner of Anthony Weiner, attempts to crash his election night party*, NEW YORK DAILY NEWS (Sept. 11, 2013), *available at* www.nydailynews.com/news/ election/sydney-leathers-attempts-crash-anthony-weiner-election-party-article-1.1451641.

[10] Indeed, the Court-appointed evaluator, Dr. Shoshanna Must, notes in her report that Anthony's original treatment was based on an evaluation "from professionals who do not appear to specialize in sexual problems." (Must Report at 13.)

Thus, in the deepest throes of his addiction and in a period when he was engaged in sexually explicit chats with dozens of adult women, Anthony made the fateful decision to respond to a fifteen-year-old, referred to here as Jane Doe ("JD"), when she contacted him online, a decision for which he has accepted responsibility and that he will always regret.

### B.     Anthony's Pattern of Sexting Online with Adults

From 2009 through September 2016, Anthony exchanged texts and other messages online with hundreds of women whose ages spanned decades.  (PSR ¶ 63; Must Report at 17–19.)  It almost always happened the same way:  Anthony did not go online looking to find partners; they came to him.  To achieve this, Anthony made himself accessible on Twitter, Facebook, and other social media platforms so that complete strangers could readily send him messages.  Typically, strangers would then contact Anthony, and he would, almost without fail, respond.  (Must Report at 17.)  These thousands of conversations, on numerous social media platforms, were not all sexual, and even those conversations that became sexual were often a mixture of the lascivious and the banal.   This isn't surprising:  Anthony sought not just sexual fulfillment from these communications, but also connections (or at least their facsimile) of the sort he struggled to create in the real world.  (*Id.*)  This objective manifested itself in one of the more notable features of Anthony's online communications: despite repeatedly being publicly shamed by his private sexting partners, Anthony did virtually nothing to conceal his identity when exchanging explicit messages online — because, if Anthony did not appear as himself, the validation he sought would be hollow.  (*Id.* at 17–18.)

### C.     Anthony's Communications with the Teenager

By early 2016, Anthony had hit a low point — rock bottom was, of course, still to come.  The volume of messages he exchanged during this period is simply staggering.  Over two months in early 2016 — at the time of the offense conduct — Anthony exchanged more than 1,500

messages with just one middle-aged woman. His communications at this time were also indiscriminate. During the three-month period charged here, Anthony exchanged explicit communications with at least *nineteen* adult women. And, his behavior was reckless and self-destructive. Anthony was increasingly careless with whom he interacted, responding, for example, to an adult Republican male posing as a female and looking for political fodder.[11] This was the Anthony Weiner that JD reached out to from hundreds of miles away, while Anthony was laid up in his apartment by a record-setting blizzard in Manhattan.

JD first contacted Anthony on Twitter on the night of January 23rd (PSR ¶ 6), announcing herself as a "huge fan."[12] In fact, and unbeknownst to Anthony, JD was looking for material for a book — one she has now written and is shopping to publishers. (PSR ¶ 19.) As she later stated to Government investigators, she also hoped somehow to influence the U.S. presidential election, in addition to securing personal profit. (*Id.*) To encourage Anthony to play along, as she later confessed to him, JD "pretended not to know EVERYTHING about" him because she "didn't want to appear suspicious." (*Id.*) To generate material, JD needed Anthony to act out — behavior she tried to elicit during their first exchange, suggesting to Anthony that "we should skype [a form of video chat] sometime," immediately after volunteering to "prove" that "I have a vagina." The next day, in a Facebook conversation, JD told Anthony "I like older guys" but "its hard to get away with these things," suggesting that they move the conversation to the confidential messaging application "Kik" so he would not be "busted." They began chatting on Kik after that, with JD

---

[11] *See* Mara Slegler, *Anthony Weiner caught in new flirty online chat*, NEW YORK POST (Aug. 13, 2016), *available at* http://nypost.com/2016/08/13/anthony-weiner-caught-in-new-flirty-online-chat/.

[12] The citations to messages exchanged between Anthony and JD, to the extent not attributed to particular paragraphs of the PSR, come from material that the Government allowed the defense to review on August 25, 2017 and certain disclosures in this same period following a *Brady* request.

selectively taking screenshots of her phone to document the exchanges before they disappeared. (PSR ¶ 9.)[13]  On Kik, JD asked Anthony to send pictures of his erect penis (prompting Anthony to stop responding) and asked him to Skype no less than eleven times before he did so more than three weeks later, on February 17, 2017.  (PSR ¶ 12.)

To be clear: that JD was trying to induce Anthony to behave badly so she could profit from it does not excuse Anthony, who never should have responded.  Nor does Anthony treat these circumstances as a justification.  In his letter to the Court, he apologizes directly to the "young person who I dragged into my sordid mess," proclaiming "I am profoundly sorry to her.  I was selfish.  I have no excuse for what I did to her." (A. Weiner Letter, Ex. 1.)  Indeed, in terms of Anthony's sickness, and in terms of his own moral culpability, JD's motives are immaterial. Anthony had no business engaging in even initial, flirtatious banter with someone he understood from the first conversation was in high school (PSR ¶ 6), even though he did not at that time know her age.[14]  And he committed a deep wrong by engaging several weeks later in the obscene communications with JD to which he has pled guilty.

The PSR reflects that these obscene communications occurred on approximately four occasions between February 18, 2016 and March 10, 2016, a period of three weeks.  (*See* PSR

---

[13] The Government disclosed that, in addition to selectively documenting her online exchanges with Anthony, JD also deleted certain material from her phone after learning that agents from the Federal Bureau of Investigation ("FBI") were *en route* to collect it, ostensibly to protect people from getting in trouble.

[14] Although Anthony fully acknowledges the wrongfulness of his conduct, disclosures by the Government raise questions about what exactly Anthony knew about JD's age when.  JD has told the Government that she told Anthony she was fifteen in one of the three Skype sessions she had with him, which occurred between February 17, 2016 and February 23, 2016.  (PSR ¶ 12.)  And a Kik message does reflect JD telling Anthony she was getting her learner's permit.  Yet in the *final* sexually explicit communication between JD and Anthony, on March 10, 2016, JD asked if Anthony would have sex with her "if" she was 15 (to which he said no) and then whether he would have sex "if" she was 18, to which he responded with a graphic comment ("I would bust that tight pussy so hard . . . .").  (PSR ¶ 10.)

¶¶ 10–14.)  The Government's evidence is that there were two sexually explicit Skype video chats, one on February 18, 2016 and one on February 23, 2016, an explicit exchange on Snapchat on March 9, 2016, and a final explicit text exchange on March 10, 2016.  (*See id.*; *supra* note 14.)  Anthony largely cut off communications with JD after that, and ignored her requests to reinitiate.  (PSR ¶ 14.)  At no time did Anthony seek to meet JD for a physical encounter.  (PSR ¶ 17.)

In May 2016, JD took the first step toward monetizing the story of her interactions with Anthony.  As described in a *New Yorker* article covering the investigation, JD sought assistance from Sydney Leathers, whose disclosures effectively ended Anthony's 2013 mayoral campaign.  JD asked Ms. Leathers for help in publicizing her exchanges with Anthony and "talk[ed] about potentially messing with Hillary's campaign."[15]  Ms. Leathers then connected JD with the *Daily Mail*, which paid a "sizeable fee" to both Ms. Leathers and JD for the story — with JD alone receiving $30,000, according to the Government.  (*See id.*; PSR ¶ 19.)  On September 21, 2016, the *Daily Mail* published its extensive story about Anthony's exchanges with JD, featuring a lengthy print interview with JD, a video interview, and the photographs of her phone screen that JD had taken to document her encounters with Anthony.  (*See* PSR ¶ 5.)  More recently, as JD shops the book about Anthony that motivated her encounters with him, she appeared on *Inside Edition* on September 11, 2017, for what the Government disclosed was a $10,000 fee and an all-expenses-paid trip.  (*See* PSR ¶ 19.)

---

[15] *See* Peter Elkind, *James Comey's Conspicuous Independence*, NEW YORKER (May 11, 2017), *available at* http://www.newyorker.com/news/news-desk/james-comeys-conspicuous-independence (hereinafter "NEW YORKER").

### D.      Anthony's Diagnosis, Intensive Treatment, and Ongoing Recovery

The *Daily Mail* exposé of Anthony's online communications with JD jolted Anthony in a way other scandals had not, and led him for the first time to grapple with the depths of his sickness and to find the strength to treat it.  On the heels of the article, Anthony agreed, still betraying some reluctance, to an evaluation by Dr. Barbara S. Levinson, a licensed therapist specializing in psychosexual disorders.[16]  (PSR ¶ 66.)  Anthony's subsequent diagnosis and treatment have been transformative.  Anthony met with Dr. Levinson for thirteen hours over the course of two days in September 2016.  During these sessions, Dr. Levinson conducted a battery of tests, on the basis of which she diagnosed Anthony with "mixed personality disorder, likely stemming from childhood emotional trauma," which manifested itself "in addictive behavior, such as sex addiction."  (*Id.*)  Dr. Levinson also ruled out any abnormal sexual interest in minors as a contributing factor to the offense, and found Anthony to be at a low risk for reoffending.  (PSR ¶¶ 66–67; Must Report at 14.)

Based on these results, Dr. Levinson prescribed that Anthony seek treatment at ███████, an in-patient sex addiction treatment facility ███████, which offered an intensive treatment program based on other successful twelve-step programs.  (PSR ¶ 67; Must Report at 14.)  At ███ ███, Anthony participated in a near-constant program of therapy sessions, all without access to electronic devices and with only the most limited communications with the outside world.  While at first resistant, Anthony became a devoted patient, contributing to group sessions, and

---

[16] Dr. Levinson, who has a Ph.D. in psychiatric nursing, has over the course of her over fifty-year career, studied, taught, and practiced in areas concerning psychiatric issues underlying sexual dysfunction.  She is also a licensed treatment provider for sex offenders and, like the Court-appointed evaluator here, frequently works with probationers and other referrals from courts for comprehensive assessments and evaluations regarding such matters.  Her *curriculum vitae* is attached as Exhibit 45.

demonstrating reflective self-awareness in individual sessions with his therapist. By the end of his six-week stay, which he had voluntarily extended by one week, Anthony had fully accepted responsibility for his destructive conduct and developed insights into the triggers for his behavior. (*See* Must Report at 14.) Indeed, based on her assessment of Anthony after his stay at ███████, Dr. Levinson concluded that Anthony was "thoroughly motivated to change." (PSR ¶¶ 66–67.)

Anthony has been vigilant in continuing his therapy since returning to New York in November 2016. He has participated in regular therapy sessions, "dutiful[ly]" attending both individual and group therapy sessions once per week. (PSR ¶ 68; Must Report at 11.) Paul Kelly, a licensed psychotherapist with over twenty-five years' experience treating sexual disorders, and Anthony's therapist since January 2017, writes that, "Anthony has shown steady and consistent progress in . . . even in the most trying of circumstances," observing that "he shows significant fortitude and persistence, and is fully engaged in therapy." (P. Kelly Letter, Ex. 43 at 2–3.) Anthony also participates "near-daily" in ████████████████████████ recovery meetings that are modelled on Alcoholics Anonymous, a proven treatment program for addressing mental disorders manifesting themselves in sexual misconduct. (Must Report at 7, 11–12, 25.) These meetings provide structure to Anthony's day, which he also populates with "healthy" activities, such as meditation, while consciously avoiding triggers, like social media use, that would endanger his recovery.

In addition to this treatment program and at the request of the Probation Department, Anthony voluntarily submitted to an evaluation by Dr. Shoshanna Must, a clinical psychologist specializing in the evaluation and treatment of individuals with sexual behavioral problems. (PSR ¶ 69; *see* Must Report.) Dr. Must's evaluation was based on six-hours of meetings across two days with Anthony; Anthony's responses to a battery of tests; Dr. Must's review of information

provided to her by the Government[17] and records of Anthony's prior treatment; and Dr. Must's

conversations with Mr. Kelly and Anthony's sponsor in recovery, among other sources. (Must

Report at 2–3.) Dr. Must's report unsurprisingly captures Anthony at a state of high emotion:



However, Dr. Must's report also captures a man ready and

willing to change: As Dr. Must notes, Anthony's responses appeared "honest[]," "thoughtful and

insightful," with Anthony taking "full responsibility" for his communications with JD. (*Id.* at 5–

6.) And, to Dr. Must, Anthony "appears to be taking his treatment very seriously." (*Id.* at 22.) In

sum, Dr. Must reached conclusions similar to Dr. Levinson's and Mr. Kelly's:

> Mr. Weiner does not have the antisocial correlates that can often drive risk to
> reoffend against minors and is considered one of the most robust risk factors when
> considering re-offense concern. He takes responsibility for his behavior, in sum
> and part, does not have a criminal history or lifestyle instability, and while
> emotionally hindered in his natural ability to relate to others, seems to care deeply
> for some family members while wanting to strengthen connections presently with
> new sexually sober friends. He appears to take an honest inventory of his
> personality flaws, and is motivated to correct them. . . .
>
> While he clearly has severe and pronounced problems with sexual self-regulation,
> he has made significant strides in accepting responsibility for his behavior and
> working on self-improvement and sexual health. His current treatment regimen is

---

[17] As noted in the PSR and Dr. Must's report, the Government initially declined to make the
communications in this case available to Dr. Must on the grounds that they had not been provided
to defense counsel. (PSR ¶ 64.) The Government instead provided summaries of these
conversations to Dr. Must, via the Probation Department. Unfortunately, Dr. Must had an
incomplete and inaccurate understanding of the offense conduct in her initial evaluation, because
she had not evaluated the actual communications and apparently misinterpreted portions of the
summaries, resulting in several unfair findings to Anthony's detriment. To its credit, the
Government agreed to provide a revised summary of the offense conduct to the Probation
Department and Dr. Must, and to allow Dr. Must to review the actual communications she had
requested at the outset. That has resulted in a more accurate evaluation — one that shows the risk
of recidivism to be 30% lower on a key measure, among other revisions. Unfortunately, Dr. Must
observes that her final evaluation was still "limited" by the fact that this material was provided
only after she had interviewed Anthony. (Must Report at 4.)

one he trusts, and he benefits from checking his thinking and decision-making with his supports, which undoubtedly modulates and mitigates the behavior. *If Mr. Weiner's motivation and dedication to his own progress continues at this pace, he is genuine and forthcoming in discussing his behaviors, and he continues to use the support and help offered to him, he has the strong potential of living a life that is sexually healthy, offense-free and value fulfilled.*

(*Id.* at 27–28 (emphasis added).)

Mental health professionals are not the only ones to have recognized Anthony's striking commitment to getting better. Fifteen participants in treatment programs with Anthony (including those in group therapy sessions with Mr. Kelly, as well as those who know Anthony from ███ meetings or ████████) have written letters testifying to Anthony's involvement in these programs, with many noting his deep commitment to full participation, both for his own success in recovery and for others participating in the programs. For example, ███,[18] who met Anthony at ████████, writes:

> I have seen, firsthand, Anthony's dogged and tireless work ethic for self-improvement and rehabilitation. I have witnessed him, after a serious leg injury, hobble from addiction meeting to addiction meeting, to therapy and rehab, both mental and physical. He did this each and every day. He was an inspiration to the many of us in the rooms who desired this level of commitment . . . .

(██ Letter, Ex. 30.) ███ who also met Anthony at ████████, writes of Anthony's commitment both to his own recovery and to assisting in the recovery of others:

> I have seen him embrace his recovery, grow spiritually and take responsibility for his past. Acceptance and humility are two character traits I have seen develop most in Anthony over the past 10 months and I am proud of him for the work he continues to do to become a better person, father and husband. . . . I know that my program is stronger because of him.

---

[18] Anthony's fellow recoverees are referred to by their first names in this submission in light of the extraordinary privacy concerns at issue, but (with one exception involving a letter writer who counsel has spoken to but who insisted on full anonymity) their full names are available to the Court in the unredacted version of their letters.

(███ Letter, Ex. 41.)  And ████, another contemporary of Anthony's from ████████, also writes that Anthony was deeply dedicated to his recovery there, and served as "a tremendous asset to all of us who have encountered him within the recovery community."  (████ Letter, Ex. 27.)

Anthony's friends and support network from recovery meetings in New York have similarly come to admire Anthony's progress and to rely on him in their own recoveries.  ████ writes: "I've seen real change in people who commit to making recovery their number one priority, and in those who do the work.  Anthony is one of those people . . . .  I've already seen incredible changes in him."  (████ Letter, Ex. 39.)  ████, who also met Anthony in recovery meetings, echoes these sentiments, writing both that Anthony's "commitment to his own recovery is apparent" and explaining how Anthony's "presence and commitment to the program helps others."  (████ Letter, Ex. 38.)  ██████ writes that "it is clear to me that [Anthony] is focused on helping others," observing he is "generous and kind" with fellow participants.  (██████ Letter, Ex. 37.)  ███████ who participates in group therapy sessions with Anthony under their therapist Mr. Kelly, writes that, in Anthony, he has "seen an increasingly evolving person with a tremendous amount of contrition [and] integrity."  (██████ Letter, Ex. 35.)  And ████, now a close friend of Anthony's, stated to Dr. Must that he has been "impressed with [Anthony's] dramatic turn around," and spoke of Anthony's "consistency in attending meetings and the energy and time which he commits to his recovery."  (Must Report at 13; *see* ████ Letter, Ex. 32.)  ████ also recalled "how Mr. Weiner is caring about him and will make sure that he checks in with him and his life, despite the stress he is enduring in his."  (Must Report at 13; *see* ████ Letter, Ex. 29 (echoing similar sentiments); ███████ Letter, Ex. 33 (same).)  Indeed, ████, another friend from the recovery meetings, writes that Anthony was there for him at a low point in August when he was contemplating suicide, and credits Anthony with saving his life.  ████ Letter, Ex. 33.)

Anthony's transformation has likewise been apparent to his long-time friends and family, who have been stunned by his progress over the past year. ███████████████████████

████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████

(PSR ¶ 50.)  Anthony's brother, Jason, also writes poignantly of Anthony's recovery:

> [B]y the time he came home in November, the way he spoke about his affliction was frank honest and painful.  Gone was the window dressing and excuses . . . . The language and deeds of recovery are now central to him.  He is taking genuine ownership of the harm he has caused to himself and the people around him.  While it was a hell of a way to get to where he is now, I'm glad he got here.

(J. Weiner Letter, Ex. 4; *see* PSR ¶ 60.)  Long-time friend, Lisa, also writes the Court that she has "known Anthony for over a decade . . . in good times and in bad" and that she can now see "his absolute commitment to getting healthy."  (Lisa Letter, Ex. 16.)  Similarly, ████████████, Anthony's long-time staffer, writes:

> I can say with absolute certainty that he has changed significantly over the past 9 months.  The Anthony I know today is a different person — one who accepts responsibility and takes ownership for his choices, past and present. . . .
>
> He is more introspective and patient and self-aware than I ever thought he could become.  There is a sensitivity to the way his actions affect others that wasn't there before.  He is more empathic than most people I know.

██████████ Letter, Ex. 15.)

Finally, Anthony himself writes about his recovery to the Court in a letter that demonstrates remarkable self-awareness and clarity:

> I'm different now.  My recovery isn't over.  I'm still gaining new insights, new ideas, and I am blessed to have the guidance of Dr. Must, Paul Kelly and others in this process.  But I am getting better and the whole me is living an honest life.  I'm still there for ███ [his son] at every turn. ███████████████████████████ ████████████████████████████  But now I don't fear that day that he asks me about who [his] daddy was.  I'll tell him I was a troubled guy who did a lot of amazing things for people I barely knew.  I'll him I was a guy [who] did a very

bad thing to a young person I never met.  I'll tell him I put his amazing mother through years of trauma and broke her heart.

But your honor, with your grace, I hope I will be able to tell him some more.  I hope I will be there to show him with my actions that although I will carry the regret, I will also be better.  He will see a more serene father.  One that speaks with wisdom and openness about the challenge of facing mental illness.  I hope I can show him that service can come in many forms.

(A. Weiner Letter, Ex. 1.)  After more than a half-decade of self-imposed ruin, Anthony's recovery over the last year has been truly remarkable.

## III.     The Improper Injection of the Investigation into the U.S. Presidential Election

While Anthony's offense against JD was personal and apolitical, the Government's investigation was marred by improper law enforcement disclosures to the press, starting in the investigation's earliest days, which — given Anthony's wife's role with the presidential campaign of Secretary Clinton — had grave political consequences.[19]

On September 22, 2016, multiple outlets, citing "law enforcement sources," reported that Anthony was under federal investigation by the FBI and the U.S. Attorney's Office for the Southern District of New York, for the conduct described in the *Daily Mail* story from the prior day, and that federal authorities had issued a subpoena for his cellphone records.[20]  This improper disclosure caused an immediate and predictable political reaction, with a spokesperson for the

---

[19] It is important to note that we do not believe that any of this is attributable to the U.S. Attorney's Office for the Southern District of New York, or the Assistant United States Attorneys or FBI case agents responsible for this matter, who have handled this case with the utmost professionalism and who have afforded Anthony courtesy and respect at every stage.

[20] *See, e.g.,* Richard Esposito, *Anthony Weiner Probed by Feds in New York for Alleged Sexts to Teen*, NBC NEWS (Sept. 22, 2016), *available at* http://www.nbcnews.com/news/us-news/weiner-probed-feds-new-york-n652921; Shimon Prokupecz, et al., *US attorney investigating Weiner sexting allegations*, CNN (Sept. 22, 2016), http://www.cnn.com/2016/09/22/politics/first-on-cnn-us-attorney-investigating-weiner-sexting-allegations/; ABC NEWS, *Federal investigators issue subpoena for Anthony Weiner's cellphone*, (Sept. 22, 2016), http://abc7ny.com/news/feds-issue-subpoena-for-anthony-weiners-cellphone/ 1522677/.

campaign of then-candidate Donald Trump calling the announcement of an investigation of "close

Clinton ally Anthony Weiner . . . extremely disturbing," and adding that "America has had enough

of the sleaze that is Clinton, Inc."[21]   And, On October 18, 2016, a "law-enforcement source" told

the *New York Post* that a grand jury would soon hear evidence against Anthony.[22]

These early statements from law enforcement to the media paled, of course, in light of what

came next.  On October 28, 2016 — ten days before the presidential election — then–FBI Director

James Comey announced that, in the course of an "unrelated case," the FBI had discovered emails

relevant to its investigation into Secretary Clinton's private server.[23]   Within moments, "law

enforcement sources" alerted the media that the "unrelated case" was the investigation into

Anthony, adding that the emails in question had been found on a laptop seized in this case.[24]

Predictably, the Trump campaign seized on this news, mockingly "thanking" Anthony and his wife

for their help.[25]   Mr. Comey's disclosure, which came over the objection of the Attorney General,

---

[21] *See, e.g.*, Sean Sullivan, *Trump campaign calls on Clinton to return donations from Anthony Weiner*, WASHINGTON POST (Sept. 22, 2016), *available at* https://www.washingtonpost.com/news/post-politics/wp/2016/09/22/trump-campaign-calls-on-clinton-to-return-donations-from-anthony-weiner/?utm_term=.d59d86318db5.

[22] *See, e.g.*, Jamie Schram & Bruce Golding, *Anthony Weiner could soon be indicted in sexting scandal*, NEW YORK POST (Oct. 18, 2016), *available at* http://nypost.com/2016/10/18/anthony-weiner-could-soon-be-indicted-in-sexting-scandal/.

[23] *See* Letter from James Comey, Director, Federal Bureau of Investigations, to Congress (Oct. 28, 2016), *available at* https://www.nytimes.com/interactive/2016/10/28/us/politics/fbi-letter.html?_r=0.

[24] *See, e.g.*, NEW YORKER, *supra* note 15; Adam Goldman & Alan Rappeport, *Emails in Anthony Weiner Inquiry Jolt Hillary Clinton's Campaign*, NEW YORK TIMES, at A1 (Oct. 29, 2016), *available at* https://www.nytimes.com/2016/10/29/us/politics/fbi-hillary-clinton-email.html?mcubz=0.

[25] *See* Jeremy Diamond, *Donald Trump: 'Thank you, Huma. Good job, Huma'*, CNN (Nov. 3, 2016), http://www.cnn.com/2016/10/31/politics/donald-trump-huma-abedin-hillary-clinton-emails/index.html.

was unquestionably improper, as the Department of Justice itself found in a May 9, 2017 memo issued by Deputy Attorney General Rod J. Rosenstein.[26]

The rest is history. Following Secretary Clinton's loss on November 8, 2017, some election analysts concluded that Mr. Comey's letter cost Secretary Clinton the election,[27] and pundits were quick to shift blame from the FBI Director's improper disclosure to Anthony[28] — as well as his wife[29] — causing immense pain to their family. Compounding this damage, when Director Comey was called to Congress to face criticism for his pre-election disclosures, he justified his actions in part by claiming that the evidence seized in the instant case showed that Anthony's wife had "forwarded hundreds and thousands of emails, some of which contain classified information" to Anthony.[30] This was wildly wrong — Ms. Abedin had forwarded only a "small number" of emails to Anthony, only two of which contained information that was later deemed classified, and all of which had been previously seen by the FBI.[31] While the FBI quietly corrected this testimony days

---

[26] *See* THE HILL, *FULL LETTER: Trump fires FBI Director Comey over Clinton emails* (May 9, 2017), http://thehill.com/blogs/pundits-blog/the-administration/332630-full-letter-deputy-attorney-general-recommends-trump.

[27] *See, e.g.*, NEW YORKER, *supra* note 15 ("Many analysts concluded that Comey's actions tilted the Presidency to Trump.").

[28] *See, e.g.*, Z. Byron Wolf, *Hillary Clinton blames James Comey for her loss.  Why not blame Anthony Weiner*, CNN (May 19, 2017), http://www.cnn.com/2017/05/19/politics/anthony-weiner-james-comey-donald-trump-hillary-clinton/index.html; Carl M. Cannon, *How Donald Trump Won*, REALCLEARPOLITICS (Nov. 10, 2016), https://www.realclearpolitics.com/articles/2016/11/10/how_donald_trump_won_132321.html.

[29] *See, e.g.*, FOXNEWS, *Clinton advisers point fingers at Huma Abedin, inner circle for loss* (Dec. 19, 2016), http://www.foxnews.com/politics/2016/12/19/clinton-advisers-point-fingers-at-huma-abedin-inner-circle-for-loss.html.

[30] *See, e.g.*, Peter Elkind, *James Comey's Testimony on Huma Abedin Forwarding Emails Was Inaccurate*, PROPUBLICA (May 8, 2017), https://www.propublica.org/article/comeys-testimony-on-huma-abedin-forwarding-emails-was-inaccurate.

[31] *See, e.g.*, *id.*

later,[32] the damage had already been done, prompting calls to investigate Anthony and his wife that continue to this day.[33]

The great irony, of course, is that JD told the Government that one of her goals in capturing Anthony's bad behavior had been to influence the outcome of the presidential election.  (PSR ¶ 19.)  The *Daily Mail* article alone was not enough to do that.  But the immediate, improper disclosure that Anthony was under federal investigation and the subsequent improper injection of this case into the presidential election may well have helped JD realize that apparent ambition.

## IV.    The Plea Agreement and Guilty Plea

On May 19, 2017, Anthony waived indictment and pled guilty to a one-count information charging a violation of 18 U.S.C. § 1470, which prohibits "knowingly transfer[ing] obscene matter to another individual who has not attained the age of 16 years, knowing that such other individual has not attained the age of 16 years, or attempt[ing] to do so."  (PSR ¶¶ 2–3.)  This statute — virtually never charged in this district, except as an addition to more serious child pornography charges — represents the least severe disposition available for an individual who has exchanged sexually explicit messages with a teenager, short of declination.

The agreement to which Anthony entered his plea of guilty (the "Plea Agreement," Ex. 42) further reveals the Government's view that the conduct here is far less severe than what is ordinarily charged in more serious obscenity and child pornography cases.  The Government took the extraordinary step of stipulating in the Plea Agreement itself that, based on the manner in which

---

[32] *Id.*

[33] *See, e.g.*, Mark Moore, *Huma won't be charged for Hillary's emails on Anthony Weiner's laptop*, NEW YORK POST (May 3, 2017), *available at* http://nypost.com/2017/05/03/huma-wont-be-charged-for-hillarys-emails-on-anthony-weiners-laptop/; CONGRESSMAN STEVE KING, *Press Release: King Calls For Wider Investigations of Obama, Clinton, Comey, Soros, Lynch, Abedin, and Weiner Scandals* (Jul. 27, 2017), https://steveking.house.gov/media-center/press-releases/king-calls-for-wider-investigations-of-obama-clinton-comey-soros-lynch.

the Sentencing Guidelines are calculated (as addressed below) and the "specific circumstances of the offense conduct in this case," a below-Guideline sentence would be "fair and appropriate." (*Id.* at 4.)  In particular, the Government represented in the Plea Agreement that a sentence in the range of 21 to 27 months would be "fair and appropriate," while also permitting the defense to seek a sentence with no jail time and to appeal any sentence over 27-months' imprisonment.  (*Id.*) The Plea Agreement likewise provided that the Government would not bring other charges that could reach the same conduct, which could have included child pornography "production" charges with a fifteen-year mandatory minimum sentence.  The Plea Agreement was based on Anthony pleading guilty at first appearance without discovery.[34]

In his plea allocution, taken by Judge Loretta Preska, Anthony accepted full and complete responsibility for his conduct, stating:

> Beginning with my service in Congress, and continuing into the first half of last year, I've compulsively sought attention from women who contacted me on social media, and I engaged with many of them in both sexual and non-sexual conversation.  These destructive impulses brought great devastation to my family and friends, and destroyed my life's dream in public service.  Yet, I remained in denial even as the world around me fell apart.  In late January 2016, I was contacted by and began exchanging online messages with a stranger who said that she was a high school student, and who I understood to be 15 years old.  Through approximately March of 2016, I engaged in obscene communications with this teenager, including sharing explicit images and encouraging her to engage in sexually explicit conduct, just as I had done and continued to do with adult women. I knew this was as morally wrong as it was unlawful.  This fall I came to grips for the first time with the depths of my sickness.  I – I had hit bottom.  Through treatment I found the courage to take a moral inventory of my defects.  I began a

---

[34] This lack of discovery did not relieve the Government of its obligation under *United States v. Brady* to disclose to the defense favorable information "material either to guilt or *punishment,*" 373 U.S. 83, 87 (1963) (emphasis added).  The defense requested *Brady* material in a letter to the Government (Ex. 46), that led to several disclosures, including with respect to the financial and political benefits the victim had admitted motivating her interactions with Anthony, benefits paid to date, that the victim had conceded she would at times say things to Anthony in the chats "to keep the exchange going," and that the victim had deleted evidence as law enforcement was coming to her house to collect it, among other items.

program of recovery and mental health treatment that I continue to follow every day. I accept full responsibility for my conduct. I have a sickness, but I do not have an excuse. I apologize to everyone I have hurt. I apologize to the teenage girl whom I mistreated so badly, and I am committed to making amends to all those I have harmed.

(Plea Tr., dated May 19, 2017, at 12:22–13:25; *see* PSR ¶ 27.)  As reported by various media outlets, Anthony "cr[ied] openly" during his allocution.[35]

## ARGUMENT

Anthony's concededly wrongful conduct is on orders of magnitude less egregious than any case involving sexually explicit communications with a teenager that has ever been prosecuted in this district, and is so far beyond the heartland of a typical sexting case that it barely belongs in that category at all.  The prototypical offense is almost formulaic — an adult male, sexually obsessed with minors (and with sexual contact often the ultimate goal), seeks out victims across the internet, obtaining the initial images through deceit (*i.e.*, pretending to be a fellow minor, or hacking into their social media accounts), and then threatens to expose the victims if they refuse to continue providing explicit material.  The sad circumstances here are *sui generis* — a curious teenager approaches an infamous addict, and (as conceded by the Government) in pursuit of money and a hand in national politics, encourages the addict to do precisely the destructive thing he is addicted to, while meticulously documenting his shameful behavior for public release.  Yes, Anthony committed a crime — he has a sickness, but not an excuse, as he stated during his plea — and with the Government having chosen to prosecute it, he comes before the Court to accept his punishment.  But the punishment should be fashioned to the unique nature of the crime that occurred.

---

[35] *See, e.g.*, Benjamin Weiser & William K. Rashbaum, *Anthony Weiner Pleads Guilty to Federal Obscenity Charge*, NEW YORK TIMES (May 19, 2017), *available at* https://www.nytimes.com/ 2017/05/19/nyregion/anthony-weiner-guilty-plea-sexting. html?_r=0.

The punishment should also be tailored to fit the man who has committed the offense: a long-sick man who required the shock of a federal investigation to finally seek help. But that was shock enough. Anthony has faithfully participated in intensive in-patient and out-patient treatment for nearly a year, and he is getting better. Moreover, Anthony does not need to go to prison to get better still; it is clear, in fact, that prison — *where it is virtually assured he will not get treatment* — will only arrest his recovery. And prison would separate Anthony, a primary caregiver and by all accounts wonderful father, from his son, depriving Anthony of the rock upon which his recovery has been built and the motivating force in becoming the better person he must be for both of them.

A sentence consisting of a significant term of probation would provide both the prospect of prison without its premature deployment, allowing first an opportunity for Anthony to face appropriate punishment in a context that will make his continuing treatment possible. A term of probation can include a host of punitive restrictions — sufficient to punish the unusual offense here — while enabling Anthony to continue to get better; minimizing the impact on his son, and permitting Anthony to make amends for his wrongs and to use his enormous talents in a productive manner once more.

## I.    The Sentencing Guidelines Calculation, Based On Illogical Cross-References, Is Due No Weight

This is a case where the Sentencing Guideline range should carry virtually no weight. As the Second Circuit has repeatedly held, and as discussed below, the Guidelines ranges employed by the U.S. Sentencing Commission for child pornography-related offenses are not based on empirical evidence, lead to irrational outcomes, and should not be accepted without significant judicial scrutiny. In this case in particular, the Guidelines range, as the Government itself appears to recognize, leads to an irrational and indefensible result. A modified range of 21 to 27 months,

settled on by the Government as "fair and appropriate" is certainly a more measured starting point that could serve as a benchmark for a typical non-contact sexting offense. But here, even this range is far excessive given the unusual and mitigating circumstances surrounding the offense.

As an initial matter, of course, the Sentencing Guidelines are purely advisory and are just one factor among many that courts are required to consider — even when the Guidelines calculation tracks empirical sentencing considerations. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Thus, while a Guideline range established through a sound methodology provides a "starting point and initial benchmark" for sentencing, the Supreme Court has instructed that courts "may not presume that the Guidelines range is reasonable" and must instead "make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 49–50 (2007).

While the Sentencing Guidelines calculations may therefore provide a useful "benchmark" or "starting point" for some offenses, their value is extraordinarily limited in certain categories of cases. As the Supreme Court has acknowledged, the weight afforded to the Guidelines calculations is owed in part due to the empirical approach typically employed by the Sentencing Commission, which "fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Kimbrough v. United States*, 552 U.S. 85, 108–09 (2007) (internal quotation marks omitted). But by the same line of reasoning, the Guideline for a particular offense is entitled to very little weight when the Guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," that is, without reference to empirical data. *Id.* In these cases, a sentencing court may well conclude that a Guidelines sentence "yields a sentence greater than necessary to achieve [18 U.S.C.] § 3553(a)'s purpose, even in a mine-run case." *Id.*

Nowhere is this more true than in the Guidelines prescribed for child pornography offenses, where, as the Second Circuit has observed, "the Commission did not use [its typical] empirical approach in formulating the Guidelines for child pornography." *United States v. Dorvee*, 616 F.3d 174, 184–88 (2d Cir. 2010) (reversing a Guidelines range sentence as substantively unreasonable). With respect to U.S.S.G. § 2G2.2, the Guideline for offenses involving the possession of child pornography (implicated in this case through a cross-reference), the *Dorvee* court observed that the multiple enhancements under the Guideline "routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases," *id.* at 186, where the Guidelines can call for harsher sentences for low-level offenders who have viewed images of minors without physical contact than for defendants who engaged in the actual, physical sexual abuse of children, *id.* at 187.  As such, the Second Circuit counseled district courts to "take seriously the broad discretion they possess in fashioning sentences under § 2G2.2 . . . bearing in mind that they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Id.* at 188.

While *Dorvee* addressed a Guideline covering child pornography possession and distribution cases, the Second Circuit has also observed that the Guideline defects described in *Dorvee* may also extend to the Guideline covering child pornography production offenses, U.S.S.G. § 2G2.1, which, like the possession Guideline, can also produce indefensible sentencing ranges.  For example, in *United States v. Sawyer*, the Second Circuit cited *Dorvee* in discussing the irrational sentence produced by the application of § 2G2.1 to a non-contact production offense, in which the defendant took explicit photographs of minors but was not found to have engaged in sexual contact with them.  672 F. App'x 63, 66–67, 66 n.3 (2d Cir. 2016) (summary order).  The

court expressed astonishment that, as in *Dorvee*, the defendant faced a far longer sentence under the Guideline than would "a defendant who repeatedly has sex with a child." *Id.* at 66.

The general failure of the child pornography Guidelines to track any sort of sentencing logic is on particular display in the instant case.  The Guidelines provide for the application of § 2G3.1 to convictions under 18 U.S.C. § 1470 for distribution of obscene material to a minor. (PSR ¶¶ 3, 29.)  That Guideline is sensible enough on its own.  It carries a base offense level of ten, § 2G3.1(a); a two-point enhancement for use of a computer service, § 2G3.1(b)(3); and a seven-point enhancement where, as in virtually all sexting cases, the defendant shares the obscene material to encourage the counterpart to respond in kind, *see* § 2G3.1(b)(1)(E).  (PSR ¶¶ 3, 29.) With credit for acceptance of responsibility, that Guideline results in a range of 21 to 27 months for a defendant in Criminal History Category I, a range the Government represents in the Plea Agreement would be "fair and appropriate" here.  (PSR ¶¶ 3, 94.)  And while a sentence within this range would, on the facts of this case, be "greater than necessary," 18 U.S.C. § 3553(a), it is not necessarily an illogical "baseline" or starting point for a typical non-contact sexting case involving a teenager.

However, although the application of § 2G3.1 by itself results in this 21 to 27 month baseline, two largely circular cross-references turn what could be a defensible Guideline starting point to one devoid of logic or merit.  First, a cross-reference at the end of § 2G3.1 directs the sentencing judge to the Guideline for possession of child pornography, § 2G2.2 — the same guideline condemned as irrational in *Dorvee* — if the defendant received sexually explicit material from the minor, a circumstance that is virtually inherent in sexting cases.  (*See* PSR ¶¶ 3, 29.)  This possession Guideline will, by itself, typically extend the Guidelines calculation in a sexting case

34

to near or above the ten-year statutory maximum sentence under 18 U.S.C. § 1470, based on the numerous enhancements found to be illogical under *Dorvee* and its progeny.

Compounding the illogical outcome of the first cross-reference, the child pornography possession Guideline to which the Court is initially referred itself contains a cross-reference directing the Court to the child pornography production Guideline, § 2G2.1, if the defendant intended to induce the minor to create and send sexually explicit images, a circumstance that yet again occurs in virtually all sexting cases *and that in practice is already accounted for by the 7-point enhancement under U.S.S.G. § 2G3.1(b)(1)(E)*, before either of the cross-references were applied.  (*See* PSR ¶¶ 3, 29.)  It is hard to fathom how this could be an intentional result of the Sentencing Commission, much less a rational one, in cases involving non-contact sexting with a teenage victim.   And yet, the result of this second cross-reference is to send the Guidelines calculation in a typical sexting case soaring higher still — to 135 to 168 months' imprisonment in this case (but for the statutory cap), effectively treating "run-of-the-mill" cases involving sexting with a minor as more morally repugnant than physical sexual abuse of children — the very outcome warned against in *Dorvee*.  (*See* PSR ¶¶ 3, 93.)  Likewise, this cross-reference punishes far more seriously a defendant who catches a fleeting sexually explicit glimpse of a minor in a private video chat (as here) than a defendant who receives a *pre-existing* sexually explicit image of the minor during the exchange and posts it on the internet for the world to view, because in the latter case the defendant was not involved in its "production."[36]

---

[36] It is worth noting that many courts have *not* applied the cross-references in sexting cases, even when the reported facts indicate the application is warranted, and have instead relied solely on the application of U.S.S.G. § 2G3.1 to calculate the relevant Guideline range.  *See, e.g., See United States v. Schofield*, No. 6:14 Cr. 23 (C-BG), Doc. No. 40 (Dec. 16, 2014, N.D. Tex.), *aff'd*, 802 F.3d 722 (5th Cir. 2015) (despite the defendant's admission to receiving sexually explicit images from a minor, the court did not discuss or apply the cross-reference); *United States v. Hughes*, 7:14

Given the illogical aspects of the child pornography Guidelines generally — and the particularly absurd results produced by those Guidelines here — it is little wonder that many judges across the country have imposed substantially below-Guidelines sentences in cases governed by these Guidelines, including cases of probation, even when the Guidelines called for many years in prison. *See, e.g., United States v. R.V.*, 157 F. Supp. 3d 207, 264–65 (E.D.N.Y. 2016) (collecting cases where district courts have imposed, and circuit courts have affirmed, sentences with minimal or no incarceration for defendants sentenced under the child pornography possession Guideline). As for this district specifically, in appropriate cases — where, as here, the defendant is assessed to be a low risk for future crime and there are other mitigating factors — judges have not hesitated to reject substantial advisory Guidelines ranges and impose noncustodial sentences. *See, e.g., United States v. Angelo Trinidad*, No. 14 Cr. 537 (NRB) (S.D.N.Y. June 23, 2015); *United States v. Daniel Pinero*, No. 14 Cr. 341 (AJN) (S.D.N.Y. Apr. 1, 2015) (sentencing defendant to a non-incarceratory sentence despite a Guidelines range of 78–97 months); *United States v. Patrick Colon*, No. 12 Cr. 462 (VB) (S.D.N.Y. May 21, 2013); *United States v. Christopher Ressa*, No. 11 Cr. 939 (RPP) (S.D.N.Y. Apr. 11, 2013) (imposing sentence of time served, around three days, and supervised release, despite advisory range of 78–97 months); *United States v. Robert Santana*, No. 10 Cr. 341 (SHS) (S.D.N.Y. Jan. 28, 2011) (imposing sentence of three years' probation and six months' community confinement, despite advisory range around five years); *United States v.*

---

Cr. 72 (RAJ), Doc. No. 39 (Sept. 2, 2014, W.D. Tex.), *aff'd*, 618 F. App'x 770 (5th Cir. 2015) (defendant received sexually explicit imagines of a minor, yet the court did not mention or apply the cross-reference); *United States v. Maldonado*, No. 1:08 Cr. 273, Doc. Nos. 121, 122, 123 (Apr. 28, 2010, E.D. Cal.) (defendant received multiple images from multiple victims, and the court did not apply or discuss the cross-reference). While these decisions may simply reflect unintentional errors (and we do not dispute that the Guideline range set out in the Plea Agreement and adopted by the pre-sentencing Probation Officer is on its face correct), they may also reflect an unstated acknowledgment by prosecutors, probation departments, and/or courts in those districts that the cross-references lead to unjustly inflated ranges.

*Leonardo Morel-Baca*, No. 11 Cr. 427 (DAB) (S.D.N.Y. Oct. 2, 2012) (sentencing defendant with 78–97 months' Guidelines range to time served of one day and supervised release); *United States v. Hector Garcia*, 10 Cr. 914 (BSJ), (S.D.N.Y. Sept. 18, 2012); *United States v. Marvin Falikovic*, No. 07 Cr. 906 (NRB) (S.D.N.Y. Mar. 5, 2008); *United States v. John Balkam*, No. 05 Cr. 689 (DLC) (S.D.N.Y. Mar. 28, 2006).

## II.     The § 3553(a) Factors Do Not Warrant A Custodial Sentence

The factors the Court must consider under 18 U.S.C. § 3553(a) — in isolation and taken together — demonstrate that a sentence of imprisonment is not required here and would result in punishment greater than necessary to achieve the goals of sentencing.

### A.     The Unique Nature and Circumstances of the Offense, Far Less Severe Than Others Prosecuted, Do Not Require Incarceration

Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider the "nature and circumstances of the offense" during sentencing, and pursuant to 18 U.S.C. § 3553(a)(2)(A), a sentence must reflect "the seriousness of the offense."  Anthony's conduct, while illegal and wrongful, was significantly less egregious than other cases involving sexually explicit online communications with a teenage victim.  While it is not possible to identify each and every such case prosecuted nationally (particularly as most do not involve opinions published on Westlaw or elsewhere), we have been able to identify fifteen cases involving sexting with a minor prosecuted in the Southern District of New York from 2005 to date, a particularly relevant data pool not only because it is the district of prosecution, but also because of the care the U.S. Attorney's Office for the Southern District of New York is known for taking in considering appropriate charges and resolutions under a statutory scheme that, if applied indiscriminately, could result in a fifteen-year mandatory minimum child pornography "production" sentence for an eighteen-year-old asking her seventeen-year-old boyfriend to take and send an explicit "selfie."  *See* 18 U.S.C. § 2251(a).

A careful look at these fifteen cases reveals a stark conclusion: Anthony's case is on orders of magnitude less egregious than any that has previously been charged as a federal crime in this district.[37]  Indeed, we have seen no other federal prosecutions — anywhere — that involve minor victims seeking out a defendant and encouraging the defendant to engage in explicit conduct so that the defendant could be publicly exposed.

As an initial matter, all other cases involving sexting between an adult and a minor or minors prosecuted in the Southern District have involved defendants with an apparent sexual interest in minors who have sought out minor victims on the internet for exploitation.  This case started the other way around.  Anthony has no deviant sexual interest in minors and was not seeking them out on the internet.  Instead, the victim here sought out Anthony specifically, knowing exactly who he was, and with the goal of eliciting his famously bad behavior online and profiting from the resulting publicity.  Indeed, the offense conduct here does not involve a *single one* of the aggravating circumstances present in the sexting offenses that have been prosecuted in this district.  Such cases have always involved at least one — and almost always more than one — of three key aggravating factors: (1) actual or attempted sexual contact with a minor; (2) a common set of predatory behaviors, such as using deception to initiate the sexting relationship with the minor (*e.g.*, pretending to be a fellow teen) and/or threatening to publicly expose the minor if the minor breaks off contact; or (3) the abuse of a relationship of authority or trust (*e.g.*, cases involving teachers, coaches, and child therapists).  This pattern of aggravating factors is also evident in out-of-district sexting cases, including from the Eastern District of New York and cases that have been

---

[37] While our review of cases extended back to 2005, we did not identify any cases from 2005 through 2007, and it is unlikely that any pre-date this period, given the advent of smartphones and associated messaging applications in the mid to late 2000s.

recently addressed by the Second Circuit, as well as in cases nationally.[38] Yet *none* of these three

hallmark factors are present here.

### I.        *Actual or Attempted Physical Contact With A Minor*

A large subset of sexting cases in the Southern District (and beyond) are essentially child

enticement cases, where the exchange of explicit images serves as preparation or "grooming" for

the planned (and, tragically, often completed) sexual abuse of a child. *See, e.g.*, *United States v.*

*Matthew Tivy*, 1:15 Cr. 855 (RA) (S.D.N.Y. 2015) (defendant initiated communications with a

minor through an online dating app, engaged in sexual acts with the minor, recorded these acts,

and shared the recordings); *United States v. Hassan Khan*, 1:15 Cr. 804 (JSR) (S.D.N.Y. 2015)

(defendant sexted with an 11-year-old girl from 2007 through 2013, then met with the minor twice

to engage in sexual intercourse); *United States v. Jonathan Delaura,* 7:12 Cr. 812 (S.D.N.Y.) (male

defendant posed as a 17-year-old girl to meet a 15-year-old boy online, arranged to meet and met

---

[38] *See, e.g.*, *United States v. Broxmeyer*, 699 F.3d 265, 270–74 (2d Cir. 2012) (N.D.N.Y.) (defendant, a field hockey coach, in addition to sexually explicit internet exchanges, engaged in a sexual relationship with one of his 17-year-old players, raped another 17-year-old, sodomized a 15-year-old player, raped a 13-year-old player, and raped or sexually assaulted at least three other minors); *United States v. Puglisi*, 458 F. App'x 31, 34 (2d Cir. 2012) (N.D.N.Y.) (defendant, a teacher at the victim's school, sought sexually explicit photographs in internet communications and had sexual intercourse with a 16-year-old student); *United States v. Mirvis*, 1:17 Mj. 00358 (PK) (E.D.N.Y. 2017) (defendant enticed minors to send him sexually explicit images over the internet, and threatened at least one minor with revealing the images if the minor refused to send more images); *United Satates v. Murillo*, 2:17 Cr. 00240 (LDW) (E.D.N.Y. 2017) (defendant posed as a 17-year-old to entice a minor to send sexually explicit images and attempted to meet with the minor); *United States v. Hutchinson*, 588 F. App'x 894, 895 (11th Cir. 2014) (defendant posed as a teenager online to meet minors, threatened to harm them if they did not send sexually explicit images, and raped several minors); *United States v. Shill*, No. 3:10-CR-493-BR, 2012 WL 6569394, at *4 (D. Or. Dec. 17, 2012), *aff'd*, 740 F.3d 1347 (9th Cir. 2014) (defendant "friended" multiple minors — classmates of his daughter — online in an effort to persuade them to engage in physical sexual contact); *United States v. Nielsen*, 694 F.3d 1032, 1034 (9th Cir. 2012) (defendant connected with 12-year old through social media site, sexted with her, then used drugs to entice her to engage in physical sexual contact).

the boy, and engaged in sexual activity with him); *United States v. Evan Zauder*, 1:12 Cr. 659 (LAK) (2012) (defendant, a grade school teacher, used the internet to engage in sexually explicit communications with at least three minors, attempted to meet at least two minors, and engaged in sexual intercourse with at least one minor).[39]  In other cases, there is a physical proximity and a discussion of physical contact between the defendant and minor, but the offense is detected before contact occurs.  *See United States v. Paal Klykken*, 1:16 Cr. 593 (VEC) (2016) (defendant engaged in sexually explicit internet messaging with a 13-year-old girl whose bedroom he could look into from his own apartment, enticed the minor to engage in sexually explicit conduct while he watched from his own home, described sex acts he wished to perform with the minor, and discussed possibility of meeting before being caught).

> ### 2.    *Predatory Behaviors*

Another category of cases, which often overlaps with the first and covers almost all of the sexting cases prosecuted in the Southern District, involves the use of a recurring set of predatory behaviors endemic in these offenses, but entirely absent here.  Often, the defendant initiates contact with the minor victim, either by stealing (or claiming to have stolen) sexual images through hacking the minor's accounts or pretending to be a fellow minor to win trust and obtain the initial sexually explicit images.  Often, these defendants then engage in "sextortion" by threatening to release the ill-gotten images to the public, the minor's parents, or even the police, if the minor does not provide additional images or engage in other sexually exploitative conduct.  *See, e.g.*, *United States v. Kelvin Acosta*, 16 Cr. 296 (PAC) (S.D.N.Y. 2016) (defendant hacked email accounts belonging to teenage girls, identified compromising material, and threatened to send the material

---

[39] The parenthetical descriptions for these and other of the sexting cases discussed herein are, where no published opinion is cited, based on a review of charging documents and other public filings, such as Government sentencing submissions and sentencing transcripts.

to their families, friends, and schools, unless they sent him additional images and/or paid him money); *United States v. Michael Marin*, 7:17 Cr. 336 (KMK) (S.D.N.Y. 2016) (defendant, posing as a minor, tricked victim into sending him a sexually explicit photograph, and threatened to post her sexually explicit photograph on the internet if she failed to provide more, which she did, including bestiality images); *United States v. David Ohnmacht*, 7:17 Mj. 1857 (S.D.N.Y. 2017) (defendant persuaded a 14-year-old girl to create a sexually explicit video and threatened to release the video if the minor did not send him additional sexually explicit videos); *United States v. Robert J. Garneau*, 7:16 Cr. 757 (NSR) (S.D.N.Y. 2016) (defendant received sexually explicit images from a 12-year-old, threatened the minor with arrest if the minor did not continue to send him images, and engaged in similar conduct with twenty additional minors).

In other cases, the defendants have offered payments to the minors in return for the production of explicit images. *See United States v. Jon Cruz*, 1:15 Cr. 338 (PKC) (S.D.N.Y. 2015) (a teacher and debate coach, who targeted minors that were the same age as his students, convinced the minors to provide sexually explicit images, sometimes by paying them). In all of these cases, the defendants have, in some manner, preyed on minors (usually more than one) and coerced them into producing explicit images through a combination of deception and threats. *See also United States v. Mark Warren*, 1:14 Cr. 78 (SHS) (S.D.N.Y. 2014) (posed as a teenager on various social media sites to entice teens to engage in sexually explicit conduct, which he secretly recorded and threatened to publish if they did not provide him with additional explicit content); *United States v. Daniel Coons*, 7:14 Cr. 454 (CS) (S.D.N.Y. 2014) (multiple minors took and shared sexually explicit photographs with defendant, which he threatened to publish if they did not send additional images); *United States v. Matthew Vado*, 1:14 Cr. 666 (PAE) (S.D.N.Y. 2014) (engaged in sexually

explicit communications with thirteen minors between the ages of 9 to 15, and threatened to publish the resulting images if the minors did not continue to send him additional explicit images).

### 3.    *Position of Trust or Authority Over Children*

A third category of cases — which can overlap with cases in the prior two categories — involves adults in a position of trust or authority with respect to minors.  Such cases in this district have included the prosecutions of teachers, camp counselors, coaches,  and a child therapist, each of whom was in a position to — and often did — abuse a relationship of trust and authority involving minors.  *See United States v. Marcus Stroud*, 7:17 Cr. 320 (CS) (S.D.N.Y. 2017) (a wrestling coach, who connected with a 14-year-old he initially met at a wrestling camp, found nude photographs of the minor from another internet source, and used the photographs to extort sexual acts from the minor); *United States v. Elliot Halberstam*, 1:15 Cr. 825 (JLC) (S.D.N.Y. 2015) (a therapist, who coerced former patient into engaging in sexually explicit conduct for the purpose of producing explicit images); *Jon Cruz*, 1:15 Cr. 338 (see above, a teacher and debate coach who solicited explicit images from minors); *United States v. Jonathan Delaura,* 7:12 Cr. 812 (KMK) (S.D.N.Y.) (see above, served as tennis instructor for at least one of his multiple victims).

\*        \*        \*

These factors — one or more of which are present in each and every adult-minor sexting case prosecuted in this district — are entirely absent here.  As an initial matter, Anthony has no sexual  obsession with minors.  He has not pursued minors, online or elsewhere.  His particular sickness did not revolve around minors at all, but rather with the compulsion to respond and sexually engage with all-comers on the internet, a destructive but not inherently criminal habit that swept into its ambit the teenage victim here, through an indisputably unusual set of circumstances. Nor does Anthony's offense exhibit any of the three severely aggravating factors present in every

other prosecution: (1) actual or attempted physical contact, (2) a predatory set of behaviors, or (3) a relationship of trust or authority with minors.  Anthony never sought physical contact with JD; their exchanges, to Anthony, were simply internet fantasy.[40]  Anthony did not act as a predator: he did not hide who he was from JD (it was she who disguised her purpose of documenting his compulsive sexual behavior for monetary gain), and he did not threaten JD with exposure if she stopped these communications (very much unlike the typical case, the victim appears to have sought such exposure from the outset, most recently in an *Inside Edition* interview in which she allowed images of her face to be broadcast).  Nor did Anthony have any relationship of trust or authority with JD; he didn't even know her.  None of this excuses Anthony from the criminal behavior he engaged in with JD, which he accepted full responsibility for during his plea and reaffirms in his letter to the Court.  But the fact remains that Anthony's criminal misconduct is so unlike any other sexting offense prosecuted in this district that it lies in a different world entirely.

The Government, while determining that this case should be prosecuted, appears in accord with this assessment of offense severity.  As noted above, the Government took the unprecedented step of permitting Anthony to plead guilty to an obscenity rather than a child pornography–related charge, as well as the further extraordinary step of agreeing that a below-Guideline sentence would be "fair and appropriate" here based, in part, on the "specific circumstances of the offense conduct in this case," a concession so unusual that the Government caveated that it "is not intended as precedent for other cases."  (Plea Agreement, Ex. 42 at 4.)  The Government has made this point eloquently in its sentencing memorandum in *United States v. Cruz*, 15 Cr. 338 (PKC), explaining

---

[40] As Dr. Must notes in her evaluation Anthony's "behavior largely fits the pattern described in the field as Virtual Offending . . . behavior, whereby the online communications with minors tend to be fantasy-driven.  Sexual fantasy is the goal, rather than contact sexual offending."  (Must Report at 28.)

why Anthony's conduct could not be compared to the conduct of the defendant in that case — a high school teacher who solicited and received explicit images from at least eight minors — based on the lack of aggravating factors in Anthony's case.  Specifically, the Government wrote:

> Cruz's argument that his case is most analogous to *United States v. Weiner* should be rejected outright . . . .  Weiner admitted to engaging in sexually explicit Internet communications with one minor teenager; Cruz had at least eight victims, and, by his own admission, likely many more. . . .  There is no allegation that Weiner hid his true identity; Cruz went to great lengths to conceal who he was and why he was soliciting child pornography.  And, while Weiner is not alleged to have sought out his minor victim, Cruz actively and persistently targeted the boys with whom he communicated, even asking some of them to refer him to their friends.  While both cases involve indisputably serious, harmful conduct, the scope and depth of Cruz's crimes — involving multiple victims over many years — makes the defendant's comparison to the Weiner case entirely inappropriate.

(Br. for the U.S., *United States v. Cruz*, 15 Cr. 338 (PKC), Doc. No. 55 (S.D.N.Y. July 7, 2017).)

## B.     Anthony's History and Personal Characteristics Warrant Leniency

Not only was Anthony's offense far less egregious than the sexting offenses typically prosecuted in this district, it was committed by a defendant struggling with a sickness that had already laid grievous waste to most of what mattered to him in life.  Pursuant to 18 U.S.C. § 3553(a)(1), the Court must consider the "the history and characteristics of the defendant" during sentencing, including the "mental or emotional condition" of the defendant.  *Rita v. United States*, 551 U.S. 338, 364–65 (2007).  These factors too counsel leniency.  Anthony's offense was borne of mental illness, not maleficence.  His astounding commitment to treatment and future wellness speaks to a core strength to his character and to the lack of risk he poses in the outside world.  And despite his personal failings, Anthony must be judged too for the great deal of good he did for New Yorkers who depended upon him throughout his years of public service.

### 1.     The Offense Was the Product of Sickness, Not Venality

There can be no question that, at the time of the offense, Anthony was a very sick man, in the throes of a self-destructive compulsion that swept up innocents in its wake.  Anthony did not

commit his offense as many a sexual predator does — seeking to flout society's standards and taking steps to get away with it — but was instead caught in a cycle of conduct that, from its inception, was all but guaranteed to end in a shameful public spectacle and likely arrest. Stepping back, the facts are striking: Anthony had not once, but twice lost his career in public scandals (first in Congress and then plummeting from front-runner status in the New York City mayoral race), and caused deep pain to himself and to those around him, by responding to the sexual overtures of strangers on the internet, in his own name. Nevertheless, in January 2016, Anthony again responded to a stranger — this time, a misguided teenager — and again took no steps to conceal his identity, after which the stranger again brought the story of their exchanges to the press. These are not the actions of a scheming criminal; it is the compulsive conduct of a sick man caught in a cycle of self-destruction.

Unsurprisingly, the mental health professionals who have examined Anthony have come to the same core conclusion: Dr. Levinson, Dr. Must, and Mr. Kelly have all determined that Anthony has no particularized sexual interest in teenagers that would drive him to commit a crime to satisfy his fantasies.[41] (P. Kelly Letter, Ex. 43 at 1–2; Must Report at 14, 28.) Instead, Anthony was in the grip of compulsive conduct that caused him to seek attention and adoration from strangers on the internet, a doomed effort to fill an emotional void that was thwarting such connections in the real world. For example, Dr. Levinson has described Anthony's illness as

---

[41]



involving "addictive behavior in which [Anthony] compulsively responded to strangers over the internet to fill [his emotional] void." Mr. Kelly similarly describes Anthony as having "sexual compulsivity problems, sometimes referred to as 'sex addiction,'" a disorder that he explains "encompasses a range of compulsive sexual behaviors, and does not always include physical sexual encounters." (P. Kelly Letter, Ex. 43 at 1.) Mr. Kelly noted that Anthony in particular displayed "an addictive, compulsive tendency toward social/sexual interactions with anonymous adult women via the internet." (*Id.* at 4.) Finally, Dr. Must described Anthony's "online sexual behavior" as being "motivated by addictive tendencies, emotional problems, social isolation and low self-worth" and involves "highly compulsive behavior aimed to relieve emotional problems." (Must Report at 28.)

The "sexual compulsivity" that Dr. Must (Must Report at 27–29), Dr. Levinson, and Mr. Kelly have concluded Anthony suffers from, or "sex addiction" as it is sometimes described, involves sexual behaviors that an individual finds to be irresistible despite an individual's awareness of negative consequences — that is, Anthony's conduct precisely. *See, e.g.*, Steven N. Gold & Christopher L. Heffner, *Sexual Addiction: Many Conceptions, Minimal Data*, 18 CLINICAL PSYCHOL. REV. 367, 368–69 (1998); Aviel Goodman, *Diagnosis and Treatment of Sexual Addiction*, 19 J. SEX & MARITAL THERAPY 225, 306 (1993). Following emerging scientific developments, courts have demonstrated increasing understanding that "sex addiction" and other behavioral addictions (such as compulsive gambling, overeating, or other detrimental behaviors) that trigger neurochemical reward[42] merit the same consideration as substance addictions in the

---

[42] *See, e.g.*, Jon E. Grant, Marc N. Potenza, Aviv Weinstein, and David A. Gorelick, *Introduction to Behavioral Addictions*, AM. J. DRUG ALCOHOL ABUSE (2011); Marc Lewis, *Behavioral Addictions vs. Substance Addictions; Whether it's drugs, booze, sex, or gambling, the brain can't tell the difference*, PSYCHOLOGY TODAY (Jun. 17, 2013), https://www.psychologytoday.com/blog/addicted-brains/201306/behavioral-addictions-vs-substance-addictions.

sentencing context.  For example, in a recent sentencing, Judge Rakoff heard expert testimony on

the disputed issue of whether the defendant had a "gambling addiction" that could be relevant to

sentencing.  *See United States v. Caspersen*, No. 16 Cr. 414 (JSR), Doc. No. 37, at 5–45 (S.D.N.Y

Dec. 7, 2016).  After hearing this testimony, Judge Rakoff concluded that it was "more likely than

not that there is such a thing as gambling disorder" and that it had "diminished [the defendant's]

ability to make rational decisions." *Id.* at 45:13–18.  Accordingly, Judge Rakoff took the addiction

into consideration in sentencing the defendant well-below the Guidelines, stating:

> Among the most fundamental programs of our legal system when it comes to crime
> are that we distinguish between people who commit crimes because they have made
> a rational choice that they would rather do something antisocial and harmful to
> others in order to gain their material benefits or other benefits, and those who act
> with diminished capacity and who are to some degree not acting with a full deck.
> And the reason the legal system makes that distinction is because the criminal
> justice system in particular is an expression, among other things, of fundamental
> moral principles.

*Id.* at 46:21–47:6; *see United States v. Liu*, 267 F. Supp. 2d 371, 376–77 (E.D.N.Y. 2003) (granting

a "downward departure to reflect [the defendant's] significantly reduced mental capacity caused

by his pathological gambling addiction"); *United States v. Harris*, No. 192 Cr. 455 (CSH), 1994

WL 683429, at *4 (S.D.N.Y. Dec. 6, 1994), *aff'd*, 79 F.3d 223 (2d Cir. 1996) (finding that "a

pathological gambling disorder . . . may qualify in law as a form of 'diminished capacity' under

U.S.S.G. § 5K2.13").

So too here.  Anthony suffered from a debilitating addiction — not to sexting with

*teenagers*, but to engaging in online sexual behavior with strangers.  His inability to stop his

behavior, even after so many negative consequences, only underscores the disordered thinking that

prompted Anthony to respond to JD.  And his resulting communications with JD were not the acts

of someone who "made a rational choice that they would rather do something antisocial and

harmful to others in order to gain . . . benefits," *see Caspersen*, No. 16 Cr. 414 (JSR), Doc. No.

37, at 46:21–47:6, but the acts of a sick man taking yet another step in his own self-induced obliteration. Indeed, such sexually compulsive behavior has been recognized by courts as a mitigating factor sufficient to warrant a lower sentence in child pornography cases. *See, e.g.*, *United States v. Tanasi*, No. 02 Cr. 96 (RWS), 2004 WL 406724, at *3–4 (S.D.N.Y. Mar. 3, 2004) (granting a downward departure due, in part, to the defendant's diminished capacity caused by sexual addiction that led him to "indiscriminately" collect and transmit pornographic images); *United States v. Shasky,* 939 F. Supp. 695, 697, 702 (D. Neb. 1996) (granting a downward departure due, in part, to evidence that the defendant suffered from a pornography addiction).

### 2.    *Anthony's Extraordinary Progress in Treatment*

The fact that Anthony's crime was the product of sickness and not venality merits leniency under 18 U.S.C. § 3553(a); however, that mere fact alone would mean far less if Anthony was not also deeply committed to his treatment and recovery — a testament both to his character and to the diminished risk he poses to others.

There can be no question that the progress Anthony has made since seeking treatment in September 2016 has been remarkable. Dr. Levinson, who evaluated Anthony directly after the *Daily Mail* exposé and placed him in an in-patient recovery program, observed that he entered treatment with some reluctance, but when she saw him again a few months later, her evaluation and additional tests made clear that he was "thoroughly motivated to change." (Must Report at 13–14.) And as Dr. Must, the Court-appointed psychologist attests: Anthony has taken "responsibility for the sum of his behavior" and "appears to be taking his treatment very seriously, and has the ability to recover relatively quickly despite setbacks." (Must Report at 20, 22.)[43]

---

[43] Indeed, evidence of Anthony's commitment to recovery is exhibited in how seriously Anthony has taken Dr. Must's therapeutic recommendations. ████████████████████████████

Concurring in the judgement of his two peers, Paul Kelly, Anthony's treating therapist since January, writes that "Anthony has shown steady and consistent progress" and that he has "confidence that with continued work in the manner he has been engaging Anthony will continue to maintain healthy and appropriate social and sexual boundaries." (P. Kelly Letter, Ex. 43 at 2.)

Anthony's commitment to continuing his treatment is clear.  Anthony regularly attends treatment meetings, where, as a fellow recoveree describes, he "shares frequently . . . with a keen intelligence and unsparing insight into the seriousness and consequences of what he has publicly called his 'sickness.'" ▮▮▮ Letter, Ex. 36.)  As recounted by Anthony's ▮▮▮ sponsor ▮▮▮ to Dr. Must regarding the "seriousness with which [Anthony] is taking his problem":

> ▮▮▮ . . . recalled how Mr. Weiner came to a meeting in snowy weather on crutches, not coerced or prodded by anyone.  He noted how he recently attended an intense retreat, which he suggested was another example of him taking his personal work seriously.  He shared that Mr. Weiner and he work in a structured, academic manner that is a good fit for him, and he follows through completing the homework, and reaches out to him if he is in duress.  Using "willingness" as a descriptor to describe Mr. Weiner, ▮▮▮ compared him to many others who are present in person only, as opposed to Mr. Weiner who goes to extra lengths to better himself.

(Must Report at 12–13.)  And several others have remarked on Anthony's refusal to miss his recovery meetings, even after debilitating knee surgery.  For example, ▮▮▮ writes:

> Every week that I went, Anthony was there.  Anthony hobbled in after surgery with crutches, came in feeling sick from a cold, came in week after week no matter what and then talked to people after the meeting.  He showed me hope, by his example and dedication, just by being there, talking and sharing his road to recovery.  He



showed me that commitment to this program can help maintain sobriety and change
our own lives as well as the people around us who rely on us and care for us.

(█████ Letter, Ex. 34; *see* █████ Letter, Ex. 30; Must Report at 12–13.)

Finally, Anthony describes the journey he has undertaken from a man unwilling to
recognize a problem to someone nearly a year into recovery:

> For years I was in denial, and even when I half-heartedly sought help, . . . I got the
> wrong kind.  Well-meaning professionals who stressed better decision making
> unwittingly helped me deny I was dealing with addictive behavior.  I lost a career
> when my secret life became public.  I lost jobs when I couldn't stop.  Finally, I went
> to rehab, recognized clearly what this pattern really was.   I finally found
> professionals who help me manage my sickness.  I found a community of people to
> support me in my recovery.  Now at this writing, I am 345 days off my destructive
> behaviors and have a daily practice to help me never return to them.

(A. Weiner Letter, Ex. 1.)

Anthony's sickness, and his dedicated efforts to overcome his disease, merit substantial
leniency. *See, e.g.*, *United States v. Grinbergs*, No. 8:05 Cr. 232, 2008 WL 4191145, at \*9 (D.
Neb. Sept. 8, 2008) (imposing a sentence 75% below the Guideline range due in part to "the
defendant's mental condition . . . [which] contributed to the offense," and his "excellent progress
in rehabilitation"); *United States v. Boyden*, No. 06 Cr. 20243, 2007 WL 1725402, at \*1, \*7–10
(E.D. Mich. June 14, 2007) (imposing a sentence of one day due, in part, to the defendant's success
in therapy treating his "sexual addiction").

### 3.      *Anthony's Decades in Public Service*

The fact that Anthony's offense was the product of sickness, and that he has made
remarkable efforts addressing this sickness, are aspects of his "history and characteristics" that
warrant leniency.  But also important to this assessment is the remarkable good work — much of
it out of the limelight — that Anthony has done through decades of public service.  Anthony's
nearly thirty years in public service left an indelible impact on scores of New Yorkers.  As
described in detail at the outset of this submission, *supra* pp. 6–12, Anthony dedicated himself

tirelessly to the needs of his constituents, fighting for them on a range of diverse issues. In short, while Anthony's worst act will substantially inform the sentence he receives, these moments — some of his best — should play a role as well.

Indeed, Anthony's empathy and commitment to helping those in need still reverberate with Anthony's constituents, staffers, and friends many years later. As Anthony's former ████████ ██████████████, writes: "I have seen that theme — of protecting the underdog — repeated over and over again, throughout Anthony's career . . . . Offering support to those most vulnerable is central to his character. . . ." ███████████ Letter, Ex. 15.) As ████████████████████████ ██████████████ writes of the "overwhelmingly positive role" Anthony "played in the public sphere through his career in public service":

> [Anthony s]tood up with low-income New Yorkers and nonprofit organizations to publically call for improved public policies to fight poverty, hunger, and homelessness. He also fought for such policies behind the scenes, standing up to leaders of his own party to push them to ensure that health care programs would cover more moderate income Americans and to get them to more forcefully oppose cuts in federal nutrition assistance benefits. . . .

(█████ Letter, Ex. 10.) And, as Janet Davas, a community leader who worked with Anthony on service projects, writes:

> It was always interesting to be out with him in public, in particular in his former district and to watch the reaction of his former constituents when they recognized him. It was obvious that they cared for him — but without fail, they asked and sometimes begged that he return to Congress so that he could help them — as he had done so ably as their representative. In turn, he was always kind and patient and would hear each individual out and offer advice and suggestions.

(J. Davas Letter, Ex. 12.)

Finally, one anecdote that ████████████ relays is particularly poignant, and speaks to Anthony's empathy and goodness beneath the public persona of brash Congressional brawler:

> Shortly before his run for Congress, Anthony's then girlfriend moved in with her cats. One night while she was out of town, one of the cats fell off the roof of

Anthony's building and managed to survive.   Anthony called me early the following morning.  He had been at an emergency veterinary service all night and had not slept.  I have never seen him so shaken. . . .

In the following weeks, Anthony nursed the cat to health.  In fact, he grew so close to his girlfriend's cat that after he and his girlfriend ended their relationship, they agreed that he would get to keep it.  That one-eyed cat was still alive the last time I visited Anthony, almost 15 years later.

( █████ Letter, Ex. 15.)  This example says much about Anthony.  His outward persona has

been that of a fighter.  His ability to make and maintain intimate personal connections with other

people is something he has always struggled with, a cause of his descent into sickness.  But beneath

what is at times an impenetrable surface, there is a deep and empathetic kindness.  It is a quality

seen most clearly in Anthony's relationship with his son.

### 4.     Anthony's Commitment to His Son

One theme that shines through the letters from family, friends, fellow recoverees, and the

mental health professionals who have examined and cared for Anthony is the extraordinary job he

has done as a father to his son, ███████████████████████████ years old.  (A.

Weiner Letter, Ex. 1.)  █████ was born at the time that Anthony's public life was collapsing around

him, and there is no question that Anthony has channeled the passion and talent he had once

reserved for public duties into being the kind of father to his son that he never had.

Since █████ birth, Anthony has been a loving, attentive, and energetic father, █████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████



█████████████ Despite the current disarray in his life, Anthony's devotion to ████ also continues today. ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

████████████████████████████████████████

█████████ As Anthony's brother, Jason, noted to Anthony's pre-sentencing Probation Officer, Anthony is "extremely dedicated to his son" (PSR ¶ 60), and as Jason writes to the Court:

> Anthony is an amazing dad.  Maybe the best I know.  Yes, he is loving and attentive. But he is also an imaginative, creative and energetic father. . . .

(J. Weiner Letter, Ex. 4.)  Friends have noted Anthony's devotion to ████ as well.  As Rabbi Darren Levin writes:

> No father could love a son more or put his son's interests first.

(Rabbi D. Levine Letter, Ex. 22.)  And, as Anthony himself writes of his relationship with ████:



The only honest and true part of me was my love for him and my desire to make sure he was safe and loved completely. ███████████

(A. Weiner Letter, Ex. 1.)

Anthony is also driven to provide ████ the happy childhood that he did not have. ████

Perhaps not surprisingly, as a result, it is clear that ████ is the motivating force in Anthony's recovery: Anthony is painfully aware of how his conduct has hurt his son, and this insight has motivated Anthony to make himself better.  Indeed, as Dr. Must writes in her report:

(Must Report at 12.)  Mr. Kelly has made similar observations, noting:

(P. Kelly Letter, Ex. 43 at 3.)  And, Anthony writes poignantly of his realization in recovery that his sexting habit had put at risk the one aspect of his life that had not been destroyed:

> I would tell myself, if I get ████████ right then all the rest of my mess can be forgiven.  If I loved him enough and gave him an amazing childhood, then at least one person will love me throughout.
>
> But I was wrong.  So long as I was still doing things that so were so completely at odds with my values and the values I wanted for him, I was not being the father he needed.  I was not teaching him perseverance and strength by getting up after each embarrassing expose about me and continuing to be a good dad.  No.  By not getting help, by continuing to dishonor his mother, by living in shame and secrets, I was not teaching him courage.  Far from it.  I regret it so much it makes me shake just to write this. . . .
>
> I see now that this whole terrible thing was necessary to bring me to this place where I can look my son in the eye soon and tell him that I accept the responsibility for my actions and every day, one day at a time, I am working to live a life of integrity.

(A. Weiner Letter, Ex. 1.)

### C.  Incarceration Is Not Required to Satisfy the Remaining Goals of Sentencing

18 U.S.C. § 3553(a) also requires that the Court impose a sentence "sufficient, but not greater than necessary," to "promote respect for the law," "provide just punishment for the offense," "afford adequate deterrence to criminal conduct," and "protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(A)–(C).  Based on the unique nature of the offense conduct discussed above, as well as Anthony's individual circumstances, a sentence of incarceration is not necessary satisfy these goals.

### *1.  Anthony's Ignominy Is Itself a Deterrent*

A period of incarceration is not necessary to deter the public from following in Anthony's footsteps.  Simply put, no one wants to be Anthony Weiner — he is a national pariah.  Since his communications with JD have become public, Anthony has been the subject of widespread public

flogging and even a death threat in the popular media.[44] Anthony's former colleagues in government have publicly shunned him,[45] and he is the routine target of late night barbs.[46]  As reported in one of the countless stories by tabloid reporters who track his every move, Anthony is now "a virtual hermit, scorned, derided, broke and alone, but for his mother and father in Brooklyn and his Manhattan restaurateur brother"[47] — this from a man many once lauded as a bright light of Congress, a possible Mayor of New York, and maybe more, before his all-consuming sexting habit destroyed each possibility, most devastatingly in this final criminal iteration of it.  Anthony is now a walking, talking billboard against sexting with a minor, and would be that even without a federal conviction.  Now, he will be a federal felon and a registered sex offender too, offering more deterrent still to anyone thinking of following his path.  Prison is not needed to deter people from following Anthony's path.  Anthony has does a fine job of this himself.

### 2.    *Anthony Does Not Present a Threat to Other Minors*

Nor is a term of incarceration necessary to dissuade Anthony himself from engaging in criminal conduct.  While it is easy to think of Anthony as a "repeat offender" — after all, this is

---

[44] *See* Sidney Fussell, *Sad, Sick Idiot Anthony Weiner to Plead Guilty to Sexting 15-Year-Old Girl*, GIZMODO (May 19, 2017), gizmodo.com/sad-sick-idiot-anthony-weiner-to-plead-guilty-to-sexti-1795368149; YOUTUBE, *Bill Maher: "I'll 'F\*cking Kill Anthony Weiner' if Clinton Loses* (Nov. 5, 2016), https://www.youtube.com/watch?v=Bl2ve4uhkko.

[45] *See* Maggie Haberman & Alexander Burns, *For Democrats, Anthony Weiner Makes an Unwelcome Return*, NEW YORK TIMES (Oct. 30, 2016), *available at* http://www.nytimes.com/2016/10/31/us/politics/anthony-weiner-democratic-reaction.html.

[46] *See* THE LATE SHOW WITH STEPHEN COLBERT, *Anthony Weiner's P\*\*\*\* Might Destroy Two Political Careers* (Nov. 1, 2016), https://www.youtube.com/watch?v=DLH36Tr-8pE.

[47] *See* Aaron Short & Khristina Naritzhnaya, *Anthony Weiner's world is about to get much smaller and sadder*, NEW YORK POST (May 20, 2017), *available at* http://nypost.com/2017/05/20/he-did-it-to-himself-anthony-weiner-faces-prison-exile/.

not his first (or even third) sexting scandal — it is crucial to bear in mind that the prior scandals, while distasteful and harmful, were not criminal.  This single instance of criminal misconduct has demonstrably had an immediate and profound impact on Anthony, causing him to finally seek and persist with treatment for his underlying disorder.

Dr. Levinson's, Mr. Kelly's, and Dr. Must's findings support this lack of threat.  While the risk metrics and labels vary, it is clear from all of these professionals that Anthony is highly unlikely to engage in sexting with a teenager again.  As noted, *no* mental health professional has found that Anthony has any pedophilic or hebephilic interests or deviant interest in teenagers at all.  Dr. Levinson deemed Anthony's risk of re-offense to be "low" (PSR ¶ 66; Must Report at 14), and Mr. Kelly concurs, writing in his letter to the Court that, "having worked therapeutically with Anthony more extensively than any of his previous therapists . . . I believe that Anthony is very unlikely to repeat the offense for which he is before the Court."  (P. Kelly Letter, Ex. 43 at 1.) And, while Dr. Must reported that the calculation of risk using highly derided standardized measures based on dated actuarial data involving the behavior of a small group of child molesters[48]

---

[48] This test, the Static-99R, leads to particularly absurd results in Anthony's case, given that he would have had a *"below average risk"* of reoffense under the test if he had sexually molested a pre-pubescent relative instead of engaged in online exchanges with a stranger. (*See* Must Report at 24–26.)  Critiques of the Static-99R and its sister test, the Static-99, come from all corners, including courts, researchers, and the media.  *See, e.g., United States v. Hall*, 664 F.3d 456, 464 (4th Cir. 2012) (finding that the Static-99R test was of limited value because it did not take into consideration important factors, such as the offender's "participation in treatment, his compliance with such treatment, his history of reoffending after treatment, and his commitment to controlling his deviant behavior"); *United States v. C.R.*, 792 F. Supp. 2d 343, 412, 446–49 (E.D.N.Y. 2011) (finding the Static-99 test cannot be used for a defendant accused solely of online child pornography crimes because the test measures recidivism of child molestation), *vacated and remanded on other grounds by, United States v. Reingold*, 731 F.3d 204 (2d Cir. 2013); Jenny Chang, *These 10 Questions Can Mean Life Behind Bars*, BUZZFEED (Apr. 22, 2015), https://www.buzzfeed.com/peteraldhous/these-10-questions-can-mean-life-behindbars?utm_term =.nsBm9MZrjE#.va8419LoDx; *see also* David Feige, *When Junk Science About Sex Offenders Infects the Supreme Court*, NEW YORK TIMES (Sept. 12, 2017) (op-ed) (noting that "[c]onvicted

is "average," she explains that this "average" means "there is a 92.5% chance that [Anthony] will not have another legal sexual problem"[49] (Must Report at 26), and makes clear in the report that she believes Anthony is not likely to reoffend due to his "intelligence, his dedication to his parenting role and son, his motivation to change, and his support group" (*id.* at 28). As repeatedly observed by other courts reduced risk of reoffense is an important sentencing factor in cases of this kind. *See, e.g.*, *United States v. E.L.*, 188 F. Supp. 3d 152, 174 (E.D.N.Y. 2016) (concluding that "[a] prison sentence in the instant case is not necessary to protect the public," because of the defendant's low risk of recidivism, which was "further mitigated by [the] defendant's participation in his current treatment program")); *R.V.*, 157 F. Supp. 3d 207; *Grinbergs*, 2008 WL 4191145, at *9 (D. Neb. Sept. 8, 2008); *Boyden*, 2007 WL 1725402, at *1, *7–10 (E.D. Mich. June 14, 2007).

Nor must the Court be confident that Anthony will never relapse in his sexting addiction to conclude that his risk of re-offense is minimal. Even if Anthony should relapse and sexually engage with others on the internet, it is abundantly clear that he has learned through this case that he must never do so again with a minor. As Mr. Kelly notes:

> Anthony's illegal behavior was an anomaly and fell well outside of his typical sexual behavior — even his sexually compulsive behavior — because Anthony does not show any predatory behavior, nor any unusual inclination toward individuals below the age of majority. While he has shown significantly poor judgement and a self-defeating tendency to engage sexual activities that are detrimental to his own best interest, these encounters have always been with consenting adults. His engagement with a person under the age of majority was well outside his general pattern of behavior and is therefore very unlikely to recur.

---

sex offenders have among the lowest rates of same-crime recidivism of any category of offender" and deriding the "junk science" that has supported views to the contrary).

[49] There is some reason to doubt that this 7.5% recidivism risk calculation is accurate as a matter of statistics or logic. Based on the communications belatedly released to Dr. Must by the Government, Dr. Must improved Anthony's scores on both the Static-99R and Stable-2007 tests, and reduced Anthony's risk of reoffense by more than 30% under the Static-99R test — from 5.6% to 3.9% in comparison to the first report. Yet inexplicably, his combined risk of reoffense from the original report remains unchanged at 7.5%. (*See* Must Report at 23–26.)

(P. Kelly Letter, Ex. 43 at 1.)

In short, Anthony poses no continuing threat to the public and should be sentenced with the lack of a need for deterrence in mind.

### 3.      *Anthony Has Already Experienced Significant Punishment, Some of It Unfair*

Nearly all defendants feel the collateral consequences of conviction — the lost employment, the harm to the family — as a form of punishment, and Anthony is no different. And federal sentencing courts routinely observe that these hardships, real as they are, are not a substitute for punishment by the government. Here, though, Anthony's case does stand out. He has already been punished in a meaningful way by the government, just not in a judicially sanctioned manner. What was supposed to be a confidential grand jury investigation into a personal offense was leaked by "law enforcement sources" and then improperly injected into the presidential election by the then-FBI Director. This conduct is not defensible and, indeed, the Government literally cannot defend it; the Deputy Attorney General of the United States has already formally concluded that Mr. Comey's public statements involving the review of evidence seized in this case were improper.[50]

There can be no question that that these improper disclosures exacted significant extra-judicial punishment on Anthony and his family. Anthony might once have been a punch line, but he is now — to many in this country — something far worse, as a result of Secretary Clinton's loss.[51] While Anthony is responsible for many shameful things in his life, neither he nor his wife should have been asked to bear such blame, for a matter entirely unrelated to this case and the

---

[50] That this memorandum may have been misused as a pretext to fire Mr. Comey does not alter the fundamental soundness of the Department of Justice's analysis.

[51] *See, e.g., supra* notes 44–46; Madeleine Weast, *Anthony Weiner Blamed for Clinton Loss by Neighbors, Has No Friends*, THE WASHINGTON FREE BEACON (Aug. 7, 2017), http://freebeacon.com/culture/weiner-has-no-friends/.

conduct precipitating it.   Moreover, while Anthony was blessed that some in public life have provided letters to the Court in his support at sentencing, many others did not, citing not the offense conduct but Anthony's status as a political pariah.   These punitive consequences are directly attributable to what the Department of Justice has conceded, at least in part, are improper disclosures relating to this investigation.

### III.   A Sentence of Probation with Conditions Including Continued Treatment and Community Service Is Sufficient, But Not Greater Than Necessary, to Satisfy the Goals of Sentencing

Given all of these factors, a sentence of probation with special conditions of supervised release, including continued treatment of the kind recommended by Dr. Must and Mr. Kelly, and community service, would be "sufficient, but not greater than necessary," to accomplish the goals of sentencing, without disrupting the remarkable progress Anthony has made in addressing his once debilitating mental illness and rebuilding his life in service to others, including his son.  *See* 18 U.S.C. § 3553(a).  A sentence of probation would sharply restrict Anthony's freedom, permit continued treatment vital to his recovery that is simply not available in prison, provide him with the ability to make amends through service, and would provide the Court with tools (and Anthony with incentives) to ensure Anthony's continued progress, specifically, in the form of the potential revocation of probation.

As an initial matter, the proposed sentence would be significantly punitive despite the lack of an incarceratory element.  Probation and registration as a sex offender will impose substantial penalties on Anthony for decades to come.[52]  As the Supreme Court recognized in *Gall*, 552 U.S.

---

[52] While it is an open question in the Second Circuit whether a defendant found guilty of violating 18 U.S.C. § 1470 is required to register under the Sex Offender Registration and Notification Act, 34 U.S.C. § 20911, *et seq.* ("SORNA"), Anthony acknowledged in the Plea Agreement that he would be required to do so.  (Plea Agreement, Ex. 42 at 6; PSR ¶ 3.)

at 48, while "custodial sentences are qualitatively more severe than probationary sentences of equivalent terms," "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." The Supreme Court elaborated:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, [and] permit unannounced visits to their homes. . . . Most probationers are also subject to individual "special conditions" imposed by the court.

*Id.* In a case of this nature, and as recommended here by the Probation Department, the "special terms" of probation would likely include significant additional restrictions on Anthony's liberty, such as permitting the Probation Department to monitor all of his online activity; submitting to searches by the Probation Department of himself, his home, his electronic devices and his business, and agreeing to polygraph testing. Indeed a court can go further still where warranted, requiring home confinement or other liberty-restricting measures. Moreover, as a registered sex offender, Anthony will be punished for his crime for at least twenty years and potentially the rest of his life. *See* 34 U.S.C. § 20913; N.Y. CORRECT. LAW § 168 (McKinney 2017); (*see also* PSR ¶ 3). As noted by Judge Weinstein, "[t]he heavy burdens of sex offender registration requirements are well-known," *E.L.*, 188 F. Supp. 3d at 173–74, and, combined with special conditions of probation and New York law governing registered sex offenders, will substantially curtail Anthony's freedoms. *See, e.g.*, 34 U.S.C. § 20913; N.Y. CORRECT. LAW § 168; N.Y. PENAL LAW § 65.10(4-a).

Finally, in addition to these restrictions, Anthony would understand that any misstep could result in incarceration. The Court's ability to revoke Anthony's probation would both serve as a powerful incentive for Anthony to fully comply with the terms of his release and provide the Court with a tool to more severely punish Anthony in the unlikely event that he failed to do so, a tool that Anthony is well aware this Court has used in similar cases. *See United States v. Forbes*, 1:09

Cr. 745 (DLC) (S.D.N.Y. Feb. 7, 2011) (revoking a sentence of straight probation and imposing 60-month sentence in child pornography possession case following the defendant's violation of the terms of his release).  The proposed sentence, in other words, gives the Court the flexibility to sentence Anthony to prison should it truly prove necessary, without prematurely foreclosing a far better suited form of punishment that does not involve incarceration.

The proposed sentence of probation also has a crucial advantage that a sentence of imprisonment does not: it enables Anthony to continue what has indisputably been a productive course of treatment, and one that Dr. Levinson, Dr. Must, Mr. Kelly, and the Probation Department strongly recommend be continued.  Dr. Must recommended specifically that Anthony "continue to receive individual and group mental health treatment with his same therapist given the benefit Mr. Weiner reports of [this regimen] both helping him manage his hypersexuality as well as provid[ing] a broad support network" and moreover that Anthony would benefit from continued treatment "in the community."  (Must Report at 29.)  In particular, she writes:

> Mr. Weiner's risk factors outlined above can be managed in the community and treated in an outpatient sex-offense-specialized treatment program.  Outside of his sexual compulsivity problem, Mr. Weiner is a highly functioning individual.  He has many strengths including his intelligence, his dedication to his parenting role and son, his motivation to change, and his support group.

(*Id.*; *see* P. Kelly Letter, Ex. 43 at 3 (noting his "full agreement" with this conclusion).)  Given the benefits Anthony has derived from his "current regimen," Dr. Must also recommended that, in addition to an "outpatient sex-offense-specialized treatment program" above, Mr. Kelly "participate on the treatment team and case conference with probation and treatment" in Anthony's ongoing recovery.[53]  (Must Report at 29.)

---

[53] Mr. Kelly recommends a similar line of continued treatment, while noting that standard sex-offender group treatment presents "therapeutic obstacles," given that it typically involves

Sentencing Anthony to confinement in the Bureau of Prisons ("BOP") would simply end Anthony's ability to get treatment: not just the treatment model Dr. Must and Mr. Kelly recommend for his condition, *but quite likely sex offender treatment of any kind*. As set forth in more detail in the attached memorandum from the National Center on Institutions and Alternatives ("NCIA"), the Bureau of Prisons offers two programs for sex offenders: a residential treatment program operating BOP facilities in Massachusetts and Illinois, and a less intensive, non-residential treatment program at BOP facilities in Arizona, Colorado, Florida, Illinois, Ohio, Texas, and Virginia.  Neither program is well-suited for Anthony.  The residential program is geared towards high-risk offenders, often with far more serious offense histories, and the non-residential program consists solely of group therapy sessions that take place only two to three times per week, with no individual therapy, and no twelve-steps based component that both Dr. Must and Mr. Kelly have found suits Anthony well.  (*See* P. Kelly Letter, Ex. 43 at 3, 5 (noting that "treatment programs within the prison system are woefully inadequate both in their availability and, sadly, in there quality"); NCIA Report, Ex. 44 at 2 (noting that studies support that sex offender treatment provided while an offender is on probation, as opposed to treatment provided in prison, is *more effective* in reducing the rate of recidivism).)  Moreover, none of the programs are available near New York, requiring Anthony to sacrifice access to the son who has been so instrumental in his recovery, as Dr. Must, Mr. Kelly, and countless others have observed.

Even if these BOP programs could substitute for the treatment recommended by the mental health professionals who have worked with Anthony — and they could not — the fact is that

---

individuals "with significantly higher levels of offense behavior than Anthony committed," and that such treatment should therefore be seen as a supplement to existing treatment and not a substitute.  (P. Kelly Letter, Ex. 43 at 3.)  Mr. Kelly also notes that he "would be very happy to continue working with Anthony both in individual therapy and group therapy" and "as part of a treatment team and in case conferences with Probation."  (*Id.* at 4.)

Anthony has virtually no chance of participating in them.  Anthony's low risk of re-offense makes

him ineligible for BOP's most intensive, residential treatment programming, which, per the BOP

itself, is "reserved for inmates with more extensive sex offense histories." (NCIA Report, Ex. 44

at 2.)  The non-residential treatment programs are only available for inmates with a projected

release date of 21 or more months.  Given that the BOP factors expected "good time" credit into

the projected release date, many of the sentences within the range the Government has identified

as "fair and appropriate" would result in a projected release that would render him ineligible *per

se* to participate.  And even sentences at the high end of the range would likely preclude his

participation given the extensive and apparently growing waitlist (likely over 1,776, based on

available public data) for these programs.  (NCIA Report, Ex. 44 at 2.)  In short, the cost of

sentencing Anthony to BOP custody is clear: ending his current treatment regimen, which by all

accounts is both urgently needed and working, potentially resulting in the release of a defendant

*more* at risk for reoffending than would have been the case under an alternative sentence that would

enable treatment in the community.  *See E.L.*, 188 F. Supp. 3d at 156 (imposing probation in a

child pornography possession case where incarceration "would have an adverse impact on the

substantial progress that defendant has already made through his participation in individual and

group therapy").

A sentence of incarceration would likewise deprive Anthony from contact with his son that

has been so vital to his recovery.  As described in detail above, Anthony's love for ███████ and his

role in raising his child, has been a primary motivation for Anthony's recovery.  Separating

Anthony from █████ — and █████ from Anthony — could harm both father and son, by

disrupting Anthony's recovery and destabilizing █████ family life at a key developmental

juncture.  As Mr. Kelly writes to the Court:



(P. Kelly Letter, Ex. 43 at 4–5.)  While Anthony, and not the Court, would of course be responsible

for any such harm — a fact he struggles with in recovery — the risk of damage to ▮▮▮▮ merits

consideration during sentencing.  Indeed, as Ms. Abedin writes in her letter to the Court:



(H. Abedin Letter, Ex. 2); *see R.V.*, 157 F. Supp. 3d at 254–56, 267 (imposing non-incarceratory

sentence in child pornography possession case, in part, because the defendant was "a father to

three young children who would be severely adversely affected if he were incarcerated" and noting

it would "strip [the defendant] of the opportunity to heal through continued sustained treatment

and the support of his close family").

    A sentence without incarceration would likewise permit Anthony to be of service to others

and to make amends for his wrongs, something vital to his recovery programs and a societal good

more broadly.  Community service is a widely recognized and acceptable alternative to

incarceration.  In 2007, the Office of Probation and Pretrial Services described community service

as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the

community.  It is practical, cost-effective, and fair-a 'win-win' proposition for everyone

involved."[54]  Courts have recognized the validity of community service as an alternative sentence

as well.  As Judge John Gleeson observed in imposing a sentence consisting of home detention

---

[54] Office of Probation and Pretrial Services, *Court & Community: An Information Series About U.S. Probation & Pretrial Services: Community Service* (2007), *available at* www.miep.uscourts. gov/PDFFI1es/court_communityall.pdf.

and 500 hours of community service, "[a]lternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive." [55]

So too here.  Over much of the last year, Anthony has focused principally on getting better (and addressing this case), because without recovery, he cannot be of service to anyone.  He has also just secured a job, as he describes in his letter, humble work ███████████████████ ███████████████████, but work that enables him to feel productive and start contributing financially to his household.  With these basic needs resolved, Anthony has turned again toward how he can be of public service.  Anthony will not, clearly, be of service in the political realm any longer, but contours of a new chapter of public service are beginning to emerge as the fog of sickness lifts.  Anthony has been a remarkable influence to others struggling with sexual compulsivity, as testified to in the letters of others in recovery, serving as a positive role model through his perseverance and helping others struggling, including a friend contemplating suicide. (*See, e.g.,* ████ Letter, Ex. 39; ████ H. Letter, Ex. 35; ████ Letter, Ex. 29; ████ Letter, Ex. 33; ████ Letter, Ex. 30; ████ Letter, Ex. 34; ████ Letter, Ex. 31; ████ Letter, Ex. 28.)  Given his high profile, he has a unique ability to shed light on these issues and encourage others to deal with problems of the sort Anthony had long been avoiding, a role he has already played for ████ and ████, among others, who write of how seeing that Anthony Weiner could tackle these issues gave them confidence that they could too.  (████ Letter, Ex. 33; ████ Letter, Ex. 28.)

Anthony's ability to perform service is not limited to those struggling with sexual compulsivity issues.  Anthony has also started counseling companies that need advice on

---

[55] Herb Hoelter, *Symposium on Alternatives to Incarceration*, U.S. SENTENCING COMM'N at 349 (Jul. 14, 2008) (quoting Sentencing Transcript, *United States v. Shamilzadeh*, No. 04 Cr. 1094, (E.D.N.Y. Apr. 1, 2008)).

navigating governmental issues on a *pro bono* basis, something Anthony became expert at in his years of constituent services. (PSR ¶ 82.) Finally, Anthony has begun to work again on a non-profit, community restaurant he developed in 2014, inspired by his restaurateur brother, and designed to give down-on-their-luck New Yorkers the skills needed for a culinary career. (*See* Lisa Letter, Ex. 16; J. Davas Letter, Ex. 12.) The non-profit encountered initial obstacles when a space that was to be donated to the facility fell through, but Anthony and his partners intend to press forward. The ways Anthony can be of service again are myriad, and a sentence requiring community service in a manner approved by his Probation Officer would provide the needed flexibility to ensure that these energies are well-channeled as Anthony's recovery continues.

In sum, a term of imprisonment would bring Anthony's indisputably successful treatment for the sickness underlying his crime to an immediate and complete halt, and separate Anthony from the son who has motivated his recovery. Given the unusual circumstances of this offense and the ability of a sentence without incarceration to impose just and meaningful punishment while permitting continued treatment, a non-incarceratory sentence of the kind proposed above would be "sufficient but not greater than necessary" to satisfy the goals of sentencing. *See* 18 U.S.C. § 3553(a).

## CONCLUSION

Anthony appears before the Court guilty of a serious crime, his behavior inexcusable no matter his sickness and no matter his victim's motive to exploit that sickness for profit or politics. Punishment must be imposed, but the sentence should suit the particulars of this unusual case and should likewise reflect and encourage the remarkable progress Anthony has made over the past year, when the Government's investigation began.

A letter from fellow recoveree ███ provides particularly poignant insight into the man that is now before the Court, a man leading a life that is both much smaller and much healthier than

the life he led before. ▨ writes of a conversation in which he gave "unsolicited advice to Anthony about controlling his 'story'," prompting Anthony to interject: "There's no more *story*. There's only ▨ He's my redemption. He's all that matters now." (▨ Letter, Ex. 40.) Anthony had managed prior scandals from the detached vantage point of a political operator, worried about the optics of how his life appeared, and not the destructive manner in which he was actually living it. He is different now.

▨ closes his short letter by relaying a still more recent conversation with Anthony that speak volumes about what Anthony's life has become, and his determination to be successful at it:

> [A]t lunch again on Saturday [Anthony] didn't focus on himself; he asked me about my job search, if I was making enough meetings, if I'd spoken with our struggling friend. As for him, he eventually [] said it was more of the same: his life was going to meetings and taking care of ▨ He shook his head and grew quiet for a moment, sadly reflecting, I thought, on how comparatively small his life had become. Then he said longingly: "If only they'd let me keep doing it."

(▨ Letter, Ex. 40.)

For the reasons set out in this submission, we respectfully request that this Court do just that.

Dated:         September 13, 2017

By: *[signature]*
    Arlo Devlin-Brown
    Erin Monju
    Covington & Burling LLP
    620 Eighth Avenue
    New York, NY 10018
    212-841-1046

    *Attorneys for Anthony Weiner*