Exhibit 41

July 24, 2017

Hon. Denise L. Cote
United States District Judge
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St.
New York, NY 10007-1312

Dear Judge Cote,

I am writing you, today, to share my personal reflections of Anthony Weiner.

Since meeting Anthony for the first time ████████████████████████████, I have seen him embrace his recovery, grow spiritually and take responsibility for his past. Acceptance and humility are two character traits I have seen develop most in Anthony over the past 10 months and I am proud of him for the work he continues to do to become a better person, father and husband.

While at ████████ Anthony not only integrated himself into the daily routine at the residence, he quickly became a mentor to the men who arrived after him. Anthony was also fully engaged in his group therapy sessions, community responsibilities and treatment programs which laid the foundation that he would ultimately leverage outside of ████████.

Anthony was a consistent participant at our (voluntary) 5:30 am morning devotional readings/discussions and was always there to do the evening "10th step" with his fellow "brothers". In addition to this, Anthony was always willing to help with cooking, inventorying of the food, cleaning as well as acting as support to the men around him.

Since leaving ████████ Anthony and I have stayed in touch and I have been encouraged to hear how he continues to embrace his recovery by attending 12-step meetings and regularly staying in communication with his network. If there is one thing that has remained consistent with Anthony is his unwavering love for his son. Having two sons of my own, I can appreciate Anthony's relationship with ████ and know ████ is everything to him.

Anthony is an example of how someone can change for the better given the right mindset, spiritual foundation, recovery tools and strong network and I know that my program is stronger because of him.



Exhibit 42



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

May 4, 2017

Arlo Devlin-Brown, Esq.
Covington & Burling LLP
620 Eighth Avenue
New York, NY 10018

      Re:    <u>United States v. Anthony Weiner,</u>
              17 Cr. _____ (   )

Dear Mr. Devlin-Brown:

      On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from Anthony Weiner ("the defendant") to Count One of the above-referenced Information. Count One charges the defendant with the transfer of obscene material to a minor, in violation of Title 18, United States Code, Section 1470, and carries a maximum term of imprisonment of 10 years, a maximum term of supervised release of three years, a maximum fine of $250,000, and a $100 mandatory special assessment. In addition to the foregoing, the Court must order restitution as specified below.

      In consideration of the defendant's plea to the above offense, the defendant will not be further prosecuted criminally by this Office (except for criminal tax violations, if any, as to which this Office cannot, and does not, make any agreement) for transmitting obscene material to, and engaging in sexually explicit communications with, a person under the age of sixteen (the "Minor Victim") in or about 2016, which communications included the receipt of one or more depictions of the Minor Victim engaged in sexually explicit conduct, it being understood that this agreement does not bar the use of such conduct as a predicate act or as the basis for a sentencing enhancement in a subsequent prosecution including, but not limited to, a prosecution pursuant to 18 U.S.C. §§ 1961 *et seq.* In addition, at the time of sentencing, the Government will move to dismiss any open Count(s) against the defendant. The defendant agrees that with respect to any and all dismissed charges he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.

      The defendant hereby admits the forfeiture allegation with respect to Count One of the Information and agrees to forfeit to the United States, pursuant to Title 18, United States Code, Section 1467, all right, title and interest of the defendant in the following specific property used to commit or to promote the commission of the offense: one iPhone, Serial No. F73PN3KRG5MG (the "Specific Property"). The defendant agrees that he will not file a claim or a petition for remission or mitigation in any forfeiture proceeding involving the Specific Property and will not cause or assist anyone else in doing so. The defendant also agrees to take all necessary steps to

pass clear title to the Specific Property to the United States, including, but not limited to, the execution of all necessary documentation. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture. The defendant consents to the entry of the Consent Order of Forfeiture annexed hereto as Exhibit A and agrees that the Consent Order of Forfeiture shall be final as to the defendant at the time it is ordered by the Court.

The defendant further agrees to make restitution in an amount ordered by the Court in accordance with Title 18, United States Code, Sections 3663, 3663A, and 3664.

In consideration of the foregoing and pursuant to United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section 6B1.4, the parties hereby stipulate to the following:

A. Offense Level

1. The November 1, 2016 Guidelines apply to this offense.

2. The offense level for Count One is calculated as follows:

    a. The Guideline applicable to the offense charged in Count One of the Information is U.S.S.G. § 2G3.1.

    b. Pursuant to U.S.S.G. § 2G3.1(a), the base offense level is 10.

    c. Pursuant to U.S.S.G. § 2G3.1(b)(1)(E), because the offense involved distribution to a minor that was intended to persuade, induce, entice, coerce, or facilitate the travel of, the minor to engage in prohibited sexual conduct, a 7-level increase is warranted.

    d. Pursuant to U.S.S.G. § 2G3.1(b)(3), because the offense involved the use of a computer or an interactive computer service, a 2-level increase is warranted.

    e. Pursuant to U.S.S.G. § 2G3.1(c) ("Cross-Reference-1"), because the offense involved receiving and possessing material involving the sexual exploitation of a minor, U.S.S.G. § 2G2.2 applies.

    f. Pursuant to U.S.S.G. § 2G2.2(c) ("Cross-Reference-2"), because the offense involved causing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct and for the purpose of transmitting a live visual depiction of such conduct, and because the offense level under U.S.S.G. § 2G2.1 is greater than the offense level under U.S.S.G. §2G2.2, U.S.S.G. § 2G2.1 applies.

    g. Pursuant to U.S.S.G. § 2G2.1(a), the base offense level is 32.

    h. Pursuant to U.S.S.G. § 2G2.1(b)(1)(B), because the offense involved a minor who had attained the age of twelve years but not attained the age of sixteen years, a 2-level increase is warranted.

    i. Pursuant to U.S.S.G. § 2G2.1(b)(6)(B)(i), because the offense involved the use of a computer or an interactive computer service to persuade, induce, entice, coerce, or facilitate the travel of, a minor to engage in sexually explicit conduct, or to otherwise solicit participation by a minor in such conduct, a 2-level increase is warranted.

3. Assuming the defendant clearly demonstrates acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence, a 2-level reduction will be warranted, pursuant to U.S.S.G. § 3E1.1(a). Furthermore, assuming the defendant has accepted responsibility as described in the previous sentence, the Government will move at sentencing for an additional 1-level reduction, pursuant to U.S.S.G. § 3E1.1(b), because the defendant gave timely notice of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Court to allocate its resources efficiently.

In accordance with the above, the applicable Guidelines offense level is 33.

B. Criminal History Category

Based upon the information now available to this Office (including representations by the defense), the defendant has zero criminal history points.

In accordance with the above, the defendant's Criminal History Category is I.

C. Sentencing Range

Based upon the calculations set forth above, the defendant's stipulated Guidelines range is 135 to 168 months' imprisonment; however, because the statutory maximum is 120 months' imprisonment, the stipulated Guidelines range is 120 months' imprisonment (the "Stipulated Guidelines Range"). In addition, after determining the defendant's ability to pay, the Court may impose a fine pursuant to U.S.S.G. § 5E1.2. At Guidelines level 33, the applicable fine range is $35,000 to $350,000.

The parties agree that neither a downward nor an upward departure from the Stipulated Guidelines Range set forth above is warranted. Accordingly, neither party will seek any departure or adjustment pursuant to the Guidelines that is not set forth herein. Nor will either party in any way suggest that the Probation Office or the Court consider such a departure or adjustment under the Guidelines.

The parties agree that either party may seek a sentence outside of the Stipulated Guidelines Range based upon the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a). In light of the specific circumstances of the offense conduct in this case and because the substantially increased Guidelines range results from the cross reference to different sections of the Guidelines, the Government submits that a sentence within the range of 21 to 27 months' imprisonment (which would be the applicable Guidelines range without application of Cross-Reference-1 and Cross-Reference-2) would be fair and appropriate. The parties understand that this Agreement reflects the distinct facts of this case and is not intended as precedent for other cases.

Except as provided in any written Proffer Agreement(s) that may have been entered into between this Office and the defendant, nothing in this Agreement limits the right of the parties (i) to present to the Probation Office or the Court any facts relevant to sentencing; (ii) to make any arguments regarding where within the Stipulated Guidelines Range (or such other range as the Court may determine) the defendant should be sentenced and regarding the factors to be considered in imposing a sentence pursuant to Title 18, United States Code, Section 3553(a); (iii) to seek an appropriately adjusted Guidelines range if it is determined based upon new information that the defendant's criminal history category is different from that set forth above; and (iv) to seek an appropriately adjusted Guidelines range or mandatory minimum term of imprisonment if it is subsequently determined that the defendant qualifies as a career offender under U.S.S.G. § 4B1.1. Nothing in this Agreement limits the right of the Government to seek denial of the adjustment for acceptance of responsibility, *see* U.S.S.G. § 3E1.1, regardless of any stipulation set forth above, if the defendant fails clearly to demonstrate acceptance of responsibility, to the satisfaction of the Government, through his allocution and subsequent conduct prior to the imposition of sentence. Similarly, nothing in this Agreement limits the right of the Government to seek an enhancement for obstruction of justice, *see* U.S.S.G. § 3C1.1, regardless of any stipulation set forth above, should it be determined that the defendant has either (i) engaged in conduct, unknown to the Government at the time of the signing of this Agreement, that constitutes obstruction of justice or (ii) committed another crime after signing this Agreement.

It is understood that pursuant to U.S.S.G. § 6B1.4(d), neither the Probation Office nor the Court is bound by the above Guidelines stipulation, either as to questions of fact or as to the determination of the proper Guidelines to apply to the facts. In the event that the Probation Office or the Court contemplates any Guidelines adjustments, departures, or calculations different from those stipulated to above, or contemplates any sentence outside of the stipulated Guidelines range, the parties reserve the right to answer any inquiries and to make all appropriate arguments concerning the same.

It is understood that the sentence to be imposed upon the defendant is determined solely by the Court. It is further understood that the Guidelines are not binding on the Court. The defendant acknowledges that his entry of a guilty plea to the charged offenses authorizes the sentencing court to impose any sentence, up to and including the statutory maximum sentence. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive. Moreover, it is understood that the defendant will have no right to withdraw his plea of guilty should the sentence imposed by the Court be outside the Guidelines range set forth above.

It is agreed (i) that the defendant will not file a direct appeal; nor bring a collateral challenge, including but not limited to an application under Title 28, United States Code, Section 2255 and/or Section 2241; nor seek a sentence modification pursuant to Title 18, United States Code, Section 3582(c), of any sentence within or below the range of 21-27 months' imprisonment and (ii) that the Government will not appeal any sentence within or above the Stipulated Guidelines Range. This provision is binding on the parties even if the Court employs a Guidelines analysis different from that stipulated to herein. Furthermore, it is agreed that any appeal as to the defendant's sentence that is not foreclosed by this provision will be limited to that portion of the sentencing calculation that is inconsistent with (or not addressed by) the above stipulation. The parties agree that this waiver applies regardless of whether the term of imprisonment is imposed to run consecutively to or concurrently with the undischarged portion of any other sentence of imprisonment that has been imposed on the defendant at the time of sentencing in this case. The defendant further agrees not to appeal any term of supervised release that is less than or equal to the statutory maximum. The defendant also agrees not to appeal any fine that is less than or equal to $350,000 and the Government agrees not to appeal any fine that is greater than or equal to $35,000. Notwithstanding the foregoing, nothing in this paragraph shall be construed to be a waiver of whatever rights the defendant may have to assert claims of ineffective assistance of counsel, whether on direct appeal, collateral review, or otherwise. Rather, it is expressly agreed that the defendant reserves those rights.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady* v. *Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio* v. *United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

The defendant understands and acknowledges that, under the Sex Offender Registration and Notification Act, a federal law, he must register and keep the registration current in each of the following jurisdictions: where he resides, where he is employed, and where he is a student. The defendant understands that the requirements for registration include providing his true name, residence address, and the names and addresses of any places where he is or will be an employee or student. The defendant further understands that the requirement to keep the registration current includes informing at least one of the aforementioned jurisdictions not later than three days after any change of name, residence, employment, or student status. The defendant understands that failure to comply with these obligations subjects him to prosecution for failure to register under federal law, Title 18, United States Code, Section 2250, which is punishable by a fine, imprisonment, or both.

It is further agreed that should the conviction following the defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the Government has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against the defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is further understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office.

Apart from any written Proffer Agreement(s) that may have been entered into between this Office and defendant, this Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

JOON H. KIM
Acting United States Attorney

By: _____
Amanda Kramer/Stephanie Lake
Assistant United States Attorneys
(212) 637-2478/1066

APPROVED:

_____
Ilan Graff
Co-Chief, General Crimes Unit

AGREED AND CONSENTED TO:

_____
Anthony Weiner

5/10/2017
DATE

APPROVED:

_____
Arlo Devlin-Brown, Esq.
Attorney for Anthony Weiner

5/10/17
DATE



Exhibit 43





Exhibit 44



NCIA
**Criminal Justice Services**
7130 Rutherford Road
Baltimore, Maryland
21244

443.780.1353 *phone*
410.265.8078 *fax*

www.ncianet.org

*Founders*
Herbert J. Hoelter
Dr. Jerome G. Miller
(1931-2015)

**NCIA SERVICES**

Criminal Justice Services

Youth In Transition
School

Adult Career
Development Center

Adult Residential Services

Business Services

Jail Suicide Prevention

Public Policy

September 8, 2017

Arlo Devlin-Brown, Esq.
Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405

**RE: Anthony Weiner/Treatment Available From BOP**

Mr. Devlin-Brown,

You asked us to evaluate the sexual offender treatment available for Mr. Weiner within the federal Bureau of Prisons, based on his individual circumstances as well as the current BOP policies and program availability. We took into account his diagnoses and recommendations from his therapist, Dr. Paul Kelly, as well as the Adult Sexual Offense Risk Evaluation Psychosexual Assessment by Dr. Shoshanna Must. We gathered the most current and relevant information publicly available regarding the BOP sexual offender programs, including information from the BOP itself and the U.S. Government Accountability Office.

We conclude that because of Mr. Weiner's relatively low risk of offending, the BOP policies prioritizing higher risk inmates, and the long waiting list for BOP sex offender programs, it is unlikely that Mr. Weiner would receive any treatment in the BOP if he were to be sentenced to incarceration.

*Mr. Weiner's Treatment Possibilities in the BOP:*

Per the Risk Evaluation/Psychosexual Assessment, Mr. Weiner has a low-moderate risk range. Since he is rated as having a low-moderate risk of re-offending, it is highly unlikely that he will be placed in the residential program. According to the BOP program

*individual focus. community perspective.*

statement 5324.10[1], "[p]lacement in the residential program is reserved for inmates with more extensive sex offense histories." Technically, he could "self-refer" to be placed in the residential program, but practically speaking he is only eligible to participate in the non-residential treatment program.

Mr. Weiner is also unlikely to qualify for a BOP non-residential treatment. As an initial matter, there is an extensive waitlist for such programs. The last available data (from 2012) shows a waiting list for SOTP-NR of 1,776 inmates.[2] It is reasonable to expect that number on the waiting list to have actually increased in the last 5 years since 2012, because in the preceding four years it jumped 400% (from 381 inmates in 2008.) Moreover, aside from the waitlist issues, these programs are typically offered to inmates facing lengthier terms of incarceration. According to the BOP, "To complete the SOTP-NR, the inmate must ordinarily have no less than 21 months to his/her projected release date." The BOP assumes that an inmate will receive good conduct time (GCT) when determining their projected release date, so any sentence within a 21-27 month range would either have a projected release date of less than 21 months or would be very close to this cut-off. None of the eight SOTP facilities are in the New York area.

Even in the unlikely event he were able to get into the program, the BOP's non-residential program offers group treatment sessions 2 to 3 times per week and does not offer individual therapy sessions. This is significantly less intensive than that which he currently participates in, and what would be available to him if he were placed on probation.

There are relatively few academic studies that have been done on effectiveness of rehabilitation programs for sex offenders (and none we found focused on the BOP). However, one 2006 meta-analysis of studies conducted on such programs in the U.S. and worldwide by the Washington State Institute for Public Policy found that while cognitive-behavioral treatment of sex offenders in prison does significantly reduce recidivism, by contrast such treatments for offenders *on probation* "demonstrated the largest effects observed in our analysis."[4] The BOP has not completed an evaluation of the effectiveness of any of their sex offender programs, despite being legally required to do so on a regular basis.[5]

---

[1] BOP Program Statement 5324.10 dated February 15, 2013. https://www.bop.gov/policy/progstat/5324_010.pdf
[2] *Timelier Reviews, Plan for Evaluations, and Updated Policies Could Improve Inmate Mental Health Services Oversight*, Government Accountability Office, pg. 50 (July 2013).
[4] *Evidence-Based Adult Corrections Programs: What Works and What Does Not*, Washington State Institute for Public Policy, pp. 5-6 (January 2006).
[5] *Timelier Reviews*, pp. 26-27.

In sum, based on Mr. Weiner's needs and circumstances, and the facts on the ground at the BOP, it is highly unlikely he would receive any treatment there. It is also apparent that the treatment available to Mr. Weiner in the community is much more intensive than any program he would be (nominally) eligible for if he were incarcerated. On the following pages, we have included the text of the relevant BOP Program Statement, adapted for readability. Please do not hesitate to contact me with any questions or concerns.

Sincerely,

Joseph D. Allen, Esq.
Senior Counsel
NCIA, Inc.
jdallen@ncianet.org
443-780-1355 (direct)

The Bureau of Prisons recognizes sex offenders as a vulnerable population within a prison setting. To that end, the BOP offers a Sex Offender Management Program (SOMP) at eight facilities, with the expressed goal of promoting the well-being of sex offenders while incarcerated and reducing the likelihood of re-offense after release. Approximately 40% of the population at SOMP institutions is sex offenders.

The Bureau of Prisons offers treatment and management to sex offenders with a history of sexual offenses who volunteer for treatment. The Bureau provides two levels of treatment intensity: residential and non-residential. Eligibility for participation in a treatment program depends on an offender's evaluated risk of future sexual offending. Institutions offering this treatment often have a higher proportion of sex offenders in their offender population. This higher concentration of sex offenders within an institution helps offenders feel more comfortable acknowledging their concerns and seeking treatment. If an inmate is interested in receiving sex offender treatment, they should contact Psychology Services to learn if they are eligible for the program. They may apply at any point in their sentence. However, inmates ordinarily enter treatment when they have between 24 to 42 months remaining on their sentence.

### Residential Sex Offender Treatment and Management Program (SOTP-R)

Residential treatment involves high intensity programming designed for high-risk sexual offenders. The program consists of cognitive-behaviorally based psychotherapy groups, totaling 10 to 12 hours per weeks for a period of 12 to 18 months. Participants in the residential program typically have multiple sex crimes, extensive non-sexual criminal histories, and/or high level of sexual deviancy or hyper-sexuality. The Bureau provides this program at FMC Devens in Massachusetts and USP Marion in Illinois. Participants benefit from a unit-based program with a cognitive behavioral emphasis. The program provides a modified therapeutic community in a prison setting that stresses pro-social values and behaviors needed in the outside community. Offenders receive treatment five days per week.

The SOTP-R is available at the following facilities:
- -FMC Devens, Ayer, MA – Administrative Security
- USP Marion, Marion, IL – Medium/ High Security

---

[6] Adapted from BOP Program Statement 5324.10.

<u>*Non-Residential Sex Offender Treatment and Management Program (SOTP-NR)*</u>

Non-Residential treatment program is a moderate intensity program designed for low to moderate risk sexual offenders. The program consists of outpatient cognitive-behaviorally based psychotherapy groups meeting 2-3 times per week totaling 4 to 6 hours per week. Program completion takes between 9 to 12 months. Most participant in the non-residential program have a history of a single sex crime, many are first time offenders serving a sentence for an internet sex offense. Participants learn basic skills and concepts to help them understand their past offenses and to reduce risk of future offending. The program shares the SOTP-R's treatment philosophy and program materials, but lacks the frequency of treatment groups and the program duration of the SOTP-R. In addition, because participants reside in the general population, there is no modified therapeutic community.

The SOTP-NR is available at the following facilities:
- FCI Elkton, Lisbon, OH - Low Security
- FCI Englewood, Littleton, CO - Low Security
- FCI Seagoville, Seagoville, TX - Low Security
- FCI Marianna, Marianna, FL – Medium Security
- USP Marion, Marion, IL – Medium Security
- FCI Petersburg, Hopewell, VA - Medium Security
- FCI Tucson, Tucson, AZ – High Security
- FMC Carswell, Fort Worth, TX – Female, Administrative Security


<u>*Core Program Elements*</u>

The SOTP's treatment model is built around the following elements:

*Risk Assessment*
Program placement and treatment planning decision will be guided by an appraisal of each treatment participant's recidivism risk level. Risk assessment will be conducted prior to placements into treatment to ensure the inmate received a level of programming commensurate with his/her treatment needs.

*Individualized Treatment Plan*
SOMP staff develop, individual treatment plans for each participant, considering risk and diagnostic factors.

*Monitoring Treatment Progress*
Treatment programs periodically evaluate participants' progress toward achieving treatment goals by ensuring that skills learned in treatment are practiced and generalized to various settings.

*Targeting Criminogenic Need*
Treatment program implement interventions that target criminogenic needs, such as offense-supporting beliefs, to reduce the likelihood of misconduct and recidivism.

*Clinical Supervision*
The SOMP Coordinator is responsible for the clinical supervision of the SOMP staff, with supervision sessions occurring no less than once a month. Supervision may include, but is not limited to, such methods as supervisor modeling, didactic instruction and assigned readings, and skills-based training.

*Cognitive Behavioral Therapy (CBT)*
CBT is a treatment model that has proven to be effective with sexual offenders and other inmate populations. The Bureau has chosen CBT as its theoretical model for sex offender treatment programs.

*Modified Therapeutic Community (only in the residential program)*
Residential-based treatment program in the Bureau follow the unit-based treatment model of an modified therapeutic community. A modified therapeutic community in a prison setting stresses pro-social clause and behaviors that are needed in the outside community.

*Therapeutic Activities Outside of Treatment Sessions (only in the residential program)*
In residential treatment programs, treatment staff promote activities that have a therapeutic impact in the treatment community. Examples include promoting positive peer pressure and peer feedback on the residential unit, assigning attitude checks and rational self-analyses to be completed outside of group, conducting community meetings, etc.

## Program Level

For each referred inmate, the referring psychologist will make an initial determination of the appropriate program level (i.e. residential or non-residential) based on instructions from the BOP computer system, Sallyport. Ordinarily, placement in the residential program is reserved for inmates with more extensive sex offense histories.

## Treatment Phases

Phase One: Orientation
- Develop the basic interpersonal skills necessary to participate in treatment groups.
- Develop basic cognitive-behavioral skills.
- Demonstrate a willingness to discuss their offense conduct and/or relevant sexual behavior with treatment staff and other group members.
- Consistently demonstrate a commitment to treatment.

Phase Two: Core Treatment
- Structured psychoeducational programs and discussion groups
- Acquire and practice cognitive-behavioral and other pro-social skills.
- Participate in a Process Group, demonstrating an appropriate level of self-disclosure.

Phase Three: Transition
- The transition phase provides an opportunity for the participant to continue practicing cognitive-behavioral skills acquired in treatment in a variety of contexts. Participants remain in the phase until they complete the objective specified on their treatment plan.

*How to enter the program*
- All treatment is voluntary, the inmate must request to be admitted to the program
- Inmates may self-refer for sex offender treatment services by submitting an Inmate Request (BP-A0148) to Staff to the Chief Psychologist at the inmate's current institution. Participants may enroll in the sex offender program at any time during the course of their sentence, provided they have time to complete the program.
- To ensure that the maximum numbers of inmates have the opportunity to benefit from the sex offender treatment programs, inmates are priorities for placement based on their Projected Release Date (PRD).
- Eligibility Criteria
  - The inmate must meet the definition of a sexual offender, as defined in the Program Statement.
  - Inmate must have sufficient time remaining on his/her sentence to complete the program including time to transfer to the SOMP institutions and receive placement in the community programs. There is a waitlist for both programs.
    - To complete the SOTP-NR, the inmate must ordinarily have no less than 21 months to his/her projected release date.
      - Referral for re-designation should be initiated when an inmate has 36 months to projected release.
    - To complete the SOTP-R, the inmate must ordinarily have no less than 27 months to his/her projected release date.
  - Ordinarily, the inmate should have no 100- or 200- level incident reports in the last year. Inmates with three or more 300- and 400-level incident reports may be precluded from placement in treatment.

Exhibit 45

CURRICULUM VITAE

**Barbara S. Levinson, PhD, CNS, LMFT, LSOTP-S**
2400 Augusta Drive, Suite 120
Houston, Texas  77057

Office:  (713) 785-7111    Fax:  (713) 785-2657
e-mail address:  blchs@msn.com
www.centerforhealthysexuality.com

## ACADEMIC PREPARATION

| | |
|---|---|
| 1984 - 5/1994 | **University of Texas**, Austin, Texas.  Ph.D.  in Psychiatric Nursing. Received degree May 1994 |
| 1978 | **Hunter College**, New York.  M.S.N. in Psychiatric Nursing - Clinical Specialist |
| 1976 | **Pace University**, New York.  B.S.N. Degree |
| 1969 | **Bronx Community College**, New York.  A.A.S. Degree in Nursing |
| 1965 | **Central School for Practical Nurses** |

## PROFESSIONAL EXPERIENCE

2/1991-present

**Private Practice**

*Center for Healthy Sexuality*
*Executive Director - Barbara Levinson*
*2400 Augusta Drive, Suite 120*
*Houston, Texas 77057*

Specializing in:
Sexual Problems/Healthy Sexuality
Paraphilias
Sexual Compulsive/Addictive Disorders
Internet Compulsivity/Addictions
Sexual Trauma/Abuse: Men & Women
Sex Offender Treatment
Assessment & Treatment of Pedophilia/Child Pornography Users
Mood and Anxiety Disorders
Post-Traumatic Stress Disorder
Obsessive/Compulsive Disorder
Marital and Relationship Problems
GLBT Issues

| 02/1991-06/1993 | . | *Belle Park Hospital*<br>*4427 Belle Park Drive*<br>*Houston, Texas 77072* |
|---|---|---|

**Director of Family Services, Belle Park Hospital**

Responsible for the creation, implementation, and supervision of an intensive family program, which included, but was not limited to:
- Family Assessments
- Family Therapy
- Family Group Services
- Intensive Family Weekend
- Crisis Intervention
- Sex Offender Program
- Family Community Education Services
- Professional Training Programs

02/1990 - 02/1991   **Director of Inpatient Services, Belle Park Hospital**

Responsible for supervision and direction of all in-patient clinical services including Unit Programming, Therapy, Social Work, Clinical Support Therapy Services as well as Director of Nursing Duties

07/1985 - 02/1990   **Director of Nursing, Belle Park Hospital**

Responsible for supervision and direction of all nursing employees

07/1984 - 07/1985   Austin State Hospital
4110 Guadalupe
Austin, Texas  78751-4296

**Nurse Administrator 11-7, Austin State Hospital**

Responsible for the overall supervision and administration of the 11-7 shift

08/1983 - 07/1984   *Green Oaks (A Psychiatric Hospital)*
*P. O. Box 749014*
*Dallas, Texas  75374-9014*

**Director of Clinical Services, Green Oaks**

Responsible for the overall administrative, clinical supervision and organization of all Clinical Services functions, which include:
- Group
- Family and Milieu Therapies
- Crisis Intervention
- Supportive Therapy
- Educational, Vocational and Activities Therapies
- Nursing Services
- Administered Clinical Services Budget
- Established and implemented standards of care
- Provided In-Service and Staff Development Programs
- Developed and implemented on-going supervision and training to professional staff in structural-strategic Family Therapy.
- Set standards of practice in compliance with J.C.A.H.

2

| 01/1980 - 08/1983 | *Grant Center Hospital*<br>*20601 S.W. 157th Avenue*<br>*Miami, Florida  33187* |
|---|---|

### Director of Nursing, Grant Center Hospital

Responsible for:
- Supervision/Hire/Fire of a staff of 180 employees
- Coordinate Staff Development Program
- Established/Implemented Safety Standards in Therapeutic Nursing
- Redesigning Quality Assurance Program
- Quality Assurance Liaison
- Total responsibility for Family Therapy Training Program
- Developing Program using Strategic Theory and Methodology
- Developed Nursing Student Training program with practicum for Master's level nursing students and undergraduates
- Aided in the development and subsequent supervision of all students, i.e., M.D., Psychology, Social Work, Nursing

### Private Practice

Treated both families and individuals.  Patients were seen in evenings and weekend hours.

| 08/1978 - 01/1980 | *Harlem Valley Psychiatric Center*<br>*The King Street Center*<br>*16 King Street*<br>*Port Chester, New York* |
|---|---|

### Director of the King Street Center

Responsible for:
- Designing the clinic model and the services it renders to the population of Rye, Harrison and Port Chester counties
- Coordination of all clinical services being rendered, which included:
  - Crisis Intervention
  - Long and short term therapy (individual, family, and group)
- Clinical supervision of multi-disciplinary staff
- Total administrative responsibility for the clinic
- Teaching of Family and Systems Theory to Psychiatrists and other Mental Health Professionals on staff
- Extensive work with the Police in Port Chester in teaching of Crisis Intervention and Conflict Management to Police Officers

| 04/1978 - 08/1979<br>(part-time) | *Misericordia Hospital*<br>*Bronx, New York* |
|---|---|

### Liaison Psychiatry Consultant

Responsible for assessing all psychiatric patients that came into the Emergency Room and making appropriate recommendations

Consulted on the general medical and surgical floors when there was some difficulty with a patient.

11/1977 - 08/1978

*Harlem Valley Psychiatric Center*
*Sound Shore Community Services*
*New Rochelle, New York*

### Crisis Intervention and Family Therapy Consultant

Worked with a multi-disciplinary team providing crisis intervention services
    for individuals and families
Responsible for on-going crisis cases and providing supervision in crisis
    intervention, brief therapy and family therapy.
Gave seminars on Family Therapy
Acted as Administrative Consultant to the team leaders
Active in setting up community liaisons with the Police

07/1969 - 11/1977

*Bronx Psychiatric Center*
*Bronx, New York*

Albert Einstein College of Medicine; Tremont Crisis Center

### Faculty Member, Residence Training Program, Tremont Crisis Center

Tremont Crisis Center was a program designed to train psychiatric residents
generically in an outpatient community based facility. The center had
responsibility to provide mental health services to a catchments area of 120,000
people in the Tremont area of the Bronx.

### Out-patient Director, 8/77 - 11/77, Tremont Crisis Center

Coordinated all out-patient center activities
Oversaw Clinical Services rendered by the facility
Responsible for teaching and the direct supervision of the Staff Members/
    Psychiatric Residents doing Family Therapy and Crisis Intervention

### Crisis Team Leader, 2/74 - 8/77, Tremont Crisis Center
### Crisis Team Member, 11/71 - 2/74, Tremont Crisis Center

Administrative and Clinical Responsibilities

### Community Liaison, 6/71 - 11/71, Tremont Crisis Center

Developed Community Resources File
Acted as Liaison between Tremont Crisis Center and community agencies
Responsible for developing agency contacts and advertising the Center's
    functions

4

**Head Nurse, Staff Nurse, Bronx Psychiatric Center Training Unit, 6/69 - 6/71**

As Head Nurse:
 Coordinated and directed nursing staff
 Co-therapist in a mural group for six months
 Co-therapist in a psychodrama group for six months

As Staff Nurse:
 Assisted in the day-to-day operation of a 15-20-patient ward
 Assisted in the formulation of Treatment Plans
 Primary Therapist for several patients
 Received supervision in long-term therapy

04/1965 - 08/1967

*Coney Island Hospital*
*Brooklyn, New York*

**Licensed Practical Nurse, Coney Island Hospital**

Staff Nurse on a medical floor for 6-month period
12 to 8 shift on OBS-GYN for 1-1/2 years
Charge Nurse on the 12 to 8 shift (Labor and Delivery/Anti-partum/Post-
 partum/Nursery Rotation

10/1964 - 04/1965

*Gracie Square Hospital*
*New York City, New York*

**Licensed Practical Nurse, Gracie Square Hospital**

Staff Nurse-Psychiatric Ward with 30-35 patient population

06/1963 - 10/1964

*Creedmore State Hospital*
*Queens, New York*

**Ward Attendant, Creedmore State Hospital**

Worked in the Children's Building on the blind children's ward. Also rotated to
other wards and worked with children between the ages of 3 to 16 years of age.

**SPECIAL TRAINING**

 Licensed Sex Offender Treatment Provider (LSOTP)
  Extensive training in the treatment of Sex Offender population
  Over 25 years of experience working with this patient population

Certified Sex Addiction Therapist and Supervisor by **IITAP** (International Institute for Trauma and Addiction Professionals)

Extensive training and over 25 years of experience in the treatment of Sex Addiction, Sexual Dysfunction, and Sexual Compulsivity Treated patients with the following paraphilias:

Pedophilia
Child Molestation
Exhibitionism
Voyeurism
Fetishes
Sadomasochism
Frottage
Incest
Cross Dressing

Extensive training with Internet Addiction/Child Pornography from leading experts in the field and law enforcement agencies. Attended several seminars on criminal profiling

Extensive background in the treatment of persons convicted of possession/transportation of child pornography via the Internet

Over 25 years of experience treating Internet Addiction/Compulsivity

Certified Diplomate of Sex Therapy (**AASECT**) American Association of Sexuality Educators, Counselors and Therapists

Monarch 21 Clinician Level I for Administration of the Penile Plethysmograph (**PPG**)

Monarch 21 Clinician Level II for Clinical Interpretation of the Penile Plethysmograph (**PPG**)

Survivors of Incest: Extensive group therapy and supervision

Extensive Family Therapy training in Structural Strategic Approach

Ericksonian Approach to Hypnotherapy

Strategic Family Therapy Team-Training- 3 Years

Family Therapy Seminars-Levels One & Two-Albert Einstein Faculty-2 Years

500 Hours of Clinical Supervision on Family cases-Albert Einstein Faculty

Over 300 Hours of Clinical Supervision in Individual Therapy-Albert Einstein Faculty

Over 100 Hours of Clinical Supervision in Group Therapy-Albert Einstein Faculty

Group Process Seminar-Albert Einstein Faculty-1 Year

3 Years of Clinical Supervision in Psychopharmacology

Supervision in Cognitive Behavioral Interventions

EMDR (Eye Movement Desensitization and Reprocessing) Levels I & II Training

2006-2009  Professional Improvement Program conducted by Patrick Carnes
3 year-long comprehensive program with quarterly meetings to focus on
new research and the development of innovative strategies to deliver a
cost effective, structured intensive program for sex addicts and sex
offenders

## SPECIAL CONTRACTS

U. S. Department of Justice (Federal Probation)

U. S. Department of Justice (Pre-Trial Services)

Fort Bend County Probation

## CONSULTATION/TEACHING EXPERIENCE

1985 - Present          Presented at several conferences on Sex Offender Treatment and Treatment of
Sex Addiction. Have consulted with physicians, lawyers, judges, and other
health care professionals on the treatment of sex offenders, sex addiction, sexual
compulsivity, and cybersex addiction

Presented at numerous conferences/probation offices/community programs on
Cybersex Addiction: Diagnosis and Treatment, Healthy Sexuality;
Assessment & Diagnosis, Use of the DSM, Disclosure in Couple Therapy,
Developed Task-Centered Approach for Sex Offenders, Interpretation of the
Sexual Dependency Inventory (SDI-R) & Post Traumatic Stress Index (PTSD-
R); Sexual Addiction in the Gay Community: Diagnosis & Treatment;
Similarities/Differences in Sex Addicts and Sex Offenders, Healthy Sexual
Relationships: A Guide to Intimacy; Schema Therapy: Basic Concepts for Use
in Sex Offender Treatment; Cybersex Issues and the Mind of the Offender;
Understanding Partner Trauma; Sex Addiction: Viewing Child Pornography:
Making a Diagnosis of Pedophilia: Criteria, Indications, and Problems;
Cybersex Issues and The Mind of the Offender: Sex Addiction: Viewing Child
Pornography; Sex Offender Treatment Issues

1985 - 1991             Consultant for Hospital Corporation of America
Performed surveys on Quality Assurance
Consult with nursing departments regarding staffing, standards of practice, and
organization of nursing services, computerization, and team building
Consult with hospitals on instituting nursing diagnosis
Led Quality Assurance seminars and workshops

1985 – Present          Lectured on co-dependency, healthy sexuality, sexual addiction, love addiction
Cybersex addiction, Typology of Sex Offenders, and sexual
preference
Extensive public speaking experience
Guest appearances on numerous radio and television programs covering topics
of Sex Offenders, Sex Addiction, and Voyeurism
Lectured extensively to professionals on Family Therapy
Supervised Masters level students in nursing from the University of Texas

| | |
|---|---|
| 1987 | Developed an R. N. Internship Program for 4 Hospital Corporation of America Hospitals in Houston, Texas |
| | Chairman of the Regional Director of Nursing Meeting in Houston |
| | Consulted with several hospitals outside of the Houston area in Quality Assurance/Quality Improvement |
| 1985 - 1994 | Faculty member for Care Communications of Chicago.  As faculty member, have presented at several QA conferences throughout the nation. |
| 1982 - 1983 | Clinical practicum instructor and lecturer |
| 1976 - 1980 | Conducted Human Network Peers Seminars as weekend workshops on Family and Network Skills in Tarrytown, N.Y., Canada, New Jersey and Albany, New York |
| 1977 - 1980 | Consultant to psychiatrists in private practice on strategic skills used in Family Therapy. |
| 1969 - 1977 | Supervised psychiatric residents in Crisis Intervention Theory |
| 1974 - 1976 | Conducted Crisis Intervention Workshops for Police Department in New York, Brooklyn Community College (guidance counselors), Middletown Psychiatric Clinic, Carmel Psychiatric Clinic, and Bronx Community College Health Services. |

## COMMUNITY ACTIVITIES:

| | |
|---|---|
| 1992 - Present | Active in the community - Public speaking on Television and Radio Programs Local Channel 2 News features "Ask Dr. Barbara" on multiple news programs |
| | Presenter at Conferences and attendance at numerous health fairs and meetings of probation officers only to list a few. |
| 1985 - 1992 | Member of the Referral Development Committee at Belle Park Lectured extensively to community groups |
| | Co-Chair of the Multi-Ethnic Cultural Committee |
| 1974 - 1976 | Established a direct liaison with the 48th Precinct, N. Y. Police Department Initiating workshops between the 48th Precinct N. Y. Police Department, staff and residents of TCC Conducted groups at the precinct on Mental Health and Crisis Intervention |
| | Over 800 hours of direct work on patrol with N. Y. Police, responding to crisis calls, family disputes, or other related emergencies |
| | Attended the Police Academy Seminars on Crisis Intervention and Conflict Management |
| | Taught a ten-week seminar on Crisis Intervention and Conflict Management to Police Officers, South Bronx, 48th, 44th 41st, 40th, and 42nd Precincts |

## LICENSURES, CERTIFICATIONS AND AFFILIATIONS

**Clinical Nurse Specialist in Psychiatric/Mental Health, State of Texas**

**Licensed Sex Offender Treatment Provider (LSOTP)**

**Licensed Sex Offender Treatment Provider Supervisor**

**Licensed Sex Offender Treatment Provider / Supervisor / Deregistration Evaluation Specialist**

**Licensed Marriage and Family Therapist (LMFT)**

**A.N.A. Certified Clinical Nurse Specialist** in Psychiatric/Adult Mental Health Nursing

**Certified Diplomate of Sex Therapy** (AASECT-American Association of Sexuality Educators, Counselors, and Therapists)

**Certified Sex Addiction Therapist** (IITAP-International Institute for Trauma and Addiction Professionals)

**Certified Sex Addiction Therapist Supervisor** (IITAP- International Institute for Trauma and Addiction Professionals)

**Certified Multi-Addiction Therapist** (IITAP- International Institute for Trauma and Addiction Professionals)

**Certified EMDR Therapist** by EMDRIA (Eye Movement Desensitization Reprocessing) EMDR has been extensively researched and proven to be an effective method for the treatment of trauma

**Adjunct Professor,** University of Miami, Florida International University, 1980-1983

**Adjunct Professor,** University of Texas, 1985 to Present

**Affiliate Professor,** Barry College, 1980 - 1983

## PROFESSIONAL ORGANIZATIONS

Texas Association Sex Offender Treatment - Past President

Association for Treatment of Sex Abusers (ATSA)

Texas Association for Treatment of Sex Abusers (TxATSA), Clinical Member

American Association for Sexuality Educators, Counselors and Therapists (AASECT) Served as District III Representative- Board of Directors 'for five (5) years.

American Association for Marriage and Family Therapy (AAMFT)

Society for the Advancement of Sexual Health (SASH) Formerly-National Council on Sexual Addiction & Compulsivity

Eye Movement Desensitization Reprocessing International Association (EMDRIA)

9

Houston Association for Marriage & Family Therapy **(HAMFT)**,
Clinical  Member

Sigma Theta Tau, Nursing Honor Society

## PUBLICATIONS

Authored an article in American Association of Marriage and Family Therapists'
bi-monthly periodical, **_Family Therapy_** entitled "Sex Offender or Sex Addict?
January/February 2010 issue

Authored a chapter in **_Mending the Shattered Heart: A Guide for Partners of
Sex Addicts_** edited by Stephanie Carnes, PhD, entitled "What Does it Mean if
My Partner Has Shown an Interest in Minors?"  Copyright 2008 by Gentle Path
Press

Co-Authored, "Ethical Dilemmas Related to Disclosure Issues: Sex Addiction
Therapists in the Trenches" in _Sexual Addiction & Compulsivity_, 13:1-39, 2006
Copyright, Taylor & Francis Group, LLC
ISSN: 1072-0162 print/1532-5318 online
DOI: 10.1080/10720160500529193

Co-Authored, **_"Cybersex Addiction: Diagnosis and Treatment"_**, originally
presented at the 2001 AASECT Annual Conference in San Francisco, CA and
later at the Parisexo-Regimedia Conference in Boulogne, France.  In 2001,this
presentation was translated into French for publication.

Co-Authored a syllabus on Standards of Care and Quality Assurance monitoring
    "Protocols for Evaluating the Quality of Psychiatric Care"
    with Eric Joseph, MPH and Karen Sandrick.

Published a chapter entitled "Cognitive Behavior Therapy" for a clinical nursing
textbook edited by Gertrude McFarland.

Dissertation - Development and Validation of the **_Levinson Victim Empathy
    Scale (L-VES)_**, an instrument used by numerous treatment facilities
    across the nation to measure victim empathy in an adult population

## RESEARCH

Provided  data of 150+ participants:  University of Mississippi Sex Addiction
Research Project  entitled _Structural Congruence of the Sexual Dependency
Inventory_ (SDI) utilizing **SDI** client data and results of client's **MMPI-II**
Minnesota Multiphasic Inventory-II.    02/2011- 04/2014

American Foundation for Addiction Research (AFAR) : Current Research site
for research study underway : **Genetic Markers in Sexual Addiction**
Principal Investigator, Patrick Carnes, PhD: study commenced 08/2016.

## REFERENCES

Obtainable upon request

---

**Barbara Levinson, PhD, CNS, LMFT, LSOTP-S**

Exhibit 46

**Arlo Devlin-Brown**

Covington & Burling LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
T  +1 212 841 1046
adevlin-brown@cov.com

**By Electronic Mail**                                      August 27, 2017
Amanda Kramer
Stephanie Lake
Assistant United States Attorneys

Re: *United States* v. *Anthony Weiner,* 17 Cr. 307 (DLC)

Dear Ms. Kramer and Ms. Lake:

We write on behalf of our client Anthony Weiner to reiterate our oral request of August 21, 2017 and e-mail request of August 22, 2017 for any *Brady* material in the Government's possession that may be relevant to sentencing.  While the Government's obligation to produce such material in a timely fashion is, of course, independent from whether there is a specific request, we write as a matter of prudence and based on information you have shared since August 21 to reiterate the importance of such disclosures and to provide you with a non-exhaustive description of material that we believe falls into these categories and should promptly be disclosed to the defense.

In making this request, we reaffirm that Mr. Weiner has and continues to accept full responsibility for his conduct.  He engaged in sexually explicit communications with a teenage girl, as he has admitted in Court, he has no excuse for it, and will soon face consequences for his conduct.  Precisely what those consequences will be depends mightily on the Court's view of the "nature and circumstances of the offense," a view that may may be shaped by such factors as to how badly the victim was aggrieved, how quickly and readily Mr. Weiner engaged in the criminal activity, and any other mitigating facts surrounding the offense conduct.  Likewise, the psychosexual evaluation commissioned by the Court is rooted significantly in the evaluator's view of the scope of the offense conduct and Mr. Weiner's acknowledgement of such conduct.  It is therefore crucial that we are informed of all offense conduct information favorable to the defense to the extent it has not already been provided so that we can ensure that the sentence imposed in this case is rooted in a full and fair understanding of all relevant facts.

**The Government's Obligation To Provide *Brady* Material on Issues Relating to Punishment**

As an initial matter, and as you are no doubt aware, the Government's duty to provide *Brady* information extends through all phases of a criminal proceeding, and the scope of information required to be provided extends beyond evidence of guilt or innocence to issues relating to punishment.  As *Brady* itself held, the prosecution is required to disclose any evidence "favorable" to the defendant that is "material either to guilt *or punishment,"* 373 U.S. at 87

(emphasis added)." Though *Brady*'s text is clear, prosecutors "all too frequently forget" that *Brady*'s disclosure obligations extend to sentencing. *United States v. Feeney*, 501 F.Supp. 1324, 1334 (D. Col. 1980). *See also Cone v. Bell*, 556 U.S. 449, 475 (2009) (vacating and remanding where suppressed evidence, although not material to guilt, may have been material to "assessment of the proper punishment in [the] case.") ∴. *United States v. Quinn*, 537 F. Supp. 2d 99 (D.D.C. 2008) (prosecution violated *Brady* by failing to disclose information favorable to the defense it had learned between guilty plea and sentencing because this information was material to sentencing).

### The Need for *Brady* Material Here

The Government's obligation to produce *Brady* relevant to sentencing in this case is particularly critical as the agreed upon resolution of the case, enabling Mr. Weiner to avoid being charged with a child pornography "production" statute carrying a 15 year mandatory minimum sentence, involved a plea at first appearance to a criminal Information which described the offense only in general terms in a non-descript "to wit" clause and without discovery.[1] While we suggested in our call of June 9, 2016 that you simultaneously share with us the offense conduct summaries you would share with the Probation Office and psychosexual evaluator, you declined that request. Nor did you make any *Brady* disclosures to us prior to the completion of the Evaluation and draft Presentence Investigation Report. Accordingly, without awareness of what had been shared with the evaluator, we had to rely on the Government to provide to the evaluator any favorable information about the offense conduct that could have been relevant to the now-complete evaluation.

Only last Friday, August 18, did we learn of the offense conduct the Government had provided to the Probation Department. Based on evidence you permitted us to view at our request since then, we are concerned that the offense was not described fairly or in some cases accurately and that facts favorable to the defendant concerning that conduct were not disclosed to us or the evaluator prior to completion of the evaluation. We do not need to debate that issue now and hope that it can be resolved cooperatively. We appreciate that you are working with us in good faith to propose revised offense conduct that addresses issues we are concerned about and will join our recommendation that the evaluator be permitted to review the underlying chat records as she had requested at the outset. We note our concerns with the disclosures relating to the evaluation process simply to illustrate the importance of *Brady* material to this case, avoid any similar issues with respect to how the Government describes the offense to the Court, and to make clear that we request all favorable information relating to the offense conduct or other relevant sentencing considerations.

### Material Favorable To The Offense Relevant to Sentencing

Below is a non-exhaustive list of material that may be favorable to the defense at sentencing. It is non-exhaustive because we are not aware of the full scope of the investigation

---

[1]  You did in the course of plea discussions make representations with respect to the certain evidence the Government had in its possession -- notably, a Snapchat message -- which were helpful to those discussions and which we very much appreciate.

and therefore cannot identify all material that may be favorable to the defense from a sentencing perspective. It is apparent, however, from review of the offense conduct provided to Probation that information relating to the victim could well constitute *Brady* material both directly (inasmuch as information about the victim favorable to the defense could impact the Court's assessment of the nature and circumstances of the offense) and indirectly to the extent various assertions as to the offense conduct are based in whole or part on her credibility, which is vouched for by the Government in the PSR.

1. Any evidence relating to the victim's selective documentation or provision of chat records to law enforcement that suggest material favorable to the defense, including material that could put statements by the defendant in context, was excluded (or not requested of the victim by law enforcement);

2. Any statements made by the victim to law enforcement that are inconsistent with:
   a. other evidence obtained in your investigation;
   b. with other statements she has made, whether to law enforcement, the media or others
   c. any factual assertions concerning the offense the Government has provided at any stage to the Probation Department or to the evaluator, or that the Government intends to assert at sentencing

3. Any information (including false denials of same by the victim) relating to financial benefits being sought by the victim, including but not limited to:
   a. evidence that she interacted with Mr. Weiner in order to develop material for a planned book
   b. evidence that the victim is in fact preparing such a book, and/or that she is shopping a book to publishers
   c. evidence that the victim or her family sought or obtained payments from media outlets in return for providing a story regarding interaction with Mr. Weiner
   d. evidence that the victim sought to document her interactions with law enforcement, including recording conversations with law enforcement, potentially for the purpose of gathering material for a book
   e. statements made by the victim to the effect that she would seek financial benefits (outside of restitution in the criminal case) based on the outcome of this prosecution
   f. communications with Sydney Leathers regarding financial benefits
   *We appreciate that you made a disclosure to us in this regard on August 23; we simply request that that information and any additional relevant information be documented.*

4. Any information relating to political motivations by the victim or her father to damage the political prospects of Secretary Hillary Clinton, and/or disclosures made to the Trump campaign or its surrogates prior to the publication of the *Daily Mail* article;

5. 

**Other Requests**

As you know, we requested last week that you provide us with records of communications between Mr. Weiner and the victim, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(B)(i), which provides that the Government must produce upon the defendant's request "any relevant written or recorded statement by the defendant that is within the government's possession, custody, or control" and "the attorney for the government knows — or through due diligence could know — that the statement exists." This discovery provision applies to sentencing. *See United States v. Carucci*, 183 F.R.D. 614 (S.D.N.Y. 1999). You made records of chats between Mr. Weiner and the victim available for our review this past Friday, but please advise if there is other discoverable information pursuant to this provision.

We appreciate your professionalism and courtesy at all stages of this process.

Respectfully submitted,

/s Arlo Devlin-Brown

Arlo Devlin-Brown