```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4            v.                          17 Cr. 307 (DLC)

 5   ANTHONY WEINER,

 6               Defendant.

 7   ------------------------------x

 8                                   New York, N.Y.
                                     September 25, 2017
 9                                   10:00 a.m.

10
     Before:
11
                         HON. DENISE COTE,
12
                                       District Judge
13

14                        APPEARANCES

15   JOON H. KIM
          Acting United States Attorney for the
16        Southern District of New York
     AMANDA KRAMER
17   STEPHANIE LAKE
          Assistant United States Attorneys
18
     COVINGTON & BURLING LLP
19        Attorneys for Defendant
     ARLO DEVLIN-BROWN
20   ERIN MONJU
     PAUL FITZGERALD DOWNS
21

22
     ALSO PRESENT:   JOHN ROBERTSON, FBI
23                   STACY SHAHRANI, FBI
                     DEREK STILES, Paralegal
24

25
```

```
 1                (Case called)

 2                MS. KRAMER:  Good morning, your Honor.  For the

 3     government, AUSAs Amanda Kramer and Stephanie Lake, and joining

 4     us at counsel table are FBI Special Agents John Robertson and

 5     Stacey Shahrani.

 6                MR. DEVLIN-BROWN:  Arlo Devlin-Brown for the defendant

 7     and joining me at counsel table is my client, Anthony Weiner,

 8     and Erin Monju as well.  Behind me is Paul Downs, also from my

 9     law firm, and Derek Stiles, paralegal in my office.

10                THE COURT:  Thank you.

11                Mr. Devlin-Brown, have you and your client both read

12     the presentence report?

13                MR. DEVLIN-BROWN:  We have, your Honor.

14                THE COURT:  Have you discussed it with each other?

15                MR. DEVLIN-BROWN:  We have.

16                THE COURT:  Do you have any objections to the report

17     other than what might be contained in your written sentencing

18     submissions to me?

19                MR. DEVLIN-BROWN:  We do not, your Honor.

20                THE COURT:  The presentence report will be made part

21     of the record in this case and placed under seal.  If an appeal

22     is taken, counsel on appeal may have access to the sealed

23     report without further application to this Court.

24                I have reviewed the PSR and the sexual offense risk

25     evaluation of September 11, 2017, performed at the request of
```

1    the probation department.  The defendant voluntarily

2    participated in that examination and a 29-page report was

3    issued.

4         And I've also received letters from the victim, the

5    father, and grandmother, and the defendant's short response to

6    those.  All of those matters will be sealed as a part of the

7    sentence.

8         In addition, I have a memorandum from the defendant

9    with exhibits and a government memorandum.  There have been

10   limited redactions made to those documents.  They have largely

11   been filed in the public record.  I have reviewed the proposed

12   redactions.  I approve each of them.

13        There was one request that I had with respect to

14   Exhibit 43 to the defense sentencing submission which was

15   originally filed entirely under seal.  I asked the parties to

16   consult, and I approve the proposed redactions that have been

17   submitted to me and, therefore, Exhibit 43 is also not now

18   largely in the public record.

19        I have received two letters from the public, one is

20   from a concerned New Yorker.  Another is from a Robert

21   Donnelly.  I just received Mr. Donnelly's letter this morning

22   and will file those on ECF.

23        With respect to the sentencing guidelines issue here,

24   which is our starting point, there are two relevant

25   calculations.  The crime here, which is the transfer of obscene

1    materials to a minor, is a violation of Section 1470.  A minor

2    is defined as someone under 16 years of age.  One calculation

3    for the sentencing guidelines is the 10-year maximum sentence

4    under that statute.  And that is because if you calculate the

5    sentencing guidelines in a certain way, with many cross

6    references considered that are contained in the sentencing

7    guidelines, that leads to a sentencing guidelines range of 135

8    to 168 months.  But because of the statutory maximum, the

9    sentencing guidelines calculation becomes 10 years.

10            There is another sentencing guidelines calculation and

11    it is a fairly straightforward one, straightforward application

12    of the sentencing guidelines.  It has a sentencing guidelines

13    range of 21 to 27 months.  And this is the sentencing

14    guidelines that you would arrive at for a violation of 1470

15    without consideration of all those cross references.

16            The government in its plea agreement with the

17    defendant acknowledged that that 21 to 27-month guidelines

18    range is a fair and appropriate range in this case.  The

19    probation department itself has recommended a sentence within

20    that range.  I find independently, based on all the submissions

21    that have been made to me, that it is the appropriate

22    guidelines for the 1470 violation at issue here.

23            Therefore, I will be considering the parties'

24    arguments with respect to this sentence in the context of the

25    sentencing guidelines range of 21 to 27 months and, of course,

1    I'll be considering as well all the statutory factors in

2    3553(a) that a Court must always consider in connection with

3    sentence.    The probation department has recommended a sentence

4    of 27 months.    The government has recommended a sentence within

5    the 21 to 27-month guidelines range, and the defendant has

6    asked for a probationary sentence.

7              I want to note before I hear from the parties that the

8    letters submitted to me have been very helpful.    Some of them

9    have been extraordinarily brave to write, and I found them

10    informative and have considered them.

11             Let me start.    I'll hear first from the government.

12             MS. KRAMER:    Thank you, your Honor.

13             Anthony Weiner should be sentenced to a term of

14    imprisonment of 21 to 27 months and his request for probation

15    rejected for two principal reasons:    The seriousness of the

16    offense and the need for deterrence.

17             On three separate occasions in early 2016, the

18    defendant sat in his Manhattan apartment, got online and asked

19    a real 15-year-old girl to display her naked body for him and

20    sexually perform.    There are no circumstances under which that

21    is acceptable, excusable, or insignificant.    Indeed, what the

22    defendant did is a serious felony, as he knew full well from

23    his decade as a United States congressman.    The minor victim's

24    motives and postoffense conduct don't undermine the seriousness

25    of the actions knowingly taken by the defendant.    Any effort to

1    shift the blame from the adult defendant to the minor victim in

2    this case should be flatly rejected.

3              THE COURT:  I don't actually find that the defendant

4    is attempting to shift blame.

5              MS. KRAMER:  Thank you, your Honor.

6              It's a longstanding principle of federal law that

7    adults cannot engage in sexual conduct, online or otherwise,

8    with minors of any age, including minor teenagers, and for good

9    reason.  Because minors don't have the same ability as adults

10   to protect themselves and this is true no matter how grown up

11   they may try to seem.  The law on this point is clear and it

12   must stay clear to affect general deterrence.  Adults who

13   knowingly ask any minor to engage in sexually explicit conduct

14   online have committed a very serious offense and will be duly

15   punished.

16             In this specific case a meaningful sentence of

17   imprisonment is necessary not only to reflect the seriousness

18   of the offense, to promote respect for the law, and to deter

19   others, but also to specifically deter the defendant from

20   reoffending.

21             The fact that Anthony Weiner is sitting here today is

22   very sad for him and for those close to him.  And while he

23   undoubtedly does have regret, given where he is, and truly

24   believes he will change, there is a history here that simply

25   cannot be ignored.  He has made these claims before, though not

in criminal cases, but he has made these claims and has failed

to actually follow through or demonstrate a real acceptance or

awareness of the nature of his errors in judgment.  The offense

conduct here shows an even more serious error in judgment, this

time one that is criminal and one that affects a minor.

With that history, with the record in this case, there

is not enough of a basis, in the government's view, for the

Court to have comfort that he will in fact change of his own

accord, even if supervised by probation.  Something more and

different is required, beyond personal and professional

consequences, beyond the collateral consequences that he has

faced before, beyond the scrutiny of the public, all of which

have failed to sufficiently deter him in the past.

What is required here to stop the defendant from

reoffending, to fully pierce his denial and end this tragic

cycle is a meaningful term of imprisonment.  The term that is

warranted in this case is 21 to 27 months.  That was adopted by

the probation office, as your Honor recognized, who recommends

a 27-month term of imprisonment.

Every single one of the mitigating factors raised by

the defendant and considered by probation, including that the

defendant is not a pedophile, doesn't collect or trade in child

pornography, and never tried to meet the minor victim or other

minors, are already fully and fairly reflected in the range of

21 to 27 months.  No further reduction should be given by the

1    Court.

2         In light of the seriousness of his crime, his

3    demonstrative need for specific deterrence, and the need to

4    reinforce the incredibly important principle that sexually

5    engaging with any minors online is a serious crime, Anthony

6    Weiner should be sentenced to prison for 21 to 27 months.

7         Thank you, your Honor.

8         THE COURT:  Mr. Devlin-Brown.

9         MR. DEVLIN-BROWN:  Thank you, your Honor.  I want to

10   start with a theme that Anthony sounded in his letter to the

11   Court, which dealt with what for him was a paradox of regret.

12   Because on the one hand, of course, he's filled with regret,

13   not only for the crime and the harm he has caused to the victim

14   here and to others in his life and himself, but for the whole

15   pattern beyond this crime of for years throwing away a good

16   portion of his life.  So he's filled with regret there.

17        On the other hand, it was almost a year ago when

18   Anthony's interactions with the victim here were published that

19   caused him finally, after so many years of denial, to get

20   treatment and for that he cannot be regretful.  He is grateful.

21        I want to pick up on a point that Ms. Kramer just made

22   because she noted that Anthony does have a long history and it

23   is stunning, the history, really, that it took this, this

24   criminal offense, for Anthony to realize there was a serious

25   problem in his life.

1    He had thrown away his congressional career by

2  exchanging messages with strangers on the Internet, an adult,

3  and America and New York is a very forgiving place.  He was on

4  the verge, really -- he was leading the New York City mayoral

5  primary until the voters found out that even after he left

6  Congress in this scandal he had continued with the same

7  conduct.

8    In America they say there are second acts, but there

9  are no third acts, and after that Anthony was finished.  And

10  yet even though his career had been ruined, he continued doing

11  the same thing again and again.

12    One of the ironies I found here, your Honor, in

13  looking through the history was that the gist of one of the

14  original diagnoses back when he left Congress in 2011 was along

15  the lines of Anthony was in control of his conduct and he was

16  perhaps a powerful man, as powerful men sometimes do, acting

17  out because they have that privilege and that power.  And while

18  that is something that could be plausible if you are looking at

19  Anthony Weiner in 2011, it doesn't explain Anthony Weiner in

20  2016, after so much damage he had done to his life and he just

21  kept on doing it.

22    Anthony Weiner had a sickness.  Dr. Must, the

23  probation officer's appointed evaluator, found that he was

24  highly compulsive in his sexual behaviors and that they were

25  motivated by addictive tendencies.  And I know the label sex

1    addict, people have a visceral reaction sometimes against it

2    because it just sounds like an excuse, notwithstanding the fact

3    that there is increasing neurobiological research that it's

4    ongoing, but it shows that anything that can sort of light up

5    the reward center of the brain where those dopamine receptors

6    are can lead to harmful behaviors that are difficult to stop.

7            Ultimately, your Honor, I don't think this is a case

8    on these facts where the label really matters and a particular

9    diagnosis really matters because I think it's clear that

10   Anthony had a deep sickness, however you want to call it.

11           Just stepping back a little bit, he had ruined his

12   career repeatedly by exchanging messages under his own name

13   with strangers on the Internet, some portion of whom went

14   public with their encounters, and then he did the exact same

15   thing here.  Ending up here today was almost -- perhaps not to

16   Anthony Weiner, but perhaps to maybe anyone else who would have

17   known he had done this -- foreseeable.

18           I submit these repeated acts of self-destruction are

19   not those of a scheming criminal.  That doesn't excuse him, but

20   he was a sick man at the time he did this.

21           I think it's also important to emphasize that the

22   sickness was not fundamentally or even really at all about a

23   sexual obsession with teenagers.  That's clear enough from his

24   history.  He had exchanged hundreds of messages or probably

25   thousands of messages with hundreds of woman over the years,

1   all of whom had been adults.  At the time of the offense,

2   around the time of the offense, he was in contact with as many

3   as 19 other adult women.  This was his first teenager and it

4   was his last teenage victim.

5          It's also clear from the court-appointed evaluator,

6   Dr. Must, as it has been from everyone else who has examined

7   him, that he does not have an abnormal sexual interest in

8   teenagers.

9          The government's brief did attempt to cast some doubt

10  on this a bit.  It suggested that an isolated statement that

11  Mr. Weiner had made to the examiner, as well as a supposed

12  interest in particular sorts of pornography, suggested perhaps

13  that there was something to a particular sexual interest in

14  teenagers that is abnormal and deviant.  I think those

15  arguments, your Honor, could be readily rejected.  I don't know

16  if the Court has concerns about those.

17         THE COURT:  I do not, and I didn't actually see that

18  the government was making that argument in any developed way.

19  I don't find there is any basis for it.

20         MR. DEVLIN-BROWN:  Thank you, your Honor.

21         Let me move on then beyond sort of the sickness, which

22  I think is indisputable.

23         I think it's also indisputable that Anthony is in a

24  very different place mentally and emotionally than he was a

25  year ago.  And the government says, well, this could be -- and

1    they give him credit for the work he has done, but they said

2    this could be sort of a pattern that we have seen before.

3              Respectfully, your Honor, there is no pattern.  There

4    is no pattern.  He sought treatment once in 2011, when he

5    resigned from Congress, and he is the first to admit, he is

6    very open with everyone, that he was not accepting of the

7    treatment at the time.  He didn't want to change his behavior

8    at the time.  And that, combined perhaps with therapy that says

9    you are in charge of your behaviors, you can change them if you

10   want, well, he didn't want.  And that's a flaw of Anthony's,

11   that he didn't want to change his behaviors at the time.  But

12   there hasn't been some long cycle after the 2013 mayoral

13   campaign, it's not clear if he saw the therapist a few more

14   times, but there was no big sort of public recovery and there

15   was no private recovery either.

16             But more to the point, your Honor, the transformation

17   that has occurred in Anthony is not something that remotely

18   appears phony.  Virtually every day over the past year he has

19   been going to treatment of one form or another.  He has been

20   hobbling there on crutches after knee surgery and inspiring

21   other people with his commitment to it.

22             There have been family members, family members who

23   have been very hurt by the conduct Anthony Weiner has engaged

24   in, who have observed now for the first time someone who is out

25   of their deep denial and seems very committed to making

1    themselves better.

2           Dr. Must, the independent evaluator, said specifically

3    he is not, quote, putting on airs and that he appears to be

4    taking his treatment very seriously.  She added that if his

5    motivation and dedication to his own progress continues at this

6    pace and he is genuine and forthcoming in discussing his

7    behaviors and continues to use the support and help offered to

8    him, he has a strong potential of living a life that is

9    sexually healthy, offense free, and value fulfilled.  That's

10   Dr. Musk, the independent evaluator.

11          Anthony doesn't need prison, your Honor, to continue

12   on this path towards wellness.  Dr. Must makes that clear.  She

13   says he can be treated within the community.  She even urges

14   the inclusion of his current therapist and the 12-step model

15   that has been so helpful to him to be integrated into standard

16   sex offender treatment that is often recommended in these

17   cases.

18          So it can be done outside of prison and the cold

19   reality, your Honor, is it won't happen in prison.  The Bureau

20   of Prisons, as we set out in our submission, does not offer any

21   treatment probably of any form that Anthony Weiner would be

22   eligible for, much less something that would be as suitable and

23   as beneficial to what he has been found to have engaged in now.

24          The government makes the point, and it's a valid

25   point, of course, that one of the goals of sentencing is to

1    prevent Anthony Weiner and deter Anthony Weiner from ever

2    committing an offense like this again.  And the defense of

3    course agrees with that, your Honor.  But I would submit that

4    the best way to do that, the best way to do that is to allow

5    him to continue on the progress he has been on for now, which

6    is getting better and will help him avoid making the same

7    mistakes he has before in a way that prison won't.

8            The government also makes the point, and it is also a

9    valid point, how can we rely on this present claim of

10   self-awareness and transformation.  And the reason, your Honor,

11   we recommend a probationary sentence is because it doesn't

12   require reliance on that.  A probationary sentence would impose

13   substantial restrictions on his behavior, it would give the

14   probation department substantial tools to see if he deviates

15   from this path of treatment, and it would give the Court the

16   power, which Mr. Weiner knows the Court had to use before,

17   including in similar cases, to send him to jail should he slip

18   off the path that he's been on.  Probation can be for up to

19   five years, where supervised release could be only three in

20   this case.  There are a lot of ways that probation can hold the

21   prospect of prison over Anthony Weiner but allow him to

22   continue a path that is much more successful in terms of

23   getting treatment.

24           I understand, though, your Honor, that there is more,

25   a lot more that goes into a sentencing determination than what

 1   is good for the defendant and what will help the defendant get

 2   better, what will help their family.  That's not the only thing

 3   that goes into a sentence.

 4          And I know that one difficult thing in sentencing in

 5   this case is that, as Ms. Kramer pointed out, this is a serious

 6   offense.  It is a very serious offense.  And there is a

 7   question whether the weight of an offense like this requires

 8   prison, requires prison to reflect really the significance.  I

 9   respectfully submit that that is not the case here.

10          Anthony's conduct was illegal and it was wrong, but it

11   was significantly less egregious than really every other single

12   instance of this crime involving the prosecution of adults for

13   having sexual discussions with minors on the Internet than

14   there has ever been.

15          All of the other cases that are out there that we have

16   seen, certainly all in the Southern District, have involved

17   defendants who are trolling the Internet looking for minor

18   victims to exploit, and this case started in the other

19   direction, with a minor victim reaching out to Anthony Weiner.

20          And Anthony Weiner didn't do any of the really

21   disturbing predatory things that occur in almost every other

22   case in one form or another.  This wasn't an effort to have

23   sexual contact with the victim, as it often is in these cases.

24   He didn't disguise identity to win trust from the victim

25   initially and obtain some explicit images only to, as many

1   defendants do, then threaten to expose the victim if the

2   conduct ceases.

3           This case is very unusual.  And I know your Honor has

4   seen cases in a somewhat different context, in the child

5   pornography context.  And child pornography is an

6   extraordinarily serious offense.  It's extraordinarily serious.

7   Even just viewing it, right, supports a market where this stuff

8   is made.  But there are nuances to that serious offense, too.

9   There are defendants who one has to worry about whether they

10  are going to molest children because they seem sexually

11  obsessed with children and their pattern seems to be

12  particularly focused on children.  And then there are

13  defendants in this brave new world of the Internet we live on

14  who seem to be clicking on everything and click on things they

15  shouldn't click on, but clearly don't have the same problematic

16  behaviors that pose such a risk to society.  This is a serious

17  offense, your Honor.  But there is a spectrum to these sorts of

18  offenses.

19          That brings me to the very peculiar circumstances

20  surrounding this offense, and the government intones that

21  Anthony should be sentenced for what he did, not for what

22  motivated the minor victim.  And to a significant point they

23  are absolutely right.

24          From the perspective of Anthony's morality, there are

25  two completely independent decisions that occur.  One is, the

 1   victim made a decision to encourage Anthony to engage in his

 2   infamous behaviors in order to make a profit, which she did.

 3   But that does not excuse Anthony's independent moral choice.

 4   He had a moral choice.  When confronted with someone he

 5   believed to be a minor to engage or not engage, he failed that

 6   moral test.  So his moral failing is his own and his crime is

 7   his own.

 8          But this point in the proceeding, your Honor, at

 9   sentencing is not the point where the question is, is Anthony

10   guilty of making a bad moral choice, is he guilty of a crime.

11   At this point the Court looks to a broader picture of the

12   nature and circumstances of the offense.

13          And in many cases, your Honor, harm to the victim is a

14   really crucial component of a sentence.  There are times in all

15   sorts of contexts where the damage that has occurred to an

16   innocent person because the conduct of the defendant is so

17   destructive that prison really is compelled.

18          And I submit that what Anthony did is wrong, what

19   Anthony did is harmful.  But punishing him for what he did

20   here, which was to respond to someone where he had never

21   responded to a teenaged person before, someone who was looking

22   to capitalize on his compulsions, that is different in nature

23   than someone who is seeking out victims on the Internet to

24   exploit.  They are both bad things, but there is a difference

25   and a significant difference.

 1           Your Honor, I'd like to close with where we started in

 2    the sentencing submission.  This is an unusual crime of sad

 3    coincidences that have had far-reaching consequences in this

 4    case.  But as a morality play it's a complicated one.  It's one

 5    I think without really true villains.

 6           Your Honor, you have to obviously impose a sentence

 7    that is significant to the crime that's been committed in this

 8    case.  But we would ask you to impose a sentence that is

 9    measured in terms of what actually occurred that recognizes

10    that Anthony's sickness was a significant driver of it, that

11    he's in recovery, that there is an opportunity to build on this

12    recovery and have prison be a prospect if it's necessary, but

13    not apply it now, and give an opportunity for something

14    positive to emerge from the wreckage of all of this.

15           Thank you, your Honor.

16           THE COURT:  Mr. Weiner, I'll hear anything that you

17    have to say to me on your behalf in connection with this

18    sentence.

19           THE DEFENDANT:  Your Honor, with your permission, may

20    I read it.

21           Your Honor, the crime I committed was my rock bottom,

22    but I am truly grateful that it finally began me on my

23    recovery.  Every day since has been a little bit better than

24    the one before.

25           I live a different and better life today.  I'm no

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  longer in the hole.  Now I focus on how to live my new smaller

2  life one day at a time, and I'm working to make amends for my

3  actions.  I was a very sick man for a very long time, but I'm

4  also responsible for the damage I have done.  Your Honor, I

5  have a disease, but I have no excuse.

6       Your Honor, I accept complete and total responsibility

7  for my crime.  I was the adult.  I acted not only unlawfully

8  but immorally.  And if I had done the right thing, I would not

9  be standing before you today.  I am profoundly sorry to the

10 victim for my crime.

11      The prosecutors are skeptical that I have truly

12 changed, and I don't blame them.  The description of me from

13 the government's brief is right.  I repeatedly acted in a

14 obviously destructive way when I was caught.  I claimed I would

15 never do it again.  I blamed others for my actions, but I

16 didn't stop.  I convinced myself that my behavior wasn't really

17 the problem.  It was something else.  I know there is a name

18 for people who act like that, an addict.  I recognized it in my

19 brother Seth, who was killed by his addiction, but I couldn't

20 see it in myself.

21      But, your Honor, that's not me today.  Today I am

22 gratefully recovering.  I am following a program of rigorous

23 honesty, spiritual fitness, and an abundance of support.  I go

24 to therapy twice a week.  I attend meetings every day.  I look

25 for ways to be of help to others who are sick and suffering and

1    who are struggling with what I have struggled with.  And I look

2    for ways and I hope and I pray that in the service that I do

3    I'm helping prevent other unknown victims, unknown innocents

4    from themselves becoming victims.

5           Let me tell you a bit about my son.  I left this to

6    the end because I have trouble talking about him without tears.

7    Jordan has been my salvation, the one perfect thing in my life.

8    I always told myself, if I get that one thing right, all else

9    would be forgiven.  No matter what befell me, I would always be

10   there for Jordan, showing him that if you get knocked down, you

11   dust yourself off and you get back up.

12          Your Honor, I realize now that by not being honest

13   about how I continued to knock myself down, I betrayed his

14   amazing mother.  I was teaching him the wrong things.  I was

15   hurting him instead of helping him.

16          Finally, your Honor, I'm teaching him the right

17   lessons:  Accepting responsibility, being truthful, and showing

18   compassion and, yes, the ability of all of us, no matter how

19   far we have fallen, to simply try to do the next right thing;

20   and when we are wrong, promptly admit it.  I am living in

21   amends to him, your Honor, by being the father he needs.

22          I stand before you because I victimized a young person

23   who deserved better.  I fully accept responsibility for what I

24   did.  I have lost so much and appropriately so.

25          Your Honor, I'm not asking that you trust that my

1    recovery is real.  I know it is real, which is all that

2    matters.  And I long ago forfeited the right to ask for the

3    benefit of the doubt from you or from anyone, so I don't ask

4    that you trust me.  I ask you for the opportunity to prove that

5    it is real.  I ask for the opportunity on probation to keep

6    leading my smaller, healthier life each day, to keep getting

7    better, to be of service, and to be a good father to my son.

8    If I fail, I know what will happen.  But with God's grace, I

9    will not.

10              Thank you, your Honor.

11              THE COURT:  So the crime here was the defendant's

12   engagement with a minor in early 2016.  She contacted him.  He

13   was notorious.  And as a result of their contacts he

14   transferred obscene material to her.  There were, as I

15   understand it, four illegal exchanges:  On Skype, Snapchat, and

16   a site called Confide.

17              The defendant knew this young woman was in high school

18   and getting her learner's permit.  He never took any steps to

19   ensure she wasn't a minor.  She asserts, and he does not test

20   or dispute, that at some point he learned she was 15.

21              When the minor continued or attempted to continue

22   their exchanges, the defendant essentially stopped the

23   conversation with her over the Internet somewhere in March of

24   2016, and this criminal behavior occurred at a time when the

25   defendant was intensely engaged in online communications with

1   women, some sexual, some nonsexual conversations over the

2   Internet with strangers, and it had been a pattern of his for

3   at least five years.

4           The story that's been given to me indicates that it

5   consumed an enormous amount of his time and his energy.  And as

6   he has acknowledged and his counsel has acknowledged, this

7   pattern continued despite two very public exposures of online

8   sexual exchanges with women.  In one in 2011, he lost his

9   congressional seat; another in 2013, he lost his chance to

10  become mayor of New York.

11          The public exposure this time, in 2016, has been very

12  different in a variety of ways, but I do find it to be true

13  that it has led to the defendant's first serious engagement

14  with treatment, and it appears to be effective for him.  He has

15  thrown himself into this treatment as intensely as he has

16  thrown himself into so many other things he has done in his

17  life.  I think that's one of the hallmarks of his activity as

18  it's been described to me in the submissions I have received.

19  It's one of intensity and now he is intensely engaged in his

20  treatment.

21          I have to look at the factors under Section 3553(a) to

22  decide what is the appropriate sentence here for this crime and

23  this defendant.  Let me begin by talking about the issue of

24  punishment.  This was a serious crime and it's a serious crime

25  that deserves serious punishment.  He used pornography and

1   obscene language in requesting a minor to perform sexual acts

2   for him over the Internet.  I don't think that the complexity

3   of the victim's motives or identity or the fact that she

4   initiated this contact are relevant.  They are irrelevant.  She

5   was a minor.  She was a victim.  She is entitled to the law's

6   full protection.

7           Let me turn to the issue of individual deterrence.  I

8   think this is a much more complex question.  There is no

9   evidence whatsoever that the defendant has any deviant interest

10  in teenagers or minors.  There is no evidence he ever targeted

11  teenagers or minors for any of his online activity.  His

12  illness did not involve sexual contact.  It was an intense

13  online engagement with his correspondents.

14          There is a uniform opinion by those who have examined

15  him that he is an addict.  He has a disease that involves

16  sexual compulsivity.  Some call it a sex addiction.  It is

17  sexually explicit conversations with strangers over the

18  Internet.  But I do find as well that he is finally receiving

19  effective treatment for this disease for what is described as

20  his hypersexuality.  Steps are being taken and can continue to

21  be taken to limit his access to social media, and that will be

22  a very important part of his recovery.

23          He is participating in individual and group therapy.

24  He is engaging in Sex Addicts Anonymous.  I find he is making

25  an enormous contribution to others who are suffering from that

1    same disease.  I find that it is likely if he continues with

2    this engagement that he can make an enormous contribution to

3    society in both an awareness of this problem, the risks it

4    involves to families, to those who suffer from the disease, and

5    to those who may be victimized by the disease.  I find this

6    could be a true public service.

7         But the difficulty here is that this is a very strong

8    compulsion, so strong, as we have seen, despite two very public

9    disclosures and the destruction of his career on two occasions,

10   he continued with the activity.  So it is difficult to know how

11   to weigh the issue of individual deterrence.  He has made great

12   strides, but it will remain a challenge for years to come.

13        Of course I have to be conscious of the fact that what

14   I'm describing here is not criminal unless it crosses the line

15   that our legislators have written.  The crime here was engaging

16   in this kind of activity with a minor over the Internet.  That

17   is not the focus of his addiction, but he did not control that

18   behavior to make sure it didn't cross that line.

19        Let me turn to the last factor that's very important

20   in deciding the sentence and that's one of general deterrence.

21   There is a lot written about what role general deterrence

22   should have in sentencing, but here I think it has enormous

23   importance.  Because of the defendant's notoriety, gained well

24   before he engaged in this criminal activity, there is intense

25   interest in this prosecution, in his plea, and his sentence,

1   and so there is the opportunity to make a statement that could

2   protect other minors.  General deterrence is a very significant

3   factor in this sentence.

4         Mr. Weiner, please stand.  I impose a term of

5   imprisonment of 21 months to be followed by a term of

6   supervised release of three years with the following special

7   conditions:  You must cooperate in the collection of DNA.  You

8   must comply with the requirements of the Sex Offender

9   Registration and Notification Act as directed by your probation

10  officer and the Bureau of Prisons, as well as any state sex

11  offender registration agency in the location in which you

12  reside or work.

13        You must pay the fine that I will impose.  You must

14  comply with the standard conditions of supervised release.  You

15  must submit yourself to a reasonable search by the probation

16  department.  You must seek and maintain full-time employment.

17  I want you engaged productively in full-time work.  You are to

18  provide the probation department access to any and all

19  requested financial information.

20        With respect to some of the special conditions in the

21  PSR, I'm looking in particular at pages 35 and 36.  I impose

22  the special condition at the bottom of page 35 requiring you to

23  participate in a computer Internet monitoring program

24  administered by the probation department.

25        Turning to page 36, you must submit to search of your

1    electronic storage devices and electronic communications.  You

2    may not have contact with the victim.  You must not directly

3    cause or encourage anyone else to have contact with the victim.

4    You must participate in an outpatient sex offender treatment

5    program approved by the probation department.

6         You shall be supervised by the district of your

7    residence.  You shall pay a special assessment of $100.  You

8    shall pay a fine of $10,000.  You must begin paying that fine

9    while in prison.  Upon release from prison you shall pay 10

10   percent of your gross monthly income toward the fine.

11        I decline to impose any restitution.  There is no

12   mandatory restitution available under 3663(a) or 3664.  Neither

13   the government nor the probation recommends restitution.  I

14   have looked at 3663.  It's largely irrelevant.  To the extent

15   it is not, I decline to impose restitution in the exercise of

16   my discretion.

17        Counsel, is there any legal reason I cannot impose the

18   sentence I described as stated?

19        MS. KRAMER:  No, your Honor.

20        MR. DEVLIN-BROWN:  No, your Honor.

21        THE COURT:  I order the sentence I have described on

22   the record to be imposed as stated.

23        I don't believe there are any open counts.

24        MS. KRAMER:  That's correct, your Honor.

25        THE COURT:  Mr. Weiner, I need to advise you of your

1    right to appeal.  If you are unable to pay the cost of an

2    appeal, you may apply for leave to appeal in forma pauperis.

3    Any notice of appeal must be filed within 14 days of the

4    judgment of conviction.  I'm required by law to advise you of

5    those rights, though I know of no ground for an appeal.  You

6    entered a plea of guilty here pursuant to a plea agreement.

7    You have largely given up your right to appeal.

8                    Counsel, is there anything else we need to do?

9                    MS. KRAMER:  Yes.  Very briefly, your Honor.  There

10   was a consent preliminary order of forfeiture entered on May

11   19, at the time of the plea, as docket No. 6.  I just wanted to

12   call that to the Court's attention.

13                   THE COURT:  I believe that was the forfeiture of an

14   iPhone.

15                   MS. KRAMER:  That's correct, your Honor.

16                   THE COURT:  I make that forfeiture also part of the

17   sentence.

18                   MS. KRAMER:  And, your Honor, the defendant has agreed

19   in the plea agreement, and the law requires, that upon his

20   release he must register under the Sex Offender Registration

21   and Notification Act, if the Court wants to advise the

22   defendant of his reporting obligations under that act.

23                   THE COURT:  I think I did as part of the sentence.

24                   MS. KRAMER:  I apologize, your Honor.

25                   THE COURT:  Mr. Devlin-Brown.

1          MR. DEVLIN-BROWN:  Your Honor, I know the Court's

2   ordinary practice for a defendant located in the New York City

3   area is often to recommend incarceration in the New York City

4   area.  I've spoken to a prison consultant working with us, and

5   have reason to believe this is true independently, that in a

6   sentence of this length that recommendation could well result

7   in Mr. Weiner being incarcerated at the MDC, which is a

8   maximum-security facility.  I think given the importance

9   contact with his son has played in his recovery and holding him

10  together, that would be extraordinarily detrimental.  I would

11  ask the Court to consider recommending FCI Schuylkill, and if

12  not that, recommend as low a security facility as necessary to

13  address your prison considerations.

14          THE COURT:  Mr. Devlin-Brown, I don't make

15  recommendations for particular facilities.  Do you want me to

16  recommend that the defendant be designated to a facility as

17  close to the New York City area as possible, or not?

18          MR. DEVLIN-BROWN:  No, your Honor.

19          THE COURT:  I am going to require the defendant to

20  surrender by November 6 to the designated facility.  If no

21  facility has been designated by that time, he must surrender

22  here to the marshals by 2 p.m. in this courthouse on November

23  6.

24          Thank you.

25                              o0o